IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

MARY VIGIL; FRANK VIGIL; MARTIN
SANDOVAL and PATRICK GRIEGO,

        Plaintiffs,

vs.                                           No. CIV 23-0941 JB/JFR

FEDERAL EMERGENCY MANAGEMENT
AGENCY; DEPARTMENT OF HOMELAND
SECURITY; NATIONAL RESOURCES
CONSERVATION SERVICE; UNITED
STATES DEPARTMENT OF AGRICULTURE
and ANGELA GLADWELL, in her official
capacity,

        Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the Plaintiffs' Application for Entry of

Temporary Restraining Order and Order to Show Cause Regarding Preliminary Injunction, filed

November 3, 2023 (Doc. 8)("TRO Motion").  The Court held a hearing on November 6, 2023.

See Clerk's Minutes, filed November 6, 2023 (Doc. 22).  The primary issues are: (i) whether the

Court has jurisdiction to enter, pursuant to rule 65 of the Federal Rules of Civil Procedure, a

temporary restraining order ("TRO") enjoining the Defendants from inappropriately

communicating with legally represented victims of the 2022 Hermit's Peak/Calf Canyon Fire

("Hermit's Peak Fire") about potential settlements under the Hermit's Peak/Calf Canyon Fire

Assistance Act, Pub. L. 117-180, 136 Stat. 2168 (2022)("HPCCAA"), because: (a) the Plaintiffs

have standing; (b) the United States has waived its sovereign immunity for the Plaintiffs' claims;

and (c) the Plaintiffs have invoked properly the Court's federal-question jurisdiction under 28

U.S.C. § 1331; and (ii) whether the Court should enter a TRO, because: (a) the Plaintiffs are

likely to succeed on the merits of their claims that the Defendants, by instructing their employees to improperly contact represented Hermit's Peak Fire victims without the victims' counsel present, are violating the Administrative Procedure Act, 5 U.S.C. §§ 701-706 ("APA"), 28 U.S.C. § 530B ("McDade Act"), and the New Mexico Rules of Professional Conduct ("NMRPC"); (b) the Plaintiffs are likely to suffer irreparable harm absent a TRO; and (c) the balance of the equities weighs in the Plaintiffs' favor and a TRO would be in the public's interest.  The Court first concludes that it has jurisdiction to reach the merits of the Plaintiffs' claims, because: (i) the Plaintiffs have standing; (ii) the APA sufficiently waives the United States' sovereign immunity for the Plaintiffs' claims; and (iii) 28 U.S.C. § 1331 provides for the Court's jurisdiction over the Plaintiffs' non-APA claims.  On the merits, the Court concludes that the Plaintiffs are not entitled to a TRO, because: (i) the Plaintiffs' failure to identify a viable cause of action and the fact that their allegations are, regardless, legally insufficient to state claims upon which relief can be granted, mean the Plaintiffs are not likely to succeed on the merits; (ii) the Plaintiffs are not likely to suffer irreparable harm; and (iii) the balance of the equities favors the Defendants, and a TRO would be contrary to the public's interest. Accordingly, the Court denies the Plaintiffs' request for a TRO.

## FINDINGS OF FACT

"A temporary restraining order requires the Court to make predictions about the plaintiff's likelihood of success."  Herrera v. Santa Fe Pub. Sch., 792 F. Supp. 2d 1174, 1179 (D.N.M. 2011)(Browning, J.).  Rule 52 of the Federal Rules of Civil Procedure states: "In granting or refusing an interlocutory injunction, the court must . . . state the findings and conclusions that support its action."  Fed. R. Civ. P. 52(a)(2).  "'[T]he findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding at trial on

the merits.'" Herrera v. Santa Fe Pub. Sch., 792 F. Supp. 2d at 1179 (quoting Attorney Gen. of Okla. v. Tyson Foods, Inc., 565 F.3d 769, 776 (10th Cir. 2009))(alteration in Herrera v. Santa Fe Public Schools only). See Univ. of Tex. v. Camenisch, 451 U.S. 390, 395 (1981)("[A] preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits."). Moreover, "[t]he Federal Rules of Evidence do not apply to preliminary injunction hearings." Heideman v. S. Salt Lake City, 348 F.3d 1182, 1188 (10th Cir. 2003). Accordingly, while the Court does the best it can to make accurate findings from the record before it, these findings of fact are relevant only for the purpose of determining whether to issue a TRO, and do not bind the Court or the parties at trial. See Kottke Cattle, LLC v. Zia Agric. Consulting, LLC, No. CIV 21-1004, 2021 WL 4894197, at *1 (D.N.M. October 20, 2021)(Browning, J.). The Court finds as follows:

**1.      The Hermit's Peak Fire and the HPCCAA.**

1.      The Hermit's Peak Fire began on April 6, 2022, when a United States Forest Service ("USFS")-prescribed burn in San Miguel County, New Mexico exceeded the USFS' containment capabilities and began to spread uncontrollably. See HPCCAA § 102(a)(1)-(5).

2.      On April 22, 2022, the Hermit's Peak Fire merged with the nearby Calf Canyon Fire. See Bill Gabbert, Investigators Determine Calf Canyon Fire Caused by Holdover From Prescribed Fire, Wildfire Today (May 28, 2022).

3.      By the time it was extinguished, the Hermit's Peak Fire had scorched more than 341,000 acres of land -- making it the largest wildfire in New Mexico history -- and burned down 220 structures. See Deon J. Hampton, A Way of Life is All but Extinguished by New Mexico's Largest Wildfire, NBC News (March 26, 2023); HPCCAA § 102(a)(9) ("[T]he fire resulted in the loss of Federal, State, local, Tribal, and private property.").

4.     The USFS "has assumed responsibility" for the Hermit's Peak Fire.  HPCCAA § 102(a)(8).

5.     On September 30, 2022, Congress passed the HPCCAA to "compensate victims . . . for injuries resulting from the fire and to provide for the expeditious consideration and settlement of claims for those injuries."  HPCCAA § 102(b).

6.     The HPCCAA provides that "[e]ach injured person shall be eligible to receive from the United States compensation for injury suffered by the injured person as a result of the Hermit's Peak/Calf Canyon Fire . . . ."  HPCCAA § 104(a).

7.     The HPCCAA is largely modeled on the Cerro Grande Fire Assistance Act, Pub. L. 106-246 (2001)("CGFAA"), which "required FEMA to design and administer a program to fully compensate those who suffered injuries resulting from the Cerro Grande Fire."[1]  Hermit's Peak/Calf Canyon Fire Assistance, 88 Fed. Reg. 59730, 59730 n.1 ("Final Rule")("FEMA's procedures in the IFR were generally consistent with those established for claims associated with the Cerro Grande Fire Assistance Act.").

8.     The HPCCAA contains a section entitled "Election of Remedy," which provides that "[a]n injured person may elect to seek compensation from the United States . . . by": (i) "submitting a claim under this Act"; (ii) "filing a claim or bringing a civil action under chapter 171 of title 28, United States Code (commonly known as the 'Federal Tort Claims Act')"; or (iii) "bringing an authorized civil action under any other provision of law."  HPCCAA § 104(h)(1)(A)-(C).

---

[1]"The Cerro Grande Fire resulted from a prescribed fire ignited on May 4, 2000, by National Park Service fire personnel at the Bandelier National Monument, New Mexico under an approved prescribed fire plan.  That fire burned approximately 47,750 acres and destroyed over 200 residential structures."  Final Rule 59730 n.1.

9.      Upon acceptance of an award under any of the three options outlined in § 104(h)(1), a claimant's election of remedy is "final and conclusive on the claimant with respect to all injuries resulting from the Hermit's Peak/Calf Canyon Fire . . . ."  HPCCAA § 104(h)(2). See Final Rule at 59741 ("[T]he Act provides that an injured person who accepts an award under the Act waives the right to pursue any claims arising out of or relating to the same subject matter under the Federal Tort Claims Act (FTCA) or a civil lawsuit.").

10.     The HPCCAA further provides:

> The acceptance by a claimant of any payment under this Act . . . shall . . . be final and conclusive on the claimant, with respect to all claims arising out of or relating to the same subject matter . . . and . . . constitute a complete release of all claims against the United States (including any agency or employee of the United States) under chapter 171 of title 28, United States Code (commonly known as the "Federal Tort Claims Act"), or any other Federal or State law, arising out of or relating to the same subject matter.

HPCCAA § 104(e)(1)-(2).

11.     Because the HPCCAA provides that a claimant's election of remedies becomes effective upon acceptance of an award under one of the provided manners for seeking relief, "[u]ntil the final award payment is accepted, the claimant may pursue any and/or all of the options available.  This flexibility allows injured persons to pursue different avenues of compensation until a final award is accepted."  Final Rule at 59741.

12.     By providing that claimants may seek simultaneously multiple forms of relief for injuries that the Hermit's Peak Fire caused, the HPCCAA's election of remedy procedure differs from the CGFAA's nearly identical election of remedy provision, because the CGFAA provides that a claimant's election of remedy is effective upon "filing" a notice of loss under the CGFAA, "a claim under the Federal Tort Claims Act," or initiating any other "civil Action against the United States . . . relating to the Cerro Grande Fire . . . ."  44 C.F.R. 295.12(1)-(b).  See CGFAA

104(h)(1)-(2).

**2.** **The HPCCAA Claims Process.**

13.     The HPCCAA establishes within FEMA the Office of Hermit's Peak/Calf Canyon Fire Claims ("Claims Office"), whose purpose is to "receive, process, and pay claims in accordance with" the HPCCAA.  HPCCAA § 104(a)(2).

14.     On August 29, 2023, FEMA promulgated a rule setting out procedures for claimants to seek compensation under the HPCCAA.  See 44 C.F.R. § 296.

15.     A Claims Reviewer is "an employee of the United States or a Claims Office contractor or subcontractor who is authorized by the Director of the Claims Office to review and evaluate claims submitted under the [HPCCAA]."  44 C.F.R. § 296.4.

16.     The Claims Process Rule states that "[t]he first step in the process is to file a Notice of Loss [("NOL")] with the Claims Office," 44 C.F.R. § 296.5(b); "[s]hortly thereafter, a Claims Reviewer will contact the claimant to review the claim" and "help the claimant formulate a strategy for obtaining any necessary documentation or other support," 44 C.F.R. § 296.5(c). See Declaration of Donald Siler ¶ 12, at 3-4 (dated November 5, 2023), filed November 14, 2023 (Doc. 19-1)("Siler Decl.").

17.     A Proof of Loss is "a statement attesting to the nature and extent of the claimant's injuries."  44 C.F.R. § 296.4.

18.     An Authorized Official is "an employee of the United States who is delegated with authority by the Director of the Claims Office to render binding determinations on claims and to determine compensation due to claimants under the Act."  44 C.F.R. § 296.4.

19.     "After the claimant has had an opportunity to discuss the claim with the Claims Reviewer, a Proof of Loss will be presented to the claimant for signature" and "the Claims

Reviewer will submit a report to the Authorized Official."  44 C.F.R. § 296.5(c).  See Siler Decl. ¶ 12, at 4.

20.     "The Authorized Official will review the report and determine whether compensation is due to the claimant."  44 C.F.R. § 296.5(d).  See Siler Decl. ¶ 13, at 4.

21.     If the claimant is satisfied with the Authorized Official's determination, "payment will be made after the claimant returns a completed Release and Certification Form" ("R&C"). 44 C.F.R. § 296.5(d).  See Siler Decl. ¶ 15, at 4-5.

22.     By signing a R&C, the claimant "acknowledge[es] that by accepting the final payment authorized by the Claims Office they are agreeing not to pursue other legal remedies against the United States."  Siler Decl. ¶ 15, at 4-5.

23.     "If the claimant is dissatisfied with the Authorized Official's determination, an administrative appeal may be filed with the Director of the Claims Office," and, thereafter, "[i]f the claimant remains dissatisfied after the appeal is decided, the dispute may be resolved through binding arbitration or heard in the United States District Court for the District of New Mexico." 44 C.F.R. § 296.5(d).

24.     Claims Office representatives are not empowered to make settlement offers.  See Siler Decl. ¶ 16, at 5.

**3.     The HPCCAA Claims Process as it Pertains to Represented Claimants.**

25.     The Claims Office has a "tailored process for handling claims brought by claimants represented by attorneys."  Siler Decl. ¶ 17, at 5.  See Attorney Interaction Guide at 4-6 (dated October 10, 2023), filed November 14, 2023 (Doc. 19-2)("Attorney Interaction Guide").

26.     Once a claimant designates an attorney as a third-party representative on their NOL, the Attorney Interaction Guide provides that "the Claims Office should reach out to the

attorney directly to discuss the claim." Siler Decl. ¶ 19, at 5. <u>See</u> Attorney Interaction Guide at 1-2.

27.     A represented claimant may meet with the Claims Reviewer assigned to their claim, but "[t]he claimant must independently initiate the contact and express their intent to engage with the Claims Office without the participation of their counsel." Attorney Interaction Guide at 4. <u>See</u> Siler Decl. ¶ 20, at 5-6.

28.     When represented claimants initiate contact with a Claims Office, the Claims Office staff must "clearly inform the claimant of their third-party representation and have the claimant execute a 'Claims Office Intent to Proceed Without Participation of Counsel' form" ("Intent to Proceed Form"). Siler Decl. ¶ 21, at 6 (no citation given for quotation). <u>See</u> Attorney Interaction Guide at 4-5.

29.     The Intent to Proceed Form "is intended to provide the claimant with notice that they are still represented on their claim and will have to coordinate with their attorney even if they manage parts of their claim independently." Attorney Interaction Guide at 4. <u>See</u> Intent to Proceed Without Participation of Counsel Form, filed November 14, 2023 (Doc. 19-3)("Intent to Proceed").

30.     Only after the form is signed may the Claims Reviewer "respond to the claimant's questions and/or requests . . . ." Attorney Interaction Guide at 4.

31.     Claims Reviewers do not make visits to claimants' personal residences, but site visits required by the Site Inspection Team may be scheduled through a claimant's third-party representative. <u>See</u> Siler Decl. ¶ 18, at 5.

32.     The FEMA attorneys working out of local Claims Offices or out of Washington, D.C., do "not participate in or direct Claims Office operations other than to provide legal counsel

on programmatic and legal issues."  Letter from Michael K. Cameron, FEMA Principal Deputy Chief Counsel, to Mark Dow at 6 (dated October 6, 2023), filed November 14, 2023 (Doc. 19-5)("October 6 Letter").  See id. ("FEMA counsel have no programmatic operational responsibilities.").

33.    The agency employees implementing the claims process are FEMA counsel's clients, in the sense that the attorneys advise the employees on legal issues, but do not direct them to undertake any specific activities.  See Transcript of Hearing at 41:20-25 (taken November 6, 2023), filed December 28, 2023 (Doc. 24)("Tr.")(Juzaitis)(explaining that FEMA employees "are our clients in the sense that we provide them legal advice" and that they are "certainly not our agents in the sense that we can direct anything that they do"); id. at 49:19-25 (Court, Juzaitis); October 6 Letter at 2 ("[C]laims personnel do not take direction from counsel . . . .").

34.    FEMA attorneys do not "draft settlement documents" nor do they "direct the substance of communications that . . . claims office personnel engage in with claimants."  Tr. at 22:12-23:5 (Court, Juzaitis).

35.    FEMA "counsel does not interact personally with claimants in a professional capacity."  October 6 Letter at 2.

36.    Claimants may retain counsel and nothing in the HPCCAA, the HPCCAA's regulations, or FEMA's guidance prevents them from doing so.  See HPCCAA § 104(j) (acknowledging claimants' right to legal representation); 44 C.F.R. § 296.21(b) (same); Attorney Interaction Guidance at 1-6 (providing guidance to Claims Office employees regarding interactions with attorneys representing claimants).

37.    FEMA and NRCS have made it clear that claimants, including the Plaintiffs, can

continue to be represented by counsel if they choose to proceed through the claims process.  See Siler Decl ¶ 22, at 6; Attorney Interaction Guidance at 1.

**4.      Correspondence Between the Parties.**

38.     On August 4, 2023, Antonia Roybal-Mack, an attorney for the Vigils and Sandoval, sent a letter to FEMA's Office of Chief Counsel ("OCC") and NRCS' Office of General Counsel requesting "that both FEMA and NRCS immediately cease any direct communication with our clients regarding any aspect of their claims or potential claims under the Act."  Letter from Antonia Roybal-Mack to Jordan Fried and NRCS Field Office at 2 (dated August 4, 2023), filed November 3, 2023 (Doc. 9-4)("Request to Cease Contact").

39.     On September 1, 2023, FEMA's Principal Deputy Chief Counsel, Michael Cameron, responded to the Request to Cease Contact, explaining that FEMA attorneys are in compliance with applicable rules of professional conduct, and "have not attempted to contact, or been in contact with, your clients . . . ."  Letter from Michael Cameron to Antonia Roybal-Mack at 1 (dated September 1, 2023), filed November 3, 2023 (Doc. 9-7)("September 1 Letter").

40.     The September 1 Letter further explained: "To the extent that a claimant or potential claimant reaches out to the Office directly for assistance, the Claims Office will assist, regardless of whether they may have otherwise sought representation."  September 1 Letter at 1.

41.     On September 15, 2023, Mark Dow and Cynthia Weisman, attorneys for the Vigils and Sandoval, sent a letter to Cameron and FEMA's Chief Counsel, Adrian Sevier, asserting that "the Government is violating the New Mexico Rules of Professional Conduct, the ABA Rules of Professional Conduct, the Administrative Procedure Act (APA), and the Federal Tort Claims Act (FTCA) by persisting in direct contact with represented parties -- without notice to their counsel."  Letter from Mark Dow and Cynthia Weisman to Adrian Sevier and Michael

Cameron at 1 (dated September 15, 2023), filed November 11, 2023 (Doc. 9-8)("Notice Letter")(emphasis in original).

42.     The Notice Letter advises: "Failure to meet and confer by Tuesday, September 26, 2023, shall result in immediate legal recourse in the United States District Court for the District of New Mexico."  Notice Letter at 3.

43.     On October 6, 2023, Mr. Cameron wrote a letter in response to the Notice Letter providing that FEMA's OCC "does not agree with your allegation that it has violated any ethical obligations: OCC counsel are not in direct or indirect communications with your clients," and disputing that FEMA attorneys were violating any federal law.  October 6 Letter at 4.

44.     In error, however, the October 6 Letter was never sent, because two FEMA employees thought that the other employee had sent the letter, and the Plaintiffs' counsel did not become aware of the letter until the Court held a hearing on the Plaintiffs' request for a TRO. See Letter from Alexander M.M. Uballez and Nicolas M. Sydow to the Court at 2 (dated November 7, 2023), filed November 7, 2023 (Doc. 18).

     **5.     Mary and Frank Vigil's Claims Process Experience.**

45.     The Hermit's Peak Fire damaged Mary and Frank Vigil's ("the Vigils") property. See Declaration of Mary and Frank Vigil ¶ 1, at 1 (dated August 17, 2023), filed October 25, 2023 (Doc. 2-1)("Vigil Decl.").

46.     On August 6, 2023, the Vigils received a telephone call asking if they were home, and, subsequently, four individuals from the United States Department of Agriculture ("USDA") arrived at the Vigils' residence and completed an assessment of the Vigils' property.  See Vigil Decl. ¶ 2, at 1.

47.     The next day, August 7, 2023, the same individuals who had visited the Vigils'
property the previous day called and requested a meeting with the Vigils.  See Vigil Decl. ¶ 3, at
1.

48.     On August 8, 2023, during a meeting outside the USDA office in Las Vegas, New
Mexico, USDA representatives showed the Vigils documents, told them how much
compensation they could receive, asked the Vigils if a lawyer represented them, and informed
the Vigils that they would have to proceed to the local FEMA office to complete the paperwork.
See Vigil Decl. ¶ 3, at 1.

49.     The Vigils proceeded to the FEMA office, where Lorenzo Olivas, a FEMA
representative, informed the Vigils that FEMA could not work with the Vigils if they had a
lawyer and told the Vigils to let go of their lawyer.  See Vigil Decl. ¶ 4, at 1-2.

50.     Olivas asked the Vigils if "Roybal" represented them and when the Vigils
responded in the affirmative, Olivas informed the Vigils that if they want to take the amount
FEMA is offering, they would have to "withdraw" from their legal representation.  Vigil Decl.
¶ 4, at 2.

51.     The Vigils signed a NOL on August 17, 2023, and submitted the NOL "through a
third-party representative, Royal-Mack & Cordova, PC."  See Siler Decl. ¶ 27, at 7.

52.     The Vigils initiated contact with a Claims Navigator[2] on or around August 29,
2023, at which time they did not speak with the Claims Reviewer assigned to their case.  See
Siler Decl. ¶ 32, at 8.

_____

[2]The HPCCAA regulations does not provide a definition for Claims Navigators.  See 44
C.F.R. § 296.4.  In practice, Claims Navigators take on the role the Claims Process Rule assigns
to Claims Reviewers to assist claimants in preparing their POL form.  See Privacy Impact
Assessment for the Hermit's Peak/Calf Canyon Claims and Loss Information Portal (CLIP) at 2,

53.     The Claims Office has not taken any action to initiate a claims payment to the Vigils.  See Siler Decl. ¶ 27, at 7.

**6.      Patrick Griego's Claims Process Experience.**

54.     The Hermit's Peak Fire damaged Griego's property.   See Supplemental Declaration of Patrick Griego ¶ 1, at 1 (dated November 3, 2023), filed November 3, 2023 (Doc. 12)("Griego Supp. Decl.").

55.     Griego entered into an attorney-client relationship with Roybal-Mack & Cordova PC in June, 2022, see Second Declaration of Patrick Griego ¶ 2, at 1 (dated November 27, 2023), filed November 28, 2023 (Doc. 20-1)("Griego Second Decl."), when Griego filed a federal lawsuit against the USFS, see Affidavit of Patrick Griego ¶ 3, at 1 (dated October 30, 2023), filed November 3, 2023 (Doc. 9-1)("Griego Aff.").

56.     On August 4, 2023, Roybal-Mack included Griego in a "List of Current HPCC Households," which Roybal-Mack attached to a letter it sent to Natural Resources Conservation Service ("NRCS") and FEMA representatives on August 4, 2023.  Request to Cease Contact at 4.

57.     On August 14, 2023, Griego visited a claims office to "see if there was going to be help for the flooding" that he had recently experienced on his property.  Griego Second Decl. ¶ 7, at 1-2.

58.     On October 24, 2023, Griego filed a lawsuit against FEMA in federal court.  See Griego Supp. Decl. ¶ 2, at 1.

---

Department of Homeland Security (April 27, 2023)("Privacy Impact Assessment"), https://www.dhs.gov/sites/default/files/2023-04/privacy-pia-fema058-hermitspeakclip-april2023.pdf.  Once the POL is complete, it is submitted to a Claims Reviewer for initial review and then passed on to an Authorized Official for a final determination.  See Privacy Impact Assessment at 2.

59.     On October 26, 2023, FEMA representatives came to Griego's home unannounced and offered him $1,500,000.00 to settle his case if he agreed to terminate the relationship with his attorney.  See Griego Supp. Decl. ¶ 3, at 1; Griego Second Decl. ¶ 9, at 2.

60.     Griego's attorney was not present when FEMA representatives came to Griego's home on October 26, 2023.  See Griego Supp. Decl. ¶ 3, at 1.

61.     Since the October 26, 2023, visit, "Sherry Serna from FEMA has continued to contact" Griego.  Griego Second Decl. ¶ 10, at 2.  See Griego Supp. Decl. ¶ 4, at 1.

62.     On October 30, 2023, Griego signed a NOL listing Antonia Roybal-Mack as his attorney.  See Griego Second Decl. ¶ 4, at 1.[3]

**7.     Martin Sandoval's Claims Process Experience.**

63.     Sandoval is a victim of the Hermit's Peak Fire.  See Declaration of Martin Sandoval ¶ 1, at 1 (dated August 25, 2023), filed October 25, 2023 (Doc. 2-3)("Sandoval Decl.").

64.     In November, 2022, Sandoval provided his telephone number to NRCS, at which time he informed the NRCS that he had "been burned out."  Sandoval Decl. ¶ 4, at 1.

65.     The NCRS informed Sandoval that "they could 'help' with fencing."  Sandoval Decl. ¶ 4, at 1 (no citation given for quotation).

66.     Sandoval signed an NOL on June 23, 2023, and submitted the NOL through Roybal-Mack as a third-party representative.  See Siler Decl. ¶ 33, at 8.

_____

[3]The Siler Decl. indicates that Griego also signed an NOL on August 14, 2023 -- the same day that Griego visited the claims office -- in which Griego did not identify a third-party representative.  See Siler Decl. ¶ 36 at 9.  Griego indicates that he "does not know" if he signed an NOL on August 14, 2023, Griego Second Decl. ¶ 6, at 1, and states: "I did not intend to sign a Notice of Loss, if I in fact signed a notice of loss," Griego Second Decl. ¶ 10, at 2.

67.     On August 2, 2023, Sandoval received a telephone call from an individual named Daniel Romero.  See Sandoval Decl. ¶ 2, at 1.

68.     During the telephone call, "Romero said he wanted to perform an 'assessment' by walking [Sandoval's] property to see what was damaged."  Sandoval Decl. ¶ 3, at 1 (no citation given for quotation).

69.     Romero also "discussed a restoration plan."  Sandoval Decl. ¶ 3, at 1.

70.     Sandoval informed Romero that he wanted to "run it through [his] attorney," and Romero responded that he "would only talk to [Sandoval] directly."  Sandoval Decl. ¶ 5, at 1.

71.     When Sandoval told Romero that he wanted to have his "attorney present for the inspection," Romero responded that he "could only talk to [Sandoval] directly" and provided Sandoval with his telephone number in case Sandoval changed his mind.  Sandoval Decl. ¶ 5, at 1.

72.     None of the Plaintiffs have obtained a Final Decision through the HPCCAA claims process.  See Siler Decl. ¶¶ 31, 35, 37, at 8-9.

## PROCEDURAL BACKGROUND

The Vigils, Griego, and Sandoval ("the Plaintiffs") filed their complaint on November 3, 2023.  See Verified First Amended Complaint for (I) Temporary Restraining Order, Preliminary Injunction, and Permanent Injunction, and (II) Declaratory Relief, filed November 3, 2023 (Doc. 7)("Complaint").  In the Complaint, the Plaintiffs' request that the Court: (i) direct FEMA and NRCS' to cease "unauthorized contact with represented claimants including presenting settlement offers without involvement of counsel"; and (ii) require FEMA to distribute HPCCAA settlement awards to New Mexico Supreme Court-approved" Interest on Lawyers' Trust Accounts ("IOLTA") accounts "when directed by client and attorney."  Complaint at 1-2.  The

Plaintiffs seek injunctive relief -- in the form of a TRO, preliminary injunction, and permanent injunction -- as well as declaratory relief.  See Complaint at 22.

1.      **The Request for a TRO.**

On November 3, 2023, the Plaintiffs filed their application for a TRO, see TRO Motion at 1, and accompanying Memorandum Brief in Support of Application for Entry of Temporary Restraining Order and Order to Show Cause Regarding Preliminary Injunction, filed November 3, 2023 (Doc. 9)("TRO Brief").  Focusing on the Complaint's first claim, the TRO Motion and TRO Brief seek to prevent FEMA and NRCS from "contacting represented Hermit's Peak/Calf Canyon (HPCC) Fire Claimants without notification and consent of their counsel."  TRO Brief at 1.  The Plaintiffs argue that "[i]t is the official policy of FEMA to seek to dissuade claimants from being represented by counsel, and to interfere with the attorney-client relationship."  TRO Brief at 1.  This interference, the Plaintiffs contend, constitutes a violation of 5 U.S.C. § 500, the McDade Act, and NMRPC 16-402[4], all of which define FEMA and NCRS attorneys' permissible conduct.  See TRO Brief at 7-10.  The Plaintiffs aver that the Court has jurisdiction to enjoin unlawful federal attorney conduct pursuant to: (i) 28 U.S.C. § 1331, because the action requires the Court to construe an act of Congress, see Complaint ¶ 4, at 3; (ii) the APA, because a final agency action has aggrieved the Plaintiffs, see Complaint ¶ 6, at 3; and (iii) the "inherent power under Article III of the United States Constitution to control the practice of law of federal agencies and their attorneys in New Mexico," Complaint ¶ 8, at 4.  Together, according to the

---

[4]In the Memo, the Plaintiffs cite to New Mexico Rule of Professional Conduct 6-402. See Memo. at 8.  The Plaintiffs, however, quote the language of New Mexico Rule of Professional Conduct 16-402 ("Rule 16-402"), which addresses attorney communication with represented parties.  See Memo. at 8-9.  The Court presumes, therefore, that the Plaintiffs intended to rely on Rule 16-402.

Plaintiffs, these acts and rules prevent federal attorneys from communicating directly with represented claimants "about claims, the claims process, or settlement, without the lawyer's knowledge, permission and participation (if the lawyer chooses to participate)." Memo at 8.[5]

The Plaintiffs detail FEMA and NRCS' "knowing" violations of federal law through what they contend are improper communications with represented claimants with the knowledge that the Plaintiffs are represented by counsel in violation of federal law. See TRO Brief at 1-3. Specifically, the Plaintiffs allege that FEMA and NCRS representatives have: (i) made settlement offers to the Plaintiffs; (ii) directed the Plaintiffs to end their relationship with counsel; and (iii) refused to perform site assessments on the Plaintiffs' real property with an attorney present. See TRO Brief at 2-5. For example, the Plaintiffs identify that, during conversations to explore the possibility of receiving a settlement under the HPCCAA, Olivas, a FEMA representative, told the Vigils that they should "'let go'" of their legal representation and that FEMA would not "work with" the Vigils if they "'had a lawyer.'" TRO Brief at 2-3 (quoting Vigil Decl. ¶ 4, at 1-2). Similarly, FEMA representatives visited Plaintiff Patrick Griego at his "home and offered him a $1.5 million settlement but only if he agreed to end his relationship with undersigned counsel and 'drop the lawsuit.'" TRO Brief at 3-4 (no citation given for quotation). See Griego Aff. ¶¶ 6-7, at 1-2. The Plaintiffs argue that, through these interactions, the Defendants "unlawfully interfere in the attorney-client relationship." TRO Brief at 13.

---

[5]In contrast to their arguments in the TRO Brief, the Plaintiffs' civil cover sheet provides that the Plaintiffs file their case under 5 U.S.C. § 552 -- the Freedom of Information Act ("FOIA") -- and indicates that the cause of the action is "Attorney's Fees." Civil Cover Sheet at 1, filed October 25, 2023 (Doc. 1).

The Plaintiffs further aver that their counsel have made numerous attempts to contact FEMA and NRCS imploring them to "cease contact" with Hermits Peak Fire victims whom counsel represent. TRO Brief at 3, 5-6. The Plaintiffs detail a letter their counsel sent to FEMA and NRCS indicating that counsel represents Sandoval and Griego. See TRO Brief at 5. In addition, the Plaintiffs describe communications from FEMA and NRCS representatives, including a letter from FEMA Principal Deputy Chief Counsel, Michael Cameron, advising the Plaintiffs' counsel that FEMA Claims Offices will continue to assist claimants who "'reach[] out to the Office directly for assistance . . . regardless of whether they may have otherwise sought representation.'" TRO Brief at 6 (quoting September 1 Letter at 1). Finally, the Plaintiffs contend that FEMA and NCRS have rebuffed their attempts to "meet and confer" regarding their concerns about impermissible contact with represented claimants. TRO Brief at 6.

**2.      The Hearing.**

The Court held a hearing on November 6, 2023. The Court began by informing the parties that it was "not convinced that the plaintiffs have a substantial likelihood of success on the merits," because the Court does not see evidence that FEMA or NRCS attorneys are violating the NMRPC 16-402 by "directing" their agents to communicate with represented claimants. Tr. at 3:15-8:7 (Court). The Court invited the Plaintiffs to speak in support of their request for a TRO. See Tr. at 8:9-10 (Court). The Plaintiffs began by reiterating that the opinion of the Honorable Juan Burciaga, United States District Judge for the United States District Court for the District of New Mexico, in Matter of Doe, 801 F. Supp. 478 (D.N.M. 1992)(Burciaga, J.), in which a Federal Bureau of Investigations ("FBI") agent communicated directly with a represented defendant, stood for the proposition that "an attorney, through agents, cannot communicate through those agents to interfere with the attorney-client relationship." Tr. at 8:14-

9:7 (Court, Dow).  The Court responded that it did not believe the contention that attorneys may not direct their agents to communicate with represented parties was in dispute, but that "an FBI agent . . . talking to criminal defendants without counsel" had different dimensions than this case's facts.  Tr. at 9:8-11 (Court).  The Court expressed that, while it did not like to see federal employees "discouraging attorney use," it recognized that clients sometimes "cut the attorneys out" and settle the case themselves.  Tr. at 10:4-13 (Court, Dow).  The Plaintiffs responded that they did not cut their attorneys out, and this was a situation where FEMA and NRCS attorneys are directing their agents to give settlement offers to represented claimants and telling them that they should get rid of their legal representation.  See Tr. at 10:14-12:21 (Court, Dow).

In response to the Court's inclination that the Plaintiffs had not demonstrated that FEMA and NRCS attorneys were directing employee communications with represented claimants, see, e.g., Tr. at 13:15-17 (Court)("Are the attorneys drafting the settlement offers and giving them to the frontline workers, and they're taking them over?"), the Plaintiffs directed the Court to the September 1 Letter, in which FEMA indicated that it would assist represented claimants who reach out to Claims Offices,  see Tr. at 13:14-14:8 (Court, Dow).  The Plaintiffs asserted that FEMA and NRCS attorneys "are on actual notice" that settlement communications are occurring between represented parties, and FEMA and NRCS employees.  Tr. at 16:3-5 (Dow).  The Plaintiffs' argued that, where represented claimants approach FEMA and NRCS employees, the employees should reach out to the claimant's counsel and not "continue the communication once the client says, 'I'm represented . . . .'"  Tr. at 16:9-18 (Dow).  The Plaintiffs concluded by clarifying that their "concern is not only about [their attorneys] being cut out," but is really about FEMA and NRCS' practice of "end-running a lawyer" to make "low-ball settlement."  Tr. at 17-5:14 (Tosdal).  "It defies belief," the plaintiffs asserted, that "the United States Attorney or

FEMA attorney[s]" would not have approved "a $1.5 million settlement" offer.  Tr. at 18:5-10 (Tosdal). The Plaintiffs contended that the Court was drawing an "unrealistic" line by positing that there is a difference between the United States Attorney's Office directing an FBI agent to communicate with a represented defendant, and FEMA and NRCS counsel directing their staff to communicate with represented claimants.  Tr. at 17:15-18:4 (Tosdal).

The Defendants responded that their "belief" was "that these Government attorneys are not involved," but that the actions of concern were taken solely "by claims office personnel for FEMA," who are not attorneys.  Tr. at 19:3-17 (Court, Sydow).  The Defendants outlined the different actors in the claims process: (i) FEMA "agency counsel" who "set[] policies"; (ii) "the claims office[s] that are processing claims brought to them in northern New Mexico"; and (ii) NRCS, which conducts independent "damage evaluations" that claimants can take to FEMA to expedite the claims process.  Tr. at 20:3-16 (Sydow).  The Defendants explained that the FEMA claims office employees are not agents of FEMA's attorneys.  See Tr. at 32:2-9 (Court, Sydow). The Court inquired whether there were any FEMA attorneys present at the hearing, and the Plaintiffs introduced Anthony Juzaitis, an attorney with FEMA's OCC who works out of FEMA's Santa Fe Claims Office.  See Tr. at 21:14-22:10 (Court, Juzaitis, Sydow).  Mr. Juzaitis explained that, while he advises claims office personnel on "policy," he does not "draft settlement documents" nor "direct the substance of communications that our claims office personnel engage in with claimants."   Tr. at 22:12-23:5 (Court, Juzaitis).  In his view, Mr. Juzaitis provided, FEMA Claims Office employees are his clients, "in the sense that we provide them legal advice," and these individuals "are certainly not our agents in the sense that we can direct anything that they do."  Tr. at 41:17-25 (Court, Juzaitis).  See id. at 49:19-25 (Court, Juzaitis)(explaining that FEMA attorneys are not involved in settlement offers).   The parties

disputed whether the damage estimates that NRCS staff provide, like the $1.5-million offer that Griego received, could be considered a settlement offer or whether these estimates are simply "valuations of people's damages" that do not constitute a FEMA offer.  Tr. at 50:2-20 (Court, Sydow, Tosdal).

The Defendants contended that the concerns in the Plaintiffs' request for a TRO do not constitute a "judicial emergency," because, despite the Plaintiffs' argument to the contrary, the Defendants had continuously offered to "meet and confer" with the Plaintiffs.  Tr. at 24:21-25:2 (Sydow).  For example, the Defendants explained that they offered to meet and confer with the Plaintiffs in two letters that FEMA and NRCS representatives sent on October 6, 2023, and October 18, 2023, that the Defendants indicated the Plaintiffs did not attach to the Complaint or TRO Brief.  See Tr. at 25:2-18 (Court, Sydow).  The Defendants explained that these two letters clarify that "counsel does not have supervisory control over claims office personnel, and does not direct or control activities.  Counsel does not interact personally with claimants in a professional capacity."  Tr. at 25:24-26:4 (Sydow).  The Defendants highlighted that the October 18, 2023, letter explains to the Plaintiffs' attorneys: "Claims personnel only work with the claimants, some of whom may be your clients, when the claimant insists that they want to proceed without counsel."  Tr. at 27:25-28:2 (Sydow).  Mr. Juzaitis explained that non-lawyers in FEMA's "policy branch" established the procedures outlined in the October letters and that he was "[r]easonably confident" that all individuals in his Claims Office followed these same procedures.  Tr. at 30:8-31:6 (Court, Juzaitis, Sydow).  The Plaintiffs indicated that they had never received either of the October letters and requested that both letters be re-sent.  See Tr. at 43:1-7 (Court, Tosdal); id. at 51:9-20 (Court, Dow)("[T]he October 6 letter to me never got to me . . . . And Mr. Tosdal never got the October 18 letter.").

The Defendants argued that the Court lacked jurisdiction over the Plaintiffs' claims, because State Supreme Courts and State bar authorities enforce attorney "disciplinary rules," and "[t]here is not a free-floating federal cause of action to enforce State Bar disciplinary rules."  Tr. at 33:7-24 (Sydow).  The Court indicated that it did not believe the Plaintiffs were asking it to "discipline anybody," but rather to "enjoin attorneys from doing things," Tr. at 33:17-23 (Court), to which the Defendants responded that an "injunction . . . must be connected to a cause of action" and that the statutes the Plaintiffs reference do not confer jurisdiction over their claims, Tr. at 35:23-38:17 (Court, Dow, Sydow).  First, the Defendants contended that APA § 50)(f) "does not create an independent cause of action," because it is a "narrow provision" that "require[es] certain written notices to be given to attorneys in official agency actions."  Tr. at 37:2-19 (Sydow).  Second, the Defendants averred that, while the McDade Act provides "that certain federal attorneys are subject to state professional conduct rules that govern attorneys in the state where the attorney engages in that attorney's duties," FEMA and NRCS attorneys do not fall under the statutory definition of "attorney for the Government," and, therefore, the McDade Act does not cover the attorneys.  Tr. at 38:5-17 (Sydow).  The United States also provided that the Court lacks jurisdiction, because there are "no statute[s] creating or containing an independent cause of action for enforcement or a waiver of sovereign immunity against the United States."  Tr. at 38:18-23 (Sydow).

Moreover, the Defendants argued, the Plaintiffs have not established standing to bring their claims.  See Tr. at 38:24-39:13 (Sydow).  Specifically, the Defendants contended that the Plaintiffs have not established that they suffered an injury by, for example, "alleg[ing] that they have received worse settlement offers or less money than if they had gone through an attorney." Tr. at 39:1-6 (Sydow).  Furthermore, the Defendants provided, "the relief that's requested is

about all communications with all represented claimants under this act, which is far broader than any injury that would need to be redressed to these individual plaintiffs." Tr. at 39:6-11 (Sydow). The Defendants concluded that, under the four factors for determining whether to grant preliminary relief outlined in Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7 (2008)("Winter"), both the cases' jurisdictional and merits-based defects render the Plaintiffs' claims unlikely to succeed on the merits, and the balance of equities favors the Defendants, because granting the Plaintiffs' requested relief would "contravene the purpose of this act that is intended to provide fast compensation and easy compensation to the fire victims by disrupting the operations that FEMA has set up in northern New Mexico." Tr. at 39:14-40:24 (Sydow).

In response, the Plaintiffs first requested that the Defendants waive attorney-client privilege "on a limited basis" so the Plaintiffs can ask FEMA and NRCS employees "who have been engaged in offering settlements to fire victims . . . whether attorneys are involved in this." Tr. at 43:8-46:11 (Court, Tosdal). The Court indicated that it did not believe the Plaintiffs are entitled to penetrate the attorney-client privilege as to communications between FEMA and NRCS attorneys, and FEMA and NRCS employees, about policy, where the Plaintiffs do not have any evidence that the attorneys are directing employees to offer claimants settlement offers. See Tr. at 46:12-47:19 (Court, Tosdal). The Plaintiffs argued that they have circumstantial evidence that FEMA and NRCS attorneys are directing FEMA and NRCS employees' conduct in regard to communications with settlements: no government "contractor or employee offers [a] $1.5 million settlement without legal approval." Tr. at 47:20-25 (Tosdal). Mr. Juzaitis replied that, while he is unfamiliar with the $1.5 million settlement at issue, all settlement offers are offered to claimants and approved by "claims adjusters" who are not attorneys, Tr. at 49:6-25 (Court, Juzaitis), and the Defendants reiterated that the $1.5 million settlement is an "NRCS

valuation estimate from this other entity under USDA that does these valuations of people's damages.  It is not a FEMA offer," Tr. at 50:2-13 (Court, Sydow).  The Plaintiffs acknowledged that the $1.5 million settlement came from NRCS, an agency that the Plaintiffs acknowledged did not have an attorney in New Mexico.  See Tr. at 50:16-24 (Court, Tosdal).

The Court invited the Plaintiffs to have the last word on their request for a TRO.  See Tr. 51:3-4 (Court).  The Plaintiffs argued that the Court has "extremely broad power under the Constitution" to exercise "supervisory control over federal agents" and "enforce the rules of professional conduct."  Tr. at 51:21-52:7 (Dow).  The Plaintiffs clarified that they are requesting a TRO in respect to themselves only and not the "general public."  Tr. at 51:8-11 (Dow).  The Plaintiffs contended that, despite the FEMA and NRCS policy described in the October letters to "work with counsel for claimants, not to actively dissuade claimants from seeking assistance of counsel," the Plaintiffs affidavits established that this policy is "malarkey," because "[w]hat is actually happening here is contrary to the policy that's set forth in these two letters."  Tr. at 53:10-57:5 (Court, Dow).  The Court queried whether the actions of certain NRCS and FEMA employees are really "the policy of the lawyers," to which the Plaintiffs responded that the FEMA and NRCS attorney's ethical violation lays in the fact that "[t]heir agents are not following their directives as applied."  Tr. at 58:9-10 (Dow).  The Plaintiffs stated: "It's policy where FEMA representatives at a claims office, receiving a $1.5 million settlement offer saying: Lose your counsel."  Tr. at 60:1-3 (Dow).  The Plaintiffs concluded by asserting that they are requesting "a narrow TRO protecting the attorney-client relationship, where the client has not said: I want to get rid of my counsel," Tr. at 59:4-8 (Dow), and also requested the Court hold an evidentiary hearing on the request for a preliminary injunction, see Tr. at 61:8-11 (Dow).  The Court informed the parties that it would wait to hold an evidentiary hearing until it had filed an

opinion on the Plaintiffs' request for a TRO.  <u>See</u> Tr. at 62:5-11 (Court).    The Plaintiffs explained that they were "comfortable with [the Court] taking as much time" as was necessary to provide an opinion and order on the requested TRO.  Tr. at 62:1-4 (Court, Tosdal).

     **3.**       **<u>The Plaintiffs' Supplemental Brief.</u>**

     On November 6, 2023, the Plaintiffs filed their First Supplemental Memorandum Brief in Support of Application for Entry of Temporary Restraining Order and Order to Show Cause Regarding Preliminary Injunction, filed November 6, 2023 (Doc. 15)("Supp. TRO Brief").  In the Supp. TRO Brief, the Plaintiffs clarify that they are requesting that the Court prevent the Defendants from "violating their own policies and procedures" as set forth in the October letters, which the Plaintiffs reiterated they had not seen until the November 6 hearing.  <u>See</u> Supp. TRO Brief at 1.  The Plaintiffs argue that, despite that FEMA and NRCS policy directs employees to interact with represented claimants only where the claimants initiate contact, "agency representatives directly contacted" the Plaintiffs, whom FEMA and NRCS employees were aware counsel represented.  Supp. TRO Brief at 1-3.  The Plaintiffs insist that "[a]gency contact with the Vigils and with Mr. Griego was in direct violation of agency policy," Supp. TRO Brief at 3, and that there is no "'written confirmation' that either the Vigils or Mr. Griego sought to proceed without their chosen counsel," Supp. TRO Brief at 5 (no citation given for quotation).

     The Plaintiffs argue that "FEMA/NRCS' general counsel is directly encouraging agency personnel to directly contact clients," Supp. TRO Brief at 4, and that "FEMA/NRCS has made it clear they believe they should be able to continue to interfere with attorney-client relationships with impunity," Supp. TRO Brief at 5.  The Plaintiffs state: "Contrary to the policies and procedures laid out above, on information and belief, agency counsel is complicit in allowing and encouraging non-attorney Government personnel to engage in this conduct."  Supp. TRO

Brief at 5.  The Plaintiffs contend that "[i]t is not mere coincidence that Mr. Griego was contacted directly by FEMA personnel two days after his FOIA complaint was filed in federal court."  Supp. TRO Brief at 6.  For these reasons, the Plaintiffs conclude that FEMA and NRCS attorneys engaged in a "knowing violation of New Mexico Rules of Professional Conduct Rules 16-402 and 16-804," which bind federal attorneys pursuant to "28 U.S.C. § 530B(a)."  Supp. TRO Brief at 6-7.

> ### 4.      **The Response**.

On November 14, 2023, FEMA, NRCS, the Department of Homeland Security ("DHS"), the USDA, and Angela Gladwell (collectively, the "Defendants"), filed the Defendants' Response to Application for Entry of Temporary Restraining Order and Order to Show Cause Regarding Preliminary Injunction, filed November 14, 2023 (Doc. 19)("Response").   In the Response, the Defendants argue that the "Plaintiffs do not identify a judicial emergency that warrants the Court's immediate entry of a TRO," and that entry of a TRO "would disrupt the Federal Government's efforts to quickly pay claims to victims . . . ."  Response at 1-2.  The Defendants contend that: (i) the Plaintiffs are "unlikely to prevail on the merits of their claims," because they "do not offer any substantiated allegation of a violation of the Rules of Professional Conduct or of federal law"; and (ii) "the Court lacks jurisdiction over Plaintiffs' claims which are barred by the Government's sovereign immunity and which fail to state a claim."  Response at 1.

The Defendants begin by describing that FEMA and NRCS play distinct roles in the HPCCAA claims process.  See Response at 2.  FEMA "manages the claims process under the Act."  Response at 2-3.  NRCS, on the other hand, "does not receive Notices of Loss, approve or negotiate claims, or make claims payments"; rather, NRCS "conducts surveys and provides

'Conservation Restoration Plans' that may serve as estimates of damages from the HPCC Fire."
Response at 3 (no citation given for quotation).  "The $1,500,000 'offer' referenced by Plaintiff
Patrick Griego," the Defendants aver, "is one such NRCS plan."  Response at 3 (no citation
given for quotation).  The Defendants outline FEMA's "guidance regarding interactions with
claimants who are represented by counsel," Response at 4, and describe that the Defendants have
"informed Plaintiffs' counsel that the Claims Office does not have a policy, attorney-directed or
otherwise, of initiating contact with represented claimants," Response at 6.

    The Defendants respond to each individual Plaintiff's allegations.  See Response at 8-9.
The Defendants aver that "Griego's Notice of Loss filed with FEMA did not indicate in the
designated portion of the form that he was represented by counsel," and that "Griego's purported
claim settlement of $1.5 million was a NRCS Conservation Restoration Plan, not an offer by
FEMA to settle a claim."  Response at 8.  As to the Vigils' claims regarding FEMA and NRCS'
improper communications, the Defendants contend that the Vigils do "not establish improper
contact by government attorneys or their agents," because they had not yet filed an NOL "at the
time of their alleged interactions with NRCS and FEMA personnel," and FEMA records indicate
that it was the Vigils who contacted the agency thereafter.  Response at 9.  The Defendants
provide that "FEMA's records indicate that all contact by its claims reviewer on Mr. Sandoval's
claim has been through counsel," and conclude that, "in all three accounts, Plaintiffs offer no
evidence or allegation that any actions or communications were made at the direction of
attorneys."  Response at 8-9.

    The Defendants next argue that the Court lacks jurisdiction over the Plaintiffs' claims for
three separate reasons.  First, the Defendants contend that the "Plaintiffs have not met their
burden of identifying any statute or other waiver of the United States' sovereign immunity that

would permit this action to proceed." Response at 10. Second, the Defendants aver that the Plaintiffs do "not set forth any viable cause of action that can provide a foundation for the Court's jurisdiction." Response at 10. Specifically, the Defendants posit that the Declaratory Judgment Act, 28 U.S.C. § 2201, the APA's § 500(f), and the McDade Act, do not provide independent bases for a cause of action. See Response at 11-12. Moreover, the Defendants provide that Matter of Doe, 801 F. Supp. 478, to which the Plaintiffs cite in support of their argument that the Court has inherent Article III power to enforce ethical rules against government lawyers, actually "supports the primacy of state courts in enforcing state ethical rules." Response at 12-13. Third, the Defendants argue that the Plaintiffs have not established standing, because the Plaintiffs have not demonstrated that "they are harmed by any direct communications with FEMA or NRCS personnel," and therefore have not shown an injury in fact. Response at 13.

Turning to the merits of the Plaintiffs' claims, the Defendants contend that, as a legal matter, the third and fourth Winter factors -- the "balance of equities" and that the requested "injunction is in public interest" -- "'merge when, like here, the government is the opposing party.'" Response at 14 (quoting Aposhian v. Barr, 958 F.3d 969, 978 (10th Cir. 2020)). Furthermore, the Defendants posit that the Plaintiffs' burden is heightened, because, by seeking a "prohibition on all agency communications with represented claimants," they seek a "particularly disfavored" form of injunctive relief. Response at 14-15. As to the first Winter factor, the Defendants argue that, in addition to the Plaintiffs' failure to establish jurisdiction, the Plaintiffs "conflate the actions of FEMA and NRCS personnel and, critically, offer no evidence that government attorneys are directing FEMA's claims personnel or NRCS's employees." Response at 15-16. Specifically, the Defendants aver that the Plaintiffs cannot establish a violation of the

NMRPC, because "FEMA counsel have no operational control over the Claims Office's claims personnel [and] do not direct their activities," and, even if the Plaintiffs could show a NMRPC violation, the Plaintiffs do not identify a proper method "to bring an action in federal court to enforce States' ethics rules against federal government lawyers." Response at 15-20. The Defendants highlight that the Plaintiffs have shifted their argument, and "now argue that [FEMA and NRCS] guidance isn't being followed in practice." Response at 18.

The Defendants next argue that the Plaintiffs "have not established that they will be irreparably harmed absent a TRO" for three reason: (i) the Plaintiffs have not provided evidence that their attorney-client relationships were "disrupted"; (ii) the Plaintiffs "can mitigate any such harm, if they desire, by not interacting with FEMA or NRCS personnel without their attorneys"; and (iii) "client-to-client communications do not constitute harm at all," because they are "permissible," and "valuable tools for quickly and responsively handling claims." Response at 22. Finally, the Defendants contend that the "last two factors" under Winter weigh against granting injunctive relief, because "forbidding speech by the employees of two agencies would constitute 'an intrusion by a federal court into the workings of a coordinate branch of government,' irreparably harming the Executive Branch and raising profound separation-of-powers concerns." Response at 22 (quoting INS v. Legalization Assistance Project, 510 U.S. 1301, 1306 (1993)).

### 5. The Reply.

The Plaintiffs lodge the Plaintiffs' Reply to Defendants' Response to Application for Entry of Temporary Restraining Order and Order to Show Cause Regarding Preliminary Injunction, filed November 28, 2023 (Doc. 20)("Reply"). In the Reply, the Plaintiffs request that the Court order the Defendants "to immediately stop violating their own policies and procedures

as set forth" in the October 6 Letter.  Reply at 1.  Specifically, the Plaintiffs argue that FEMA and NRCS policy violates section 500(f) of the APA and the NMRPC, because, in the October letters, FEMA's counsel "instruct[s] agency employees to contact claimants . . . *ex parte* with written settlement offers" and to submit "written 'Intent to Proceed without Participation of Counsel.'"  Reply at 1 (no citation given for quotation).  See id. at 2 ("FEMA's counsel is advising agency employees to violate the APA's § 500(f) by engaging in conduct they are not legally entitled to take . . . .").

The Plaintiffs contend that the Court may hear the claims, because Congress waived sovereign immunity under the HPCCAA, the Court has jurisdiction, and the Plaintiffs have established standing.  See Reply at 2.  First, the Plaintiffs provide that the HPCCAA "provides a limited waiver of sovereign immunity . . . to file suit to enforce and protect the[] right granted under the Act to be represented by counsel."  Reply at 2 (citing 44 C.F.R. 296, at 61-62).  Second, according to the Plaintiffs, 28 U.S.C § 1331 and APA § 702 confer upon the Court authority to enforce violations of APA § 500(f) and the McDade Act.  See Reply at 3.  In addition, the Plaintiffs posit that the "Court has the inherent power under Article III of the United States Constitution to control the practice of law of federal Agencies and their attorneys in New Mexico, and pendent jurisdiction to prohibit a pattern and practice of continued violations of the NM RPC."  Reply at 3.  Third, the Plaintiffs argue that they have standing to bring their claims, because the communications they have received constitute an injury in fact to the attorney-client relationship,  and "[t]here is a clear causal connection between the conduct of agency counsel, employees providing written settlement offers ex parte, and injury to the attorney-client relationship."  Reply at 3.

Because "5 U.S.C. § 500(f) requires every FEMA employee to provide every written communication regarding a represented client directly to the claimant's counsel," the Plaintiffs aver that they are likely to succeed on the merits.  Reply at 6-7.  The Plaintiffs explain that, while represented clients may communicate with other represented clients without violating NMRPC 16-402, § 500(f) precludes "federal agencies such as FEMA/NRCS and their employees" from "communicat[ing] freely with a represented participant in a matter before the agency."  Reply at 7.  "Section 2 of the bills [codified as 5 U.S.C. § 500(f)] . . . would provide that once a participant in any matter before an agency is, in fact, properly represented by an attorney and that fact has been made known in writing to the agency, transactions between the agency and the participant shall be carried out through the attorney."  See Reply at 8 (quoting 1965 U.S.C.C.A.N. 4170, 4176).  While the Plaintiffs acknowledge "that § 500(f) does not create an independent cause of action," they argue that the fact remains that agencies are not "permitted simply to ignore or violate the mandatory requirement of the statute."  Reply at 9.  Accordingly, the Plaintiffs contend, because they are not seeking damages under § 500(f), that § 500(f) does not create an independent cause of action does not prevent the Court from "direct[ing] FEMA to comply with, and cease violating, the statute and consequently the NM RPC."  Reply at 9.

**LAW REGARDING REQUESTS FOR A TEMPORARY RESTRAINING ORDER**

The requirements for a TRO's issuance are essentially the same as those for a preliminary injunction order.  See People's Trust Fed. Credit Union v. Nat'l Credit Union Admin. Bd., 350 F. Supp. 3d 1129, 1138 (D.N.M. 2018)(Browning, J.); 13 Moore's Federal Practice ¶ 65.36(1), at 65-83 (3d ed. 2004).  The primary differences between a TRO and a preliminary injunction are that a TRO may issue without notice to the opposing party and that TROs are limited in duration to fourteen days.  See Fed. R. Civ. P. 65(b)(1)-(2).  In both cases, however, injunctive relief is an

"extraordinary remedy," and the movant must demonstrate a "clear and unequivocal right" to have a request granted.  Greater Yellowstone Coalition v. Flowers, 321 F.3d 1250, 1256 (10th Cir. 2003)).  See Herrera v. Santa Fe Pub. Sch., 792 F. Supp. 2d at 1181.  The Supreme Court of the United States of America has explained that "[t]he purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." Univ. of Tex. v. Camenisch, 451 U.S. 390, 395 (1981).  See Keirnan v. Utah Transit Auth., 339 F.3d 1217, 1220 (10th Cir. 2003)("In issuing a preliminary injunction, a court is primarily attempting to preserve the power to render a meaningful decision on the merits." (quoting Tri-State Generation & Transmission Ass'n v. Shoshone River Power, Inc., 805 F.2d 351, 355 (10th Cir. 1986))).

To establish its right to a TRO under rule 65(b), the moving party must "establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."  Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 20 (2008)("Winter")(citing Munaf v. Geren, 553 U.S. 674, 689-90 (2008)); Amoco Prod. Co. v. Gambell, 480 U.S. 531, 542 (1987); Weinberger v. Romero-Barcelo, 456 U.S. 305, 311-12 (1982)).  A moving party must demonstrate that "immediate and irreparable injury, loss, or damage will result" unless a court issues the order.  Fed. R. Civ. P. 65(b).  "[I]rreparable injury" is "harm that cannot be undone, such as by an award of compensatory damages or otherwise."  Salt Lake Tribune Pub. Co., LLC v. AT & T Corp., 320 F.3d 1081, 1105 (10th Cir. 2003)(citing Tri-State Generation & Transmission Ass'n v. Shoshone River Power, Inc., 805 F.2d at 355).

The likelihood-of-success and irreparable-harm factors are "the most critical" in the analysis.  Nken v. Holder, 556 U.S. 418, 434 (2009).  It is insufficient, moreover, that a moving

party demonstrate that there is only a "possibility" either of success on the merits or of irreparable harm. <u>Diné Citizens Against Ruining Our Env't v. Jewell</u>, 839 F.3d 1276 (10th Cir. 2016)("<u>Diné</u>"). In <u>Diné</u>, the United States Court of Appeals for the Tenth Circuit held that a relaxed test for preliminary relief is "inconsistent with the Supreme Court's recent decision in <u>Winter v. Natural Resources Defense Council</u>," which "overruled the Ninth Circuit's application of a modified preliminary injunction test under which plaintiffs . . . could receive a preliminary injunction based only on a possibility, rather than a likelihood, of irreparable harm." <u>Diné</u>, 839 F.3d at 1282 (citing <u>Winter</u>, 555 U.S. at 22). The Tenth Circuit concluded that, although the standard which the Supreme Court found incorrect in <u>Winter</u> dealt with the irreparable-harm factor, "<u>Winter</u>'s rationale seems to apply with equal force" to the likelihood-of-success factor. <u>Diné</u>, 839 F.3d at 1282. Accordingly, the Tenth Circuit holds that "any modified test which relaxes one of the prongs for preliminary relief and thus deviates from the standard test is impermissible." <u>Diné</u>, 839 F.3d at 1282.

Under rule 65(c), the court may issue a TRO "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). The United States, and its officers and agencies, are exempt from this requirement. <u>See</u> Fed. R. Civ. P. 65(c). The court must consider whether a bond is necessary. <u>See</u> <u>Coquina Oil Corp. v. Transwestern Pipeline Co.</u>, 825 F.2d 1461, 1462 (10th Cir. 1987)(concluding that, where a trial court does not "contemplate the imposition of the bond, its order granting a preliminary injunction is unsupportable"). <u>See also</u> <u>Flood v. ClearOne Comm'ns</u>, 618 F.3 1100, 1126 n.4 (10th Cir. 2010). Courts in the Tenth Circuit "have 'wide discretion under Rule 65(c) in determining whether to require security'" and may, therefore, impose no bond requirement. <u>RoDa Drilling</u>

Co. v. Siegal, 552 F.3d 1203, at 1215 (10th Cir. 2009)(quoting Winnebago Tribe of Neb. v. Stovall, 341 F.3d 1202, 1206 (10th Cir. 2003)).[6]

## LAW REGARDING STANDING

A federal court may hear cases only where the plaintiff has standing to sue. Standing has two components. First, standing has a constitutional component arising from Article III's requirement that federal courts hear only genuine cases or controversies. Second, standing has a prudential component. See Habecker v. Town of Estes Park, Colo., 518 F.3d 1217, 1224 n.7 (10th Cir. 2008)(noting that prudential standing concerns may prevent judicial resolution of a case even where constitutional standing exists). The burden of establishing standing rests on the plaintiff. See, e.g., Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 104 (1998). The plaintiff must "'allege . . . facts essential to show jurisdiction. If [they] fai[l] to make the necessary allegations, [they have] no standing.'" FW/PBS, Inc. v. City of Dallas, 493 U.S. 215, 231 (1990)(quoting McNutt v. Gen. Motors Acceptance Corp., 298 U.S. 178, 189

---

[6]The Court has written numerous times on the topic of TROs and PIs. See, e.g., O Centro Espirita Beneficiente Uniao Do Vegetal v. Duke, 286 F. Supp. 3d 1239, 1269-70 (D.N.M. 2017)(Browning, J.)(issuing a preliminary injunction requiring the United States Citizen and Immigration Services ("USCIS") to reconsider a religious minister's I-129 nonimmigrant R-1 petition, in part because it was substantially likely that the USCIS' first denial of the minister's R-1 petition violated the Religious Freedom Restoration Act); Herrera v. Santa Fe Pub. Schs., 792 F. Supp. 2d at 1200 (granting a TRO prohibiting the Santa Fe Public Schools from suspicionless pat-down searches of its students before prom and graduation); Salazar v. San Juan County Detention Center, No. CIV 15-041, 2016 WL 335447 (D.N.M. January 15, 2016)(Browning, J.)(denying a request for injunctive relief after concluding that, although the plaintiffs faced irreparable harm, the balance of equities favored them, an injunction was not adverse to the public interest, and the plaintiffs were unlikely to succeed on the merits); New Mexico Cattle Growers' Ass'n v. United States Forest Serv., No. CIV 23-0150, 2023 WL 2185698 (D.N.M. February 22, 2023)(Browning, J.)(declining to issue a TRO because the plaintiffs did not demonstrate substantial likelihood of success on the merits nor make a showing that they were likely to suffer irreparable harm in relation to the United States Forest Service's plan to shoot 150 cattle in New Mexico's Gila Wilderness).

(1936))(alteration and ellipsis in FW/PBS, Inc. v. City of Dallas).   Moreover, where the defendant challenges standing, a court must presume lack of jurisdiction "'unless the contrary appears affirmatively from the record.'"   Renne v. Geary, 501 U.S. 312, 316 (1991)(quoting Bender v. Williamsport Area Sch. Dist., 475 U.S. 534, 546 (1986)).   "'[I]t is a long-settled principle that standing cannot be inferred argumentatively from averments in the pleadings, but rather must affirmatively appear in the record.'"   Phelps v. Hamilton, 122 F.3d 1309, 1326 (10th Cir. 1997)(quoting FW/PBS v. City of Dallas, 493 U.S. at 231)).

### 1.    **Article III Standing**.

"Article III of the Constitution limits the jurisdiction of federal courts to Cases and Controversies."   San Juan Cty., Utah v. United States, 503 F.3d 1163, 1171 (10th Cir. 2007)(en banc).   See U.S. Const. art. III, § 2.   "In general, this inquiry seeks to determine 'whether [the plaintiff has] "such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination."'"   Wyoming ex rel. Crank v. United States, 539 F.3d 1236, 1241 (10th Cir. 2008)(quoting Massachusetts v. EPA, 549 U.S. 497, 539 (2007)(quoting Baker v. Carr, 369 U.S. 186, 204 (1962)(alteration in Wyoming ex rel. Crank))).   "[A] suit does not present a Case or Controversy unless the plaintiff satisfies the requirements of Article III standing."   San Juan Cty., Utah v. United States, 503 F.3d at 1171.   To establish Article III standing, a plaintiff must show three things: "(1) 'an injury in fact that is both concrete and particularized as well as actual or imminent'; (2) a causal relationship between the injury and the challenged conduct; and (3) a likelihood that the injury would be redressed by a favorable decision."   Protocols, LLC v. Leavitt, 549 F.3d at 1298 (quoting Lujan v. Defs. Of Wildlife, 504 U.S. 555, 561 (1992)).

"Standing is determined as of the time the action is brought."  Nova Health Sys. v. Gandy, 416 F.3d 1149, 1154 (10th Cir. 2005).

The Court has addressed whether a party has Article III standing on multiple occasions and in a variety of contexts.  In New Mexico v. McAleenan, 450 F. Supp. 3d 1130 (D.N.M. 2020)(Browning, J.), the Court concluded that the plaintiffs, the State of New Mexico and the City of Albuquerque, had Article III standing to sue the Department of Homeland Security in connection with an abruptly implemented practice of leaving paroled asylees in various locations in New Mexico which required both entities to provide emergency care to the asylees.  See 450 F. Supp. 3d at 1175-88.  In Swepi, LP v. Mora Cty., N.M., 81 F. Supp. 3d 1075 (D.N.M. 2015)(Browning, J.), the Court concluded that an energy exploration company had Article III standing to bring a range of claims against a county that implemented an ordinance banning, among other things, the extraction of oil, natural gas, or other hydrocarbons.  See 81 F. Supp. 3d at 1148-57.  In League of United Latin Am. Citizens, N.M. (LULAC) v. Ferrera, 792 F. Supp. 2d 1222 (D.N.M. 2011)(Browning, J.), the Court concluded that a plaintiff who ran in a primary election for a position on the Court of Appeals of New Mexico and whose opponent brought an ethics complaint against him that led to summary suspension as an attorney before the election, which he lost, had "not sufficiently alleged an injury-in-fact traceable to the Defendants' actions or that a judgment in his favor would likely ameliorate his alleged injury-in-fact."  792 F. Supp. 2d at 1226-27, 1239.  In Northern New Mexicans Protecting Land Water & Rts. v. United States, 161 F. Supp. 3d 1020 (D.N.M. 2016)(Browning, J.), aff'd, 704 F. App'x 723 (10th Cir. 2017), the Court held that a nonprofit organization did not satisfy "the Supreme Court's three-part test governing associational standing."  161 F. Supp. 3d at 1040.

2.    __Prudential Standing__.

 "Prudential standing is not jurisdictional in the same sense as Article III standing." __Finstuen v. Crutcher__, 496 F.3d 1139, 1147 (10th Cir. 2007).  Prudential standing consists of "a judicially created set of principles that, like constitutional standing, places 'limits on the class of persons who may invoke the courts' decisional and remedial powers.'" __Bd. of Cty. Comm'rs v. Geringer__, 297 F.3d 1108, 1112 (10th Cir. 2002)(quoting __Warth v. Seldin__, 422 U.S. 490, 499 (1975).  Generally, there are three prudential standing requirements: (i) "a plaintiff must assert his own rights, rather than those belonging to third parties"; (ii) "the plaintiff's claim must not be a generalized grievance shared in substantially equal measure by all or a large class of citizens"; and (iii) "'a plaintiff's grievance must arguably fall within the zone of interests protected or regulated by the statutory provision or constitutional guarantee invoked in the suit.'" __Bd. of Cty. Comm'rs v. Geringer__, 297 F.3d at 1112 (quoting __Bennett v. Spear__, 520 U.S. 154, 162, 117 S. Ct. 1154, 1161 (1997)).

Traditionally, federal courts framed the zone-of-interests test as an issue of prudential standing.  __See__ __Lexmark Int'l v. Static Control Components__, 572 U.S. 118, 127 (2014). The Supreme Court clarified, however, that the zone-of-interests analysis "is an issue that requires us to determine, using traditional tools of statutory interpretation, whether a legislatively conferred cause of action encompasses a particular plaintiff's claim." __Lexmark Int'l v. Static Control Components__, 572 U.S. at 127.  Statutory standing "extends only to plaintiffs whose interests fall within the zone of interests protected by the law invoked." __Lexmark Int'l v. Static Control Components__, 572 U.S. at 127.   Notably, the Supreme Court has stated that it "often 'conspicuously included the word "arguably" in the test to indicate that the benefit of any doubt goes to the plaintiff.'" __Lexmark Int'l v. Static Control Components__, 527 U.S. at 130 (quoting

Match-E-Be-Nash-She-Wish  Band  of  Pottawatomi  Indians  v.  Patchak, 567  U.S.  209,  225 (2012)).  Moreover, the test "'forecloses suit only when a plaintiff's "interests are so marginally related to or inconsistent with the purposes implicit in the statute that"' it cannot reasonably be assumed  that  Congress  authorized  the  plaintiff  to  sue."  Lexmark  Int'l  v.  Static  Control Components, 527  U.S.  at  130  (quoting  Match-E-Be-Nash-She-Wish  Band  of  Pottawatomi Indians v. Patchak, 567 U.S. at 225).  This "lenient approach" preserves the APA's flexible judicial-review provisions.  Lexmark Int'l v. Static Control Components, 572 U.S. at 130.  There "need be no indication of congressional purpose to benefit the would-be plaintiff."  Clark v. Sec. Industry Ass'n, 479 U.S. 388, 399-400.  Finally, whether a plaintiff's interest is protected "is to be determined not by reference to the overall purpose of the Act in question . . . but by reference to the particular provision of law upon which the plaintiff relies . . . ."  Bennett v. Spear, 520 U.S. 154, 175-76 (1997).  See Lujan v. Nat'l Wildlife Fed'n, 497 U.S. at 883.  But see Jonathan R. Siegel, Zone of Interests, 92 Geo. L.J. 317, 336-37 (2004).

## LAW REGARDING SUBJECT MATTER JURISDICTION

It is a fundamental precept of American law that the federal courts are "courts of limited jurisdiction."  Exxon Mobil Corp. v. Allapattah Servs., Inc., 545 U.S. 546, 552 (2005).  Federal courts "possess only that power authorized by [the] Constitution and statute."  Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. 375, 377 (1994).  Among the powers that Congress has bestowed upon the courts is the power to hear controversies arising under federal law -- federal question jurisdiction -- and controversies arising between citizens of different states -- diversity jurisdiction.  See 28 U.S.C. §§ 1331, 1332.

Pursuant to rule 12(h)(3) of the Federal Rules of Civil Procedure, "[i]f the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the

action." Fed. R. Civ. P. 12(h)(3). Objection to a federal court's subject matter jurisdiction "may be raised by a party, or by a court on its own initiative, at any stage in the litigation, even after trial and the entry of judgment." Arbaugh v. Y & H Corp., 546 U.S. 500, 506 (2006). See Kontrick v. Ryan, 540 U.S. 443, 455 (2004)("A litigant generally may raise a court's lack of subject-matter jurisdiction at any time in the same civil action, even initially at the highest appellate instance."); Mansfield, Coldwater & Lake Mich. Ry. Co. v. Swan, 111 U.S. 379, 382 (1884)(holding that the nature and limits of federal judicial power require the court to raise the issue of subject-matter jurisdiction sua sponte). Whenever the court lacks jurisdiction of the subject matter involved in an action, the court must dismiss the action. See Tuck v. United States Auto. Ass'n, 859 F.2d 842, 844 (10th Cir. 1988).

"'The party seeking the exercise of jurisdiction bears the burden of establishing jurisdiction and must allege in his pleading the facts essential to show jurisdiction.'" United States ex rel. General Rock & Sand Corp. v. Chuska Dev. Corp., 55 F.3d 1491, 1495 (10th Cir. 1995)(quoting Penteco Corp. v. Union Gas Sys., Inc., 929 F.2d 1519, 1521 (10th Cir. 1991)). In determining whether a party adequately has presented facts sufficient to establish jurisdiction, the court should look to the complaint's face, see Whitelock v. Leatherman, 460 F.2d 507, 514 (10th Cir. 1972), accepting the well-pleaded factual allegations as true, see United States v. Rodriguez-Aguirre, 264 F.3d 1195, 1203 (10th Cir. 2001), but ignoring conclusory allegations of jurisdiction, see Groundhog v. Keeler, 442 F.2d 674, 677 (10th Cir. 1971). "[D]ismissals for lack of jurisdiction should be without prejudice, because the court, having determined that it lacks jurisdiction over the action, is *incapable* of reaching a disposition on the merits of the underlying claims." Brereton v. Bountiful City Corp., 434 F.3d 1213, 1218 (10th Cir. 2006)(emphasis in original).

The Court has addressed subject-matter jurisdiction in a number of cases. For example, the Court has determined whether the plaintiffs properly have invoked the Court's diversity jurisdiction. See 28 U.S.C. § 1332. In Denny v. Orient Lines, 375 F. Supp. 2d 1320 (D.N.M. 2005)(Browning, J.), the Court dismissed the complaint for lack of subject-matter jurisdiction, because, although the parties were citizens of different States and, therefore, diversity jurisdiction was present, the amount in controversy was less than $75,000. See 375 F. Supp. 2d at 1323. In U.S. Bank Nat'l Ass'n for Chase Mortg. Fin. Corp. Multiclass Mortg. Pass-Through Certificates Chaseflex Tr. Series 2006-1 v. First Morgan, 299 F. Supp. 3d 1202 (D.N.M. 2017)(Browning, J.), the Court remanded the case to State court, because the removing parties did not demonstrate that complete diversity existed among the parties or that there was $75,000.00 in controversy. See 299 F. Supp. 3d at 1206-09. The Court also has had ample cause to consider the scope of its federal question jurisdiction. See 28 U.S.C. § 1331. In Gallup Med Flight, LLC v. Builders Tr. of N.M., 240 F. Supp. 3d 1161 (D.N.M. 2017)(Browning, J.), a contract dispute, the Court concluded that there was not a "substantial federal question of law at issue" when the complaint was "based entirely on New Mexico contract causes of action . . . ." 240 F. Supp. 3d at 1231. In Warner Bros. Ent. Inc. v. Loyd, No. CIV 20-0062, 2023 WL 5727468 (D.N.M. September 5, 2023)(Browning, J.), the Court held that it had subject matter jurisdiction over the plaintiffs' claims, which properly arose under a range of federal statutes. See 2023 WL 5727468, *96-97. In Darr v. New Mexico Dep't of Game & Fish, 403 F. Supp. 3d 967 (D.N.M. 2019)(Browning, J.), a case removed from State court, the Court remanded the case, because the plaintiff's complaint was "based entirely on New Mexico employment and disability causes of action, none of which on their face turn on a federal issue." 403 F. Supp. 3d at 1015. The Court also exercised its supplemental jurisdiction under 28 U.S.C. § 1367(a) to

hear State-law claims that were a part of the same federal claims over which the Court had original jurisdiction.  See, e.g., 2023 WL 5727468, *98-99.

## LAW REGARDING FEDERAL QUESTION JURISDICTION

A federal district court has "original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."  28 U.S.C. § 1331.  Federal-question jurisdiction exists when "a federal question is presented on the face of the plaintiff's properly pleaded complaint."  Caterpillar, Inc. v. Williams, 482 U.S. 386, 392 (1987)(citing Gully v. First Nat'l Bank, 299 U.S. 109, 112-13 (1936)).  As "the master of the claim," the plaintiff may choose to sue in state court rather than in federal court "by exclusive reliance on state law."  Caterpillar, Inc. v. Williams, 482 U.S. at 392.

The defendant may not try to sneak a federal question through the back door by raising a federal defense, for "it is now settled law that a case may not be removed to federal court on the basis of a federal defense . . . even if the defense is anticipated in the plaintiff's complaint, and even if both parties concede that the federal defense is the only question truly at issue."  Caterpillar, Inc. v. Williams, 482 U.S. at 393 (citing Franchise Tax Bd. v. Constr. Laborers Vacation Trust, 463 U.S. 1, 12 (1983)).  See Nicodemus v. Union Pac. Corp., 318 F.3d 1231, 1236 (10th Cir. 2003)("It is well settled that '[a] defense that raises a federal question is inadequate to confer federal jurisdiction.'" (quoting Merrell Dow Pharmaceuticals, Inc. v. Thompson, 478 U.S. 804, 808 (1986))).  While a plaintiff is free to plead a federal question in his complaint, "a defendant cannot, merely by injecting a federal question into an action that asserts what is plainly a state-law claim, transform the action into one arising under federal law, thereby selecting the forum in which the claim shall be litigated."  Caterpillar, Inc. v. Williams, 482 U.S. at 399.  Even the plaintiff can go only so far in attempting to invoke federal-question jurisdiction,

because "[a]ny statements in the complaint which go beyond a statement of the plaintiff's claim and anticipate or reply to a probable defense are to be disregarded" in deciding whether federal-question jurisdiction exists.  Mescalero Apache Tribe v. Martinez, 519 F.2d 479, 481 (10th Cir. 1975).

In addition to the requirement that the federal question appear on the complaint's face, a "plaintiff's cause of action must either be: (i) created by federal law; or (ii) if it is a state-created cause of action, 'its resolution must necessarily turn on a substantial question of federal law.'" Nicodemus v. Union Pac. Corp., 318 F.3d 1231, 1235 (10th Cir. 2003)(quoting Merrell Dow Pharmaceuticals, Inc. v. Thompson, 478 U.S. at 808).  As for the second method, beyond the requirement of a "substantial" federal-law question at the case's heart, the federal question also must be "actually disputed," and its resolution must be necessary to the case's resolution.  Grable & Sons Metal Prods. v. Darue Eng'g & Mfg., 545 U.S. 308, 314 (2005).  Finally, the exercise of federal-question jurisdiction must also be "consistent with congressional judgment about the sound division of labor between state and federal courts governing the application of § 1331." Grable & Sons Metal Prods. v. Darue Eng'g & Mfg., 545 U.S. at 313.  In particular, the court must determine whether recognition of federal-question jurisdiction will federalize a "garden variety" state law claim that will overwhelm the judiciary with cases traditionally heard in state courts.  Grable & Sons Metal Prods. v. Darue Eng'g & Mfg., 545 U.S. at 318-19 (explaining that "there must always be an assessment of any disruptive portent in exercising federal jurisdiction" in accepting "garden variety" state law claims).  See David L. Hanselman, Supreme Court Federal Removal Jurisdiction, For the Defense at 25, 65, 129 S.Ct. 365, September 2005.  The Supreme Court has underscored that "the mere presence of a federal issue in a state cause of action does not automatically confer federal-question jurisdiction."   Merrell Dow

Pharmaceuticals, Inc. v. Thompson, 478 U.S. at 813.  Indeed, the Supreme Court has "forcefully

reiterated" that district courts must exercise "prudence and restraint" when determining whether

a state cause of action presents a federal question, because "determinations about federal

jurisdiction require sensitive judgments about congressional intent, judicial power, and the

federal system." Merrell Dow Pharmaceuticals, Inc. v. Thompson, 478 U.S. at 810.  See Morris

v. City of Hobart, 39 F.3d 1105, 1111 (10th Cir. 1994).

### LAW REGARDING THE UNITED STATES' SOVEREIGN IMMUNITY

The United States, as the sovereign, "cannot be sued without its consent."  Garcia v.

United States, 709 F. Supp. 2d 1133, 1137 (D.N.M. 2010)(Browning, J.).  A court has no

jurisdiction over a suit against the United States unless the United States consents to be sued.

See United States v. Mitchell, 463 U.S. 206, 212 (1983)(holding that it is "axiomatic that the

United States may not be sued without its consent and that the existence of consent is a

prerequisite for jurisdiction"); FDIC v. Meyer, 510 U.S. 471, 475 (1983)("Sovereign immunity is

jurisdictional in nature."); Cortez v. E.E.O.C., 585 F. Supp. 2d 1273, 1282 (D.N.M.

2007)(Browning, J.)("If Congress has not waived sovereign immunity, the federal court does not

have jurisdiction to hear the claim.").  The United States' agencies also have sovereign immunity

absent a waiver.  See FDIC v. Meyer, 510 U.S. at 475 ("Absent a waiver, sovereign immunity

shields the Federal Government and its agencies from suit."); Cortez v. E.E.O.C., 585 F. Supp.

2d at 1283.  Furthermore, "[w]hen the acts complained of by the plaintiff pertain to actions of

defendants in their official capacity as agents of the United States, the claim is, in actuality,

against the United States." Begay v. Pub. Serv. Co. of N.M., 710 F. Supp. 1161, at 1190

(D.N.M. 2010)(Browning, J.).   See Kentucky v. Graham, 473 U.S. 159, 165-166

(1985)(recognizing that suits against officials in their official capacities "represent only another

way of pleading an action against an entity of which an officer is an agent").  "The party bringing suit against the United States bears the burden of proving that sovereign immunity has been waived."  James v. United States, 970 F.2d 750, 753 (10th Cir. 1992).

Congress often has waived the United States' sovereign immunity by statute.  Such statutory waivers of the United States' sovereign immunity "must be unequivocally expressed in statutory text" and cannot be "implied."  Lane v. Pena, 518 U.S. 187, 192 (1996).  See Pueblo of Jemez v. United States, 430 F. Supp. 3d 943, 1149-50 (D.N.M. 2019)(Browning, J.), amended on reconsideration, 483 F. Supp. 3d 1024 (D.N.M. 2020), aff'd in part, vacated in part, rev'd in part, 63 F.4th 881 (10th Cir. 2023).  Accordingly, a "statute's legislative history cannot supply a waiver that does not appear clearly in any statutory text."  Lane v. Pena, 518 U.S. at 192.  "Moreover, a waiver of the Government's sovereign immunity will be strictly construed, in terms of its scope, in favor of the sovereign."  Lane v. Pena, 518 U.S. at 192.  For example, the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 2671-2680, waives sovereign immunity "for certain torts that United States employees cause while acting within the scope of their office or of their employment," De Baca v. United States, 403 F. Supp. 3d 1098, 1121 (D.N.M. 2019)(Browning, J.); Cortez v. E.E.O.C., 585 F. Supp. 2d at 1284 ("The only statutory authority to sue the United States for common-law torts is under the Federal Tort Claims Act . . . .").  Similarly, the Tucker Act, 28 U.S.C. § 1491, establishes a waiver of sovereign immunity for non-tortious claims seeking money damages "founded either upon the Constitution, or any Act of Congress, or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491.

Perhaps the most important waiver of the United States' sovereign immunity is found in 5 U.S.C. § 702, which provides a limited waiver of sovereign immunity for challenges to agency action that do not seek money damages.  See United States v. Murdock Mach. & Eng'g Co. of Utah, 81 F.3d 922, 930 n.8 (10th Cir. 1996)(noting that 5 U.S.C. § 702 provides "a general waiver of the government's sovereign immunity from injunctive relief").  Specifically, under 5 U.S.C. § 702, the United States waives sovereign immunity as to actions "in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority." 5 U.S.C. § 702.  The waiver found in 5 U.S.C. § 702 "is not limited to suits under the Administrative Procedure Act."  Simmat v. U.S. Bureau of Prisons, 413 F.3d 1225, 1233 (10th Cir. 2005).  See Gilmore v. Weatherford, 694 F.3d 1160, 1166 n.1 (10th Cir. 2012)("Whether plaintiffs' claims arise under the APA or common law is also immaterial with respect to the sovereign immunity analysis."); Jarita Mesa Livestock Grazing Ass'n v. U.S. Forest Serv., 58 F. Supp. 3d 1191, 1223 (D.N.M. 2014)(Browning, J.).  Because "the APA does not grant subject-matter jurisdiction," however, the APA cannot waive sovereign immunity "when the relevant statute 'precludes judicial review' or when 'agency action is committed to agency discretion by law.'"  New Mexico v. McAleenan, 450 F. Supp. 3d at 1194-95 (quoting 5 U.S.C. § 701(a)(1)-(2)).

## ANALYSIS

The Court denies the Plaintiffs' request for a TRO.  First, the Court concludes that it has jurisdiction over the Plaintiffs' non-APA claims, because: (i) the Plaintiffs have established standing to bring their claims; (ii) the APA provides a waiver of the United States' sovereign immunity; and (iii) the Court has jurisdiction pursuant to 28 U.S.C. § 1331 over the Plaintiffs

non-APA claims.  Second, the Court concludes that the Plaintiffs have not demonstrated that they are entitled to a TRO, because: (i) there is not a substantial likelihood that the Plaintiffs will succeed on the merits, because the Plaintiffs do not identify an appropriate cause of action and their allegations are legally insufficient to state claims upon which relief can be granted; (ii) the Plaintiffs are not likely to suffer irreparable injury absent a TRO; and (iii) the threatened injury does not outweigh the damage the proposed injunction may cause the Defendants, and a TRO is adverse to the public interest.

## I.       THE COURT HAS JURISDICTION OVER THE PLAINTIFFS' CLAIMS.

"Federal courts are courts of limited jurisdiction . . . ."  Montoya v. Chao, 296 F.3d 952, 955 (10th Cir. 2002).  Federal courts are therefore "empowered to hear only those cases authorized and defined in the Constitution which have been entrusted to them under a jurisdictional grant by Congress."  Henry v. Off. of Thrift Supervision, 43 F.3d 507, 511 (10th Cir. 1994).  Accordingly, pursuant to the Article III's core limitation that federal courts hear only cases or controversies plaintiffs must demonstrate their Constitutional standing to bring their claims and satisfy the various prudential standing requirements.  See Bennett v. Spear, 520 U.S. 154, 167 (1997); U.S. Const. Art. III, § 2, cl. 1.  In addition, sovereign immunity bars a court's jurisdiction where plaintiffs sue the United States and its agencies, and do not identify a proper waiver of immunity.  See United States v. Mitchell, 463 U.S. at 212.  Finally, plaintiffs must properly invoke the Court's subject matter jurisdiction by, for instance, identifying in their complaint a cause of action "created by federal law."  Nicodemus v. Union Pac. Corp., 318 F.3d at 1235.  See 28 U.S.C. § 1331 ("The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States.").  A plaintiff generally bears the burden of demonstrating the court's jurisdiction to hear his or her claims.

See Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 104 (1998).  Courts, therefore, "presume no jurisdiction exists absent an adequate showing by the party invoking federal jurisdiction."  U.S. ex rel. Hafter v. Spectrum Emergency Care, Inc., 190 F.3d 1156, 1160 (10th Cir. 1999).  "Jurisdictional issues must be addressed first and, if they are resolved against jurisdiction, the case is at an end."  Franklin Sav. Corp., In re, 385 F.3d 1279, 1286 (10th Cir. 2004)("Franklin").  See Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 94 (1998).  The Court concludes that the Plaintiffs in this case have satisfied the three primary hurdles to establishing the Court's jurisdiction.  First, the Plaintiffs have demonstrated that they have Article III standing to bring their claims.  Second, the § 702 of the APA provides a waiver of the United States' sovereign immunity for the Plaintiffs claims seeking redress for harm suffered as a result of alleged agency action.  Third, § 1331 confers federal-question jurisdiction over the Plaintiffs' non-APA claims; however, the Court lacks jurisdiction over the Plaintiffs' APA claims because the Plaintiffs do not challenge a final agency action.  The Court explains each conclusion in turn.

## A.    THE PLAINTIFFS HAVE STANDING TO BRING THEIR CLAIMS.

The Supreme Court has derived from Article III's limitation on the judicial power to resolve cases and controversies "a set of requirements that together make up the 'irreducible constitutional minimum of standing.'"  Lexmark Int'l, Inc. v. Static Control Components, Inc., 572 U.S. 118, 127 (2014)(quoting Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992)). Together, these requirements ensure the presence of the "concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions."  Baker v. Carr, 369 U.S. 186, 204 (1962).  See Sierra Club v. Morton, 405 U.S. 727, 740 (1972)(recognizing that "[t]he requirement that a party seeking review must

allege facts showing that he is himself adversely affected" serves to "put the decision . . . in the hands of those who have a direct stake in the outcome").  The standing doctrine also promotes the Constitutional separation of powers, because where real need to exercise judicial review "does not exist, allowing courts to oversee legislative or executive action 'would significantly alter the allocation of power . . . away from a democratic form of government.'"  Summers v. Earth Island Inst., 555 U.S. 488, 493 (2009)(quoting United States v. Richardson, 418 U.S. 166, 188 (1974)(Powell, J., concurring)).  To establish standing under Article III, a plaintiff must demonstrate: (i) an injury in fact; (ii) that the injury is fairly traceable to the defendant's challenged action; and (iii) that the injury is likely to be redressed by a favorable ruling.  See Lujan v. Defenders of Wildlife, 504 U.S. at 560-61.  Here, the Court concludes that the Plaintiffs have met all three requirements and thereby establishing standing to bring their claims.

## 1.    The Plaintiffs Demonstrate an Injury in Fact.

The requirement that a plaintiff demonstrate an injury in fact is "the '[f]irst and foremost' of standing's three elements."  Spokeo, Inc. v. Robins, 578 U.S. 330, 338-39 (2016), as revised (May 24, 2016)(quoting Steel Co. v. Citizens for Better Environment, 523 U.S. 83, 103 (1998)). "To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'"  Spokeo, Inc. v. Robins, 578 U.S. at 339 (quoting Lujan v. Defenders of Wildlife, 504 U.S. at 560).  While the Supreme Court has not defined precisely what is meant by a legally protected interest, see In re Special Grand Jury 89-2, 450 F.3d 1159, 1172 (10th Cir. 2006), the Supreme Court's cases make clear that "'legally protected interests' may arise from the Constitution, from common law, or 'solely by virtue of statutes creating legal rights, the invasion of which creates standing,'"  Cottrell v. Alcon Lab'ys, 874 F.3d 154, 164 (3d Cir.

2017)(quoting Lujan v. Defenders of Wildlife, 504 U.S. at 576-78).  An injury is "concrete" if it "actually exist[s]" and is "'real'" rather than "'abstract.'"  Spokeo, Inc. v. Robins, 578 U.S. at 339 (quoting Webster's Third New International Dictionary 472 (1971)).  "For an injury to be 'particularized,' it 'must affect the plaintiff in a personal and individual way.'"  Spokeo, Inc. v. Robins, 578 U.S. at 339 (quoting Lujan v. Defenders of Wildlife, 504 U.S. at 560).  An injury is "imminent" if it is "certainly impending."  Clapper v Amnesty Int'l USA, 568 U.S. 398, 409 (2013).

Here, to fulfill the injury requirement, the Plaintiffs allege an "injury to the attorney-client relationship."  Reply at 4.  See Complaint ¶¶ 66-69, at 18-19.  Specifically, the Plaintiffs contend that the communications they have received from FEMA and NRCS staff have damaged and interfered with their HPCCAA-conferred "right to have legal representation during the administrative regulatory process."   Reply at 4.  As an initial matter, the Court notes that the Plaintiffs do not contend that they have suffered a "tangible" injury, such as the loss of money or property, as a result of the alleged interference.  Spokeo, Inc. v. Robins, 578 U.S. at 340.  That fact is not fatal to their claim, however, because that an injury must be concrete does not mean that it must be "tangible."  Spokeo, Inc. v. Robins, 578 U.S. at 340 ("Although tangible injuries are perhaps easier to recognize, we have confirmed in many of our previous cases that intangible injuries can nevertheless be concrete.").  Nevertheless, "[e]ach subsidiary element of injury -- a legally protected interest, concreteness, particularization, and imminence -- must be satisfied." Trichell v. Midland Credit Mgmt., Inc., 964 F.3d 990, 996-97 (11th Cir. 2020).  As outlined in the sections that follows, the Court concludes that: (i) the Plaintiffs' right to their attorney-client relationship constitutes a "legally protected interest"; (ii) the alleged interference with that right is "concrete" and "particularized" enough to constitute a judicially cognizable injury sufficient to

confer standing; and (iii) the alleged injury is "actual or imminent, not conjectural or hypothetical." Lujan v. Defenders of Wildlife, 504 U.S. at 560.

>   **a.    The Right to an Attorney-Client Relationship is a Legally Protected Interest.**

The Court first concludes that a plaintiff's right in his or her attorney-client relationship is a "legally protected interest." Lujan v. Defenders of Wildlife, 504 U.S. at 560.  See Initiative & Referendum Inst. v. Walker, 450 F.3d 1082, 1093 (10th Cir. 2006)(recognizing that "the term 'legally protected interest' . . . has independent force and meaning" (no citation given for quotation)).  To determine whether an asserted interest is legally protected for the purposes of standing, the Tenth Circuit advises that courts "consider whether the plaintiffs have a legal right to do what is allegedly being impeded." Citizen Ctr. v. Gessler, 770 F.3d 900, 910 (10th Cir. 2014).  Here, the Plaintiffs have a legal "right to retain and consult an attorney," and to communicate freely with their chosen representation. DeLoach v. Bevers, 922 F.2d 618, 620 (10th Cir. 1990). See Eng v. Cooley, 552 F.3d 1062, 1069 (9th Cir. 2009)(identifying the "long-recognized First Amendment right to hire and consult an attorney"); Final Rule at 59730-01 ("[C]laimants have the right to hire an attorney . . . .").

Furthermore, because "an interest can support standing even if it is not protected by law," the Tenth Circuit has further advised "that once an interest has been identified as a 'judicially cognizable interest' in one case, it is such an interest in other cases as well (although there may be other grounds for granting standing in one case but not the other)." In re Special Grand Jury 89-2, 450 F.3d 1159, 1172 (10th Cir. 2006).  In Shaffer v. Def. Intel. Agency, 601 F. Supp. 2d 16 (D.D.C. 2009)(Kessler, J.), the plaintiffs "requested injunctive and declaratory relief that would permit them to discuss classified information . . . with their counsel" in connection with

Congressional investigations into a Civilian Defense Intelligence Agency program in which the plaintiffs had taken part.  601 F. Supp. 2d at 23.  The plaintiffs asserted that they had "a First Amendment constitutional right 'to share classified . . . information . . . to obtain effective legal representation that would permit adequate guidance and analysis' on relevant legal claims."  601 F. Supp. 2d at 23-24 (quoting the record).  Noting the "importance of the attorney-client relationship," the Court concluded that, "when Plaintiff Shaffer is deprived of the ability to convey all his knowledge to his attorney, he suffers an actual, concrete injury sufficient to confer standing."  601 F. Supp. 2d at 27.  Similarly, in <u>Denius v. Dunlap</u>, 209 F.3d 944 (7th Cir. 2000), the United States Court of Appeals for the Seventh Circuit concluded that the plaintiff alleged sufficiently an injury in fact for the purposes of standing where he alleged impairment to "the right to seek counsel from an attorney."  209 F.3d at 952 n.4.  The Seventh Circuit held that the right "is arguably impaired by a requirement that attorney-client communications be made available to a public employer."  209 F.3d at 952 n.4.  The Court concludes that these analyses are persuasive, and inform that Court's analysis in the present case.  Accordingly, the Court concludes that the Plaintiffs here have identified a legally protected interest in their relationship with their attorneys.

> **b.      The Plaintiffs' Alleged Injury is Sufficiently Concrete and Particularized.**

The Court turns next to whether the alleged "invasion of" this interest is sufficiently "concrete" and "particularized" to confer standing.  <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. at 560.  "For an injury to be particularized, it 'must affect the plaintiff in a personal and individual way.'"  <u>Laufer v. Looper</u>, 22 F.4th 871, 876 (10th Cir. 2022)(quoting <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. at 560 n.1).  The "'concrete'" requirement mandates that an injury be "'real"

rather than "'abstract.'"   Spokeo v. Robins, 578 U.S. at 340 (quoting Webster's Third New International Dictionary 472 (1971); Random House Dictionary of the English Language 305 (1967)).   "In determining whether an intangible harm is sufficiently concrete to constitute an injury in fact, we look to both history and to the judgment of Congress."   Lupia v. Medicredit, Inc., 8 F.4th 1184, 1191 (10th Cir. 2021).   See Laufer v. Looper, 22 F.4th at 876-77.   First, the court's inquiry into history "asks whether plaintiffs have identified a close historical or common-law analogue for their asserted injury."   TransUnion LLC v. Ramirez, 594 U.S. 413, 424 (2021). Second, "because Congress is well positioned to identify intangible harms that meet minimum Article III requirements, its judgment is also instructive and important."   Spokeo v. Robins, 578 U.S. at 341.

For example, in Lupia v. Medicredit, Inc., the plaintiff received a voicemail message on an unanswered collections call from the defendant debt collector despite that the defendant had received from the plaintiff a cease-and-desist letter the day before.   See 8 F.4th at 1189.   In undertaking its analysis of "whether an intangible harm is sufficiently concrete to constitute an injury in fact," the Tenth Circuit first looked to history, and determined that the defendant's voicemail, left after the plaintiff sent written notice disputing the debt and requesting that it cease telephone communications, constituted an injury bearing a "close relationship" to the common-law tort of intrusion upon seclusion.   8 F.4th at 1191.   As the Tenth Circuit recognizes, even though "a single phone call may not intrude to the degree required at common law," the fact that the intrusion "poses the same *kind* of harm recognized at common law" satisfies the requirement that the alleged harm share a "'close relationship'" to a historical analogue.   8 F.4th at 1191-92 (quoting Gadelhak v. AT&T Servs., Inc., 950 F.3d 458, 462-63 (7th Cir. 2020)).   Next, the Tenth Circuit considered Congress's judgment, and the Tenth Circuit found instructive the fact that

"[i]n enacting the [statute pursuant to which the plaintiff brought suit], Congress recognized that abusive debt-collection practices may intrude on another's privacy interests." Lupia v. Medicredit, Inc., 8 F.4th at 1192. Based on this assessment of history and congressional judgment, the Tenth Circuit concluded that the Plaintiff's alleged injury was sufficiently concrete. See Lupia v. Medicredit, Inc., 8 F.4th at 1193.

Here, as the Tenth Circuit instructs, the Court begins with history. Because the "case-or-controversy requirement" from which the standing doctrine derives "is grounded in historical practice, it is instructive to consider whether an alleged intangible harm has a close relationship to a harm that has traditionally been regarded as providing a basis for a lawsuit in English or American courts." Spokeo, Inc. v. Robins, 578 U.S. at 340-41. Here, the Plaintiffs' alleged harm to their attorney-client relationship is analogous to a common-law claim for tortious interference with an attorney-client contractual relationship. This tort imposes liability for interferences with an attorney-client relationship where: (i) the defendant interferes with a business or contractual right; (ii) the interference was wrongful, and not otherwise excusable; and (iii) the interference caused damages. See Wells v. Redwine, 41 F. App'x 327, 333 (10th Cir. 2002)(citing Thompson v. Box, 889 P.2d 1282, 1284 (Okla. Ct. App. 1994)). Courts have recognized tortious interference with an attorney-client relationship where a third party interferes with an attorney-client relationship by inducing a breach of the relationship, see, e.g., Marks v. Struble, 347 F. Supp. 2d 136, 144 (D.N.J. 2004)(Cooper, J.), or where the interference prevents the attorney from performing his or her professional duties, or renders the performance of professional duties more difficult or burdensome, see, e.g., Grund v. Donegan, 298 Ill. App. 3d 1034, 1038 (1st Dist. 1998). Although it is attorneys who almost always bring claims for tortious interference with the attorney-client relationship, a plaintiff may also make a claim. See,

e.g., Ahmed v. Waterman S.S. Corp., 382 F. Supp. 2d 923, 928 (E.D. Mich. 2005)(Feikens, J.)(dismissing a client's action under Michigan law against medical care providers for intentional interference with the attorney-client relationship when there was no termination of the attorney-client relationship, but only disruption).

The Plaintiffs' claim in this case closely parallels tortious interference with the attorney-client relationship's first two prima facie elements: (i) the Plaintiffs establish that they have a contractual relationship with counsel, see FOF ¶¶ 50, 55, 66, at 12-14; and (ii) they allege a wrongful interference with this contractual relationship, see Complaint ¶ 68, at 19.  In cases in which it is the client, and not the attorney, who brings the claim for tortious interference with the attorney-client relationship, the client ordinarily must prove financial loss or a termination of the attorney-client relationship.  See Ahmed v. Waterman S.S. Corp., 382 F. Supp. 2d at 928 ("Plaintiff only alleges an 'intent' to disrupt Plaintiff's relationship with his legal counsel . . . and Plaintiff does not even allege [a] termination of [the] relationship."); Vill. Mgmt., Inc. v. Hartford Acc. & Indem. Co., 662 F. Supp. 1366, 1378 (N.D. Ill. 1987)("[P]laintiffs owe some explanation of just how they can claim to have been damaged by the assertedly tortious interference (a seemingly dubious prospect).").  It is not dispositive, however, that the actions of FEMA and NCRS staff instructing the Plaintiffs to terminate their attorney-client relationship may not rise to the level of an actionable claim for tortious interference of attorney-client relationship, because "'[w]hen Spokeo instructs us to analogize to harms recognized by the common law, we are meant to look for a close relationship in kind, not degree."  Lupia v. Medicredit, Inc., 8 F.4th at 1192 (quoting Gadelhak v. AT&T Servs., Inc., 950 F.3d at 462-63).  While an instruction from a federal agency staff member to get rid of one's legal representation that does not result in the termination of the attorney-client relationship "may not intrude to the

degree required at common law," the communication "poses the same *kind* of harm recognized at common law."  Lupia v. Medicredit, Inc., 8 F.4th at 1192 (emphasis in original)(concluding that the plaintiff alleged a concrete harm, despite that "a single phone call" would not substantiate a claim for intrusion upon seclusion at common law).  See TransUnion LLC v. Ramirez, 594 U.S. at 424 ("Spokeo does not require an exact duplicate in American history and tradition.").  The Court concludes, therefore, that the existence of the common-law claim for tortious interference with the attorney-client relationship suggests that the Plaintiffs' alleged injury is concrete for Article III's purposes.

Moreover, although the degree of harm that the Plaintiffs allegedly suffered is minimal, it is still sufficient for standing purposes.  Unlike the plaintiffs in Shaffer v. Def. Intel. Agency, where the federal employees were barred from sharing any classified information related to the investigations into their conduct, the Defendants' alleged interference in the Plaintiffs' attorney-client relationship is not so severe that it has prevented the Plaintiffs from communicating with their attorneys.  See 601 F. the Supp. 2d at 21.  Indeed, even after the alleged communications, the Plaintiffs' relationship with their attorneys has retained sufficient vitality to bring this lawsuit.  Nonetheless, it is plausible that a federal employee's admonition to "withdraw" from one's legal representation, FOF ¶ 50, at 12, would "chill[]" one's ability to engage in their attorney-client relationship, Denius v. Dunlap, 209 F.3d at 952 n.4 (concluding that the plaintiff suffered an injury in fact sufficient to confer standing based on a potential chilling effect on his right to seek counsel).  Because open and uninhibited communication between a client and attorney comprise the core of a plaintiff's judicially cognizable interest in his or her attorney-client relationship, the Court concludes that, where this communication is "compromised," even in a slight way, "a plaintiff suffers a concrete injury."  Shaffer v. Def.

Intel. Agency, 601 F. Supp. 2d at 27.   See Plant Oil Powered Diesel Fuel Sys., Inc. v. ExxonMobil Corp., 801 F. Supp. 2d 1163, 1179 (D.N.M. 2011)(Browning, J.)("'Injury in fact is a low threshold, which . . . may simply be the fear or anxiety of future harm.'" (quoting Ross v. Bank of America, 524 F.3d 217, 222 (2nd Cir. 2008))(alteration added)).

Turning briefly to the "judgment of Congress," the Court concludes that the HPCCAA's recognition that claimants could retain counsel demonstrates sufficiently that Congress places importance in an individual's relationship with his or her attorney.   Spokeo, Inc. v. Robbins, 136 S. Ct. at 1549.   See HPCCAA 104(j); 88 FR 59730-01 ("[C]laimants have the right to hire an attorney . . . .").   While Congress did not, in the HPCCAA, explicitly "elevate" the invasion of the attorney-client relationship "to the status of [a] concrete, de facto injur[y]," Laufer v. Looper, 22 F.4th at 877 (quoting Spokeo, Inc. v. Robbins, 136 S. Ct. at 341)(alterations added), the Court "needn't rely on Congress's 'say-so' alone," because the Plaintiffs' "claims have roots in long-standing common-law tradition," Lupia v. Medicredit, Inc., 8 F.4th at 1184 (quoting TransUnion LLC v. Ramirez, 594 U.S. at 426).   Congress' recognition in the HPCCAA that claimants may retain counsel, therefore -- while not necessary to the Court's determination that the Plaintiffs allege an injury that is sufficiently concrete -- provides additional support for this conclusion. Finally, each Plaintiff alleges injuries that are sufficiently "particularized," because each Plaintiff alleges they suffered harm "in a personal and individual way," when they each received personally-directed communications from FEMA and NRCS staff.   Spokeo, Inc. v. Robbins, 136 S. Ct. at 339.   Each Plaintiff, therefore, demonstrates a "'personal stake' in the outcome of litigation . . . sufficient to show particularity." Kansas Nat. Res. Coal. v. United States Dep't of Interior, 971 F.3d 1222, 1244-45 (10th Cir. 2020)(Lucero, J., dissenting)(quoting Gwaltney of

Smithfield, Ltd. v. Chesapeake Bay Found., Inc., 484 U.S. 49, 66 & n.5 (1987)).  In sum, the

Plaintiffs allege intangible injuries that are both concrete and particularized.

**c.**     <u>**The Plaintiffs Allege Actual or Imminent Injuries**</u>.

The final injury-in-fact requirement is that the alleged injury be "actual or imminent, not

conjectural or hypothetical."  <u>Lujan v. Defs. of Wildlife</u>, 504 U.S. at 560.  "An alleged future

injury is sufficiently imminent 'if the threatened injury is certainly impending, or there is a

substantial risk that the harm will occur.'"  <u>Laufer v. Looper</u>, 22 F.4th at 876 (quoting <u>Susan B.

Anthony List v. Driehaus</u>, 573 U.S. 149, 158 (2014)).  Here, the Plaintiffs' alleged injuries are

sufficiently imminent.  The Plaintiffs do not allege that FEMA and NCRS might interfere with

their attorney-client relationships "some day" in the future, <u>Lujan v. Defs. of Wildlife</u>, 504 U.S.

at 564; rather, the Plaintiffs allege "actual, ongoing, persistent" instances of allegedly illegal

communications, TRO Brief at 13, and identify specific instances in which these

communications are alleged to have occurred.  As is the case here, imminence is satisfied where

"both the challenged conduct and the attendant injury have already occurred."  <u>Robins v.

Spokeo, Inc.</u>, 867 F.3d 1108, 1118 (9th Cir. 2017).  In conclusion, because the Plaintiffs allege a

concrete, particularized, and imminent invasion of a legally protected interest, the Court

concludes that the Plaintiffs have suffered an injury in fact sufficient for Article III's purposes.[7]

---

[7]The Court's conclusion that the Plaintiffs have suffered an injury in fact sufficient for standing purposes says nothing about the Plaintiffs potential for success on the merits, because "standing in no way depends on the merits of the plaintiff's contention that particular conduct is illegal."  <u>Warth v. Seldin</u>, 422 U.S. 490, 500 (1975).  <u>See</u> <u>Initiative & Referendum Inst. v. Walker</u>, 450 F.3d 1082, 1093 (10th Cir. 2006)("Standing does not go to merits . . . .").  To conflate the injury-in-fact inquiry with the distinct questions whether the plaintiff has identified a sufficient cause of action and has alleged facts sufficient to plead a legal violation "would effectively collapse our evaluation under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim into an Article III standing evaluation," <u>Cottrell v. Alcon Lab'ys</u>, 874 F.3d 154, 164 (3d Cir. 2017), and would "put the merits cart before the standing horse," <u>Initiative &</u>

2.     **The Plaintiffs Demonstrate Causation and Redressability.**

As the next step in its standing analysis, the Court concludes that the Plaintiffs' alleged injury is fairly traceable to the Defendants' challenged conduct.  "[T]o show that an injury is 'fairly traceable' to the challenged conduct, a plaintiff must allege 'a substantial likelihood that the defendant's conduct caused plaintiff's injury in fact.'"  Santa Fe All. for Pub. Health & Safety v. City of Santa Fe, 993 F.3d 802, 814 (10th Cir. 2021)(quoting Nova Health Sys. v. Gandy, 416 F.3d 1149, 1156 (10th Cir. 2005)).  A defendant satisfies the causation "requirement by advancing allegations which, if proven, allow for the conclusion that the challenged conduct is a 'but for' cause of the injury"; however, this showing "does not require a plaintiff to establish that the defendant was the proximate cause of its injury."  Santa Fe All. for Pub. Health & Safety v. City of Santa Fe, 993 F.3d at 814 (quoting Petrella v. Brownback, 697 F.3d 1285, 1293 (10th Cir. 2012)).  Here, the Plaintiffs' allegations establish that FEMA and NRCS' conduct -- i.e., the agencies' attorneys directing their employees to interfere with represented claimants' attorney-client relationships -- is a but-for cause of the alleged injury to the attorney-client relationship.  See Bennett v. Spear, 520 U.S. 154, 169 (1997)(observing that the defendant's action need not be the "very last step in the chain of causation").

Finally, at the last step of the standing analysis, the Court concludes that the requested declaratory relief likely will redress the alleged injury.  "The Supreme Court has rejected interpretations of the rule that demand complete redressability, stressing that a plaintiff need show only that a favorable decision would redress 'an injury,' not 'every injury.'"  Consumer

Referendum Inst. v. Walker, 450 F.3d at 1093.  See City of Waukesha v. Envtl. Prot. Agency, 320 F.3d 228, 235 (D.C. Cir. 2003)("[I]n reviewing the standing question, the court must be careful not to decide the questions on the merits for or against the plaintiff, and must therefore assume that on the merits the plaintiffs would be successful in their claims.").

Data Indus. Ass'n v. King, 678 F.3d 898, 902 (10th Cir. 2012)(quoting Larson v. Valente, 456 U.S. 228, 243 n.15 (1982)).  A showing that the alleged risk of harm "would be reduced to some extent if petitioners received the relief they seek" may satisfy the redressability requirement. Massachusetts v. EPA, 549 U.S. 497, 526 (2007).  Here, the Plaintiffs allege that they are continuing to receive unauthorized contact from FEMA and NRCS' representatives, see FOF ¶ 61, at 14, and request that the Court enter injunctive relief to "enjoin[]" the Defendants "from unauthorized contact with represented claimants, including not being allowed to present settlement offers to represented claimants without advice of claimants' counsel," Complaint ¶ 72, at 19.  By preventing the Defendants from such unauthorized contact, the requested relief would settle "some dispute which affects the behavior of the defendant toward the plaintiff."  Hewitt v. Helms, 482 U.S. 755, 761 (1987).  The Court concludes, therefore, that the Plaintiffs have demonstrated sufficiently their standing to bring their claims.

## B.  THE PLAINTIFFS HAVE IDENTIFIED A SUFFICIENT WAIVER OF THE UNITED STATES' SOVEREIGN IMMUNITY IN THE APA.

Next, the Court assesses the question of the United States' sovereign immunity.  The United States, as sovereign, "cannot be sued without its consent," Garcia v. United States, 709 F. Supp. 2d at 1137, and a court has no jurisdiction over a suit against the United States unless the latter consents to be sued, see United States v. Mitchell, 463 U.S. at 212.  Moreover, and relevant here, the United States' sovereign immunity also shields from suit United States' agencies absent a waiver.  See FDIC v. Meyer, 510 U.S. at 475.  Accordingly, for a claim to proceed against the United States, the plaintiff must identify a congressional waiver of sovereign immunity that is "unequivocally expressed in statutory text." Lane v. Pena, 518 U.S. at 192.  See James v. United States, 970 F.2d at 753 ("The party bringing suit against the United States bears the burden of

proving that sovereign immunity has been waived.").  Such "a waiver of the Government's sovereign immunity will be strictly construed, in terms of its scope, in favor of the sovereign." Lane v. Pena, 518 U.S. at 192.

As an initial matter, the Court concludes that each of the Defendants in this matter are entitled to sovereign immunity.  As noted above, each of the United States agencies named as defendants are entitled to sovereign immunity.  See FDIC v. Meyer, 510 U.S. at 475.  Likewise, Defendant Angela Gladwell is entitled to sovereign immunity, because the Plaintiffs sue Gladwell in her official capacity, see Complaint at 1, and "[w]hen the acts complained of by the plaintiff pertain to actions of defendants in their official capacity as agents of the United States, the claim is, in actuality, against the United States," Begay v. Pub. Serv. Co. of N.M., 710 F. Supp. 2d at 1190.  See Atkinson v. O'Neill, 867 F.2d 589, 590 (10th Cir. 1989).

On the question of waiver, the Plaintiffs argue that "Congress waived sovereign immunity for Plaintiffs to seek redress through the administrative process passed under the [HPCCAA]," which the Plaintiffs contend "provides a limited waiver of sovereign immunity for Plaintiffs to file suit to enforce and protect their right granted under the Act to be represented by counsel."  Reply at 2.  In addition, the Plaintiff's Complaint asserts that the APA waives sovereign immunity.  See Complaint ¶ 6, at 3; 5 U.S.C. § 702.  The Court concludes that: (i) the HPCCAA's limited sovereign immunity waiver does not enable the Plaintiffs' claims to proceed against the Defendants; but (ii) nevertheless, the Plaintiffs' claims are entitled to the APA's sovereign immunity waiver.  The Court explains these conclusions below.

1. **The HPCCAA Does Not Provide a Sufficient Waiver of the United States' Sovereign Immunity.**

The Court concludes that, while the HPCCAA contains a limited waiver of the United States' sovereign immunity, the Plaintiffs' claims do not fall within the waiver's limited scope. The HPCCAA provides that

> [a]ny claimant aggrieved by a final decision of the Administrator under this Act may, not later than 60 days after the date on which the decision is issued, bring a civil action in the United States District Court for the District of New Mexico, to modify or set aside the decision, in whole or in part.

HPCCAA § 104(i)(1).  See 44 C.F.R. § 296.43 ("[A] claimant dissatisfied with the outcome of an Administrative Appeal may seek judicial review of the decision by bringing a civil lawsuit against FEMA in the United States District Court for the District of New Mexico.").  The HPCCAA's regulations state that a "final decision" reviewable by the district court pursuant to Section 104(i)(1) is "[t]he Director of the Claims Office's decision on the Administrative Appeal."  44 C.F.R. § 296.41(h).  An Administrative Appeal is defined as "an appeal of the Authorized Official's Determination," and an Authorized Official's Determination, in turn, is "a report signed by an Authorized Official and mailed to the claimant evaluating each element of the claim as stated in the Proof of Loss and determining the compensation, if any, due to the claimant."  44 C.F.R. § 296.4.  In reviewing the Administrator's final decision, the district court "may only consider evidence in the Administrative Record," and the Court must "uphold FEMA's decision if it is supported by substantial evidence on the record considered as a whole."  44 C.F.R. § 296.43.  In sum, the HPCCAA and its attendant regulations establish a system by which a claimant may "bring a civil action in the United States District Court for the District of New Mexico, to modify or set aside" the decision rendered on the claimant's appeal of their compensation determination.  HPCCAA § 104(i)(1).  See 44 C.F.R. §§ 296.41(h), 296.4.

Because the claimant's right to sue FEMA in federal court is "unequivocally expressed in statutory text," the Court concludes that Section 104(i)(1) constitutes a limited waiver of sovereign immunity.  Lane v. Pena, 518 U.S. at 192.  See Oschwald v. Fed. Emergency Mgmt. Agency, No. CIV 04-667, 2005 WL 8164370 (D.N.M. January 26, 2005)(Torgerson, M.J.)(recognizing a limited waiver of sovereign immunity in the Cerro Grande Fire Assistance Act's, Pub. L. 106-246, 114 Stat 511, nearly identical judicial review provision); S. Rehab. Grp., P.L.L.C. v. Sec'y of Health & Hum. Servs., 732 F.3d 670, 678 (6th Cir. 2013)(recognizing that "Congress provided a limited waiver of sovereign immunity in the" similar language found in § 405(g) of the Medicare Act "by permitting claimants to file civil actions seeking judicial review of the Secretary's final decision").  In its response to comments on its proposed final rule, now codified at 44 C.F.R. 296, FEMA explicitly acknowledged as much and expressed -- in accordance with the Court's conclusion -- that the HPCCAA provides "a limited waiver of sovereign immunity."  Hermit's Peak/Calf Canyon Fire Assistance, 88 Fed. Reg. 59747.  See id. at 59746 ("In the Act, the United States accepted responsibility for damage resulting from the Fire and waived sovereign immunity to compensate victims in tort.").  Having concluded that a sovereign immunity waiver exists, the Court must now construe the waiver's scope to assess whether the waiver allows the Plaintiffs to bring their claims.

The waiver of sovereign immunity found in the HPCCAA contains an important limitation.  Like many similarly worded sovereign immunity waivers found in comparable federal schemes providing for judicial review of agency final decisions, § 104(i) requires claimants to exhaust their remedies under the HPCCAA by obtaining "a final decision of the Administrator" before seeking judicial review of FEMA's final decision.  HPCCAA § 104(i)(1). See 44 C.F.R. §§ 296.41 ("[A] claimant dissatisfied with the outcome of an Administrative

Appeal may seek judicial review of the decision by bringing a civil lawsuit against FEMA in the United States District Court for the District of New Mexico . . . .").  Just as the § 104(i) waives sovereign immunity for judicial review of a FEMA "final decision" under the HPCCAA, HPCCAA § 104(i)(1), 42 U.S.C. § 405 "provides for district court review of the Secretary's determinations" under the Social Security Act, 42 U.S.C. §§ 1301-1305 ("SSA"), Weinberger v. Salfi, 422 U.S. 749, 764 (1975).  Specifically, § 405(g) provides that "[a]ny individual, after any final decision of the Secretary made after a hearing . . . , may obtain a review of such decision by a civil action commenced within sixty days after the mailing to him of notice of such decision . . . ." 42 U.S.C. § 405(g).

In Weinberger v. Salfi, the Supreme Court concluded that the SSA's requirement that plaintiffs obtain "a final decision of the Secretary made after a hearing" was a jurisdictional prerequisite to seeking judicial review by filing a civil action in district court.  To reach this conclusion, the Supreme Court reasoned that the final decision requirement is "central to the requisite grant of subject-matter jurisdiction -- the statute empowers district courts to review a particular type of decision by the Secretary, that type being those which are 'final' and 'made after a hearing.'"  422 U.S. at 764.  The following year, however, the Supreme Court qualified the jurisdictional nature of § 405(g)'s final decision condition, explaining that the condition "consists of two elements, only one of which is purely 'jurisdictional' in the sense that it cannot be 'waived' by the Secretary in a particular case."  Mathews v. Eldridge, 424 U.S. 319, 328 (1976)(no citation given for quotation).  In Mathews v. Eldridge -- more famous as a Constitutional case, but also containing important holdings about administrative exhaustion -- the Supreme Court concludes that, first, § 405(g) contains a "'jurisdictional' requirement that claims be presented to the agency, and second, a 'waivable . . . requirement that the administrative

remedies prescribed by the Secretary be exhausted.'" <u>Smith v. Berryhill</u>, 139 S. Ct. 1765, 1773 (2019)(quoting <u>Mathews v. Eldridge</u>, 424 U.S. at 328). <u>See Kildare v. Saenz</u>, 325 F.3d 1078, 1082 (9th Cir. 2003)("A final decision [under § 405(g)] has two elements: (1) presentment of the claim to the Commissioner, and (2) complete exhaustion of administrative remedies.").

By way of analogy to § 405(g), the Court concludes that the final-decision condition on the HPCCAA's sovereign immunity waiver also "consists of two elements." <u>Mathews v. Eldridge</u>, 424 U.S. at 328. <u>See</u> HPCCAA § 104(i)(1); <u>Bartlett v. Schweiker</u>, 719 F.2d 1059, 1060 (10th Cir. 1983)("[T]here are two components to the final decision requirement of § 405(g) . . . ."). First, "claimants are required to have presented their claims to" FEMA. <u>S. Rehab. Grp., P.L.L.C. v. Sec'y of Health & Hum. Servs.</u>, 732 F.3d at 678. Second, "claimants must exhaust their administrative remedies resulting in a final decision," <u>S. Rehab. Grp., P.L.L.C. v. Sec'y of Health & Hum. Servs.</u>, 732 F.3d at 678, by: (i) filing a notice of loss and, subsequently, signing a proof of loss, <u>see</u> 44 C.F.R. § 296.5(b)(c); (ii) obtaining a determination from an Authorized Official, <u>see</u> 44 C.F.R. § 296.5(d); (iii) filing a notice of appeal, <u>see</u> 44 C.F.R. § 296.41(a); and (iv) obtaining a final decision on appeal, <u>see</u> 44 C.F.R. § 296.41(h); <u>Stansberry v. United States</u>, No. CIV 18-1563, 2018 WL 5619741, at *3 (N.D. Cal. October 29, 2018)(Westmore, J.)(describing § 405(g)'s "administrative review process" as involving: "(1) an initial determination; (2) reconsideration; (3) a hearing before an ALJ; and (4) review by the Appeals Council"). If the Plaintiffs have not exhausted their administrative claims, they may show that the Court should waive the exhaustion requirement by demonstrating that "the claim is (1) collateral to a substantive claim of entitlement (collaterality); (2) colorable in its showing that denial of relief will cause irreparable harm (irreparability); and (3) one whose resolution would not serve the purposes of exhaustion (futility)." <u>Sensory Neurostimulation, Inc., v. Azar</u>, 977

F.3d 969, 981 (9th Cir. 2020).  The Court concludes that the Plaintiffs presented their claims, but have not demonstrated that the HPCCAA's exhaustion requirement should be waived.

> a.  **The Plaintiffs Have Properly Presented Their Attorney-Client Interference Claim.**

The first question is whether the Plaintiffs have satisfied § 104(i)'s non-waivable presentment condition.  To satisfy "the nonwaivable and nonexcusable requirement that an individual present a claim to the agency before raising it in court," Shalala v. Illinois Council on Long Term Care, Inc., 529 U.S. 1, 15 (2000), a plaintiff must demonstrate that the agency had an "opportunity to rule on a concrete claim for reimbursement," Heckler v. Ringer, 466 U.S. 602, 622 (1984).  In the § 405(g) context, to properly present their claim, a claimant must, at a minimum, submit "a concrete claim for payment" to the agency by filing a claim for relief under the statutory scheme that contains the sovereign immunity waiver.  Heckler v. Ringer, 466 U.S. at 622.  See RICU LLC v. U.S. Dep't of Health & Hum. Servs., 22 F.4th 1031, 1037 (D.C. Cir. 2022)("[P]resentment requires submission of a concrete claim for payment.").  In Heckler v. Ringer, for example, one plaintiff brought suit challenging the Constitutionality of an agency rule disallowing Medicare reimbursement for a particular without ever undergoing the surgery in question and filing a claim for reimbursement under the statutory scheme.  466 U.S. at 620.  The Supreme Court held that the plaintiff had "not satisfied the nonwaivable exhaustion requirement of § 405(g)," and -- in reasoning sounding in present-day standing principles -- reasoned that allowing individuals in the plaintiff's position to challenge the rule "would be inviting them to bypass the exhaustion requirements of the Medicare Act by simply bringing declaratory judgment actions in federal court before they undergo the medical procedure in question."  466 U.S. at 621-22.  See Weinberger v. Salfi, 422 U.S. at 764 (concluding that the court lacked

jurisdiction over putative class members who did not allege "that they ha[d] even filed an application" for benefits).  In the social security context, the Supreme Court has recognized that the presentment requirement is rooted in 405(g)'s statutory authorization of judicial review after the claimant has obtained a final decision.  See Mathews v. Eldridge, 424 U.S. at 328 ("Absent [presentment] there can be no 'decision' of any type. And some decision by the Secretary is clearly required by the statute.").

Under the HPCCAA's similar final-decision requirement, the Plaintiffs also must demonstrate that they have presented their attorney-client relationship interference claims to FEMA.  The Court concludes that the Plaintiffs have satisfied the HPCCAA's presentment requirement.  First, the Plaintiffs have submitted to FEMA "a concrete claim for payment" under the HPCCAA, RICU LLC v. U.S. Dep't of Health & Hum. Servs., 22 F.4th at 1037, by filing their Notices of Loss, see FOF ¶¶ 51, 62, 66, at 12, 14.  See Bartlett v. Schweiker, 719 F.2d at 1061 n.2 ("The record demonstrates that six plaintiffs, by presenting the Secretary with a claim for benefits, have met the nonwaivable 'jurisdictional' element." (quoting the record)); Hanson v. Saul, No. CIV 19-8425, 2019 WL 5538920, at *1 (C.D. Cal. October 25, 2019)(Audero, M.J.)("The nonwaivable presentment requirement generally is satisfied by the filing of an application for benefits.").  In addition, the Plaintiffs have presented their specific claims that FEMA and NRCS attorneys are directing agency employees to interfere with their attorney-client relationship by sending the Notice of Impermissible Government Contact, see FOF ¶¶ 41-42, at 10-11, thereby putting FEMA on notice of their concerns and providing FEMA an "opportunity to rule" on the matter, Heckler v. Ringer, 466 U.S. at 622, "in the context of [their] specific administrative claim[s] for payment," Am. Hosp. Ass'n v. Azar, 895 F.3d 822, 826 (D.C. Cir. 2018).  See Mathews v. Eldridge, 424 U.S. at 329 ("Through his answers to the state agency

questionnaire, and his letter in response to the tentative determination that his disability had

ceased, he specifically presented the claim that his benefits should not be terminated because he

was still disabled."); StimLabs, LLC v. Becerra, 651 F. Supp. 3d 56, 60-61 (D.D.C.

2023)(Mehta, J.)(concluding that the plaintiff satisfied § 405(g)'s presentment requirement in

relation to their allegation that the Center for Medicare and Medicaid Services had an unwritten

policy to deny certain claims for Medicare reimbursement by separately "challenging

a . . . specific adverse reimbursement decision" through the administrative process).[8]

Accordingly, the Plaintiffs have satisfied the HPCCAA's presentment requirement.

---

[8]At least one district court has recently noted that the Supreme Court in Mathews v. Eldridge, by determining that "[t]he fact that Eldridge failed to raise with the Secretary his constitutional claim to a pretermination hearing" did not mean he failed to present the claim, 424 U.S. at 329, "suggested, if not held, that satisfying the presentment requirement does *not* demand the full airing of all arguments before the agency." StimLabs, LLC v. Becerra, 651 F. Supp. 3d at 61. In StimLabs, LLC v. Becerra, the Honorable Amit P. Mehta, United States District Judge for the United States District Court for the District of Columbia, reasoned further that "[w]hether the plaintiff's failure to assert a particular argument before the agency defeats a court's exercise of jurisdiction would seem to be more appropriately considered under the second, waivable jurisdictional component: exhaustion of administrative remedies." StimLabs, LLC v. Becerra, 651 F. Supp. 3d at 61. There is post-Mathews v. Eldridge case law to the contrary, however, that indicates that putting the agency on notice of the specific matter the Plaintiff seeks to raise in court in connection with their concrete claim for relief remains a crucial prerequisite to presentment. See Homewood Pro. Care Ctr., Ltd. v. Heckler, 764 F.2d 1242, 1253 (7th Cir. 1985)("Because the Medicare Act clearly requires the presentation of all disputes including any and all constitutional questions to the Board, we hold that the requirement that the constitutional question be presented is nonwaivable.").

While Mathews v. Eldridge demonstrates that certain claims, particularly those alleging Constitutional violations, need not be specifically addressed to the relevant agency to satisfy presentment, the Court concludes that, here, the Plaintiffs must, as they did here by sending the Notice of Impermissible Government Contact, put FEMA on notice of their attorney-client relationship interference claims to satisfy § 104(i)'s presentment requirement. The Supreme Court in Mathews v. Eldridge justified its conclusion that the plaintiff could satisfy 405(g)'s presentment requirement despite failing to "raise with the Secretary his constitutional claim," which sought "substantial changes in the current administrative review system," on the basis that the claim raised an issue over which the Secretary "had no authority" to resolve. 424 U.S. at 329-30. By contrast, here, FEMA could address the Plaintiffs' concerns regarding interference with their attorney-client relationship without requesting that Congress amend the HPCCAA.

### b. The Plaintiffs Have Not Properly Exhausted Their Claims nor Demonstrated that the Exhaustion Requirement Should be <u>Waived</u>.

Next, the second requirement is that the Plaintiffs exhaust the prescribed administrative procedures or, in the alternative, demonstrate that "the exhaustion requirement should be waived." <u>Bartlett v. Schweiker</u>, 719 F.2d at 1061. It is here that the Plaintiffs' attempt to identify in HPCCAA § 104(i) a waiver of sovereign immunity sufficient to bring their claims falters. As an initial matter, the Plaintiffs do not allege that they have exhausted their administrative remedies under the HPCCAA by obtaining a final decision from FEMA or otherwise following the procedures outlined in in HPCCAA § 104(i) and 44 C.F.R. 296 beyond filing their initial notices of loss. <u>See</u> FOF ¶ 72, at 15. This fact, however, is not fatal. As with § 405(g), the Court concludes that § 104(i)'s administrative exhaustion requirement is waivable. <u>See</u> <u>Mathews v. Eldridge</u>, 424 U.S. at 328 ("The waivable element is the requirement that the administrative remedies prescribed by the Secretary be exhausted."). "This requirement can be waived in two ways." <u>Bartlett v. Schweiker</u>, 719 F.2d at 1061. First, FEMA can waive the exhaustion requirement if it "is satisfied that no further review is warranted either because the internal needs of the agency are fulfilled or because the relief sought is beyond his power to confer." <u>Bartlett v. Schweiker</u>, 719 F.2d at 1061. "Second, a reviewing court may find a

---

Furthermore, the Supreme Court has, since <u>Mathews v. Eldridge</u>, reiterated the fact that, "[a]t a minimum . . . the matter must be presented to the agency prior to review in a federal court." <u>Shalala v. Illinois Council on Long Term Care, Inc.</u>, 529 U.S. at 24. Finally, the requirement that a claimant present their specific issue to the agency before they can satisfy the presentment requirement comports with a key purpose of administrative exhaustion: providing the agency with an opportunity to remedy a claimants concern without judicial intervention. <u>See</u> <u>Shalala v. Illinois Council on Long Term Care, Inc.</u>, 529 U.S. at 24 ("Proceeding through the agency in this way provides the agency the opportunity to reconsider its policies, interpretations, and regulations in light of those challenges.").

waiver . . . ."  Bartlett v. Schweiker, 719 F.2d at 1061.  Here, the Plaintiffs do not allege and the Court likewise concludes that FEMA has not waived the exhaustion requirement, because the Defendants dispute that the Plaintiffs have identified within the HPCCAA a sufficient waiver of sovereign immunity, see Response at 10, and maintain that the HPCCAA provides the proper mechanism to resolve the Plaintiffs' claims, see Tr. at 39:14-40:24 (Sydow).

The Plaintiffs must demonstrate, therefore, that the Court should find a waiver of § 104(i)'s exhaustion requirement.  "Although the discretion to waive the exhaustion requirement ordinarily rests with the Secretary, *Mathews* held that a court may infer waiver 'where a claimant's interest in having a particular issue resolved promptly is so great that deference to the agency's judgment is inappropriate.'"  Reed v. Heckler, 756 F.2d 779, 783 (10th Cir. 1985)(quoting Mathews v. Eldridge, 424 U.S. at 330).  "Waiver is warranted if the claim is (1) collateral to a substantive claim of entitlement (collaterality); (2) colorable in its showing that denial of relief will cause irreparable harm (irreparability); and (3) one whose resolution would not serve the purposes of exhaustion (futility)."  Sensory Neurostimulation, Inc., v. Azar, 977 F.3d 969, 981 (9th Cir. 2020).  See Rylee v. Apfel, No. CIV 98-1314, 1999 WL 35808938, at *1 (D.N.M. September 1, 1999)(Svet, M.J.)(applying the same three-part test).  In performing this three-part (sub)analysis, the Court concludes that, while the Plaintiffs attorney-client relationship interference claims are collateral to their claims for relief under the HPCCAA, they have not met the irreparability or futility requirements.

### i.     The Plaintiffs' Claims are Collateral to the Relief that the Administrative Proceeding Provides.

First, the Plaintiffs' claims that FEMA and NRCS attorneys are interfering with their relationships with their attorneys are collateral to their substantive claims for relief under the

HPCCAA.  A claim is not collateral if it seeks the same relief available under the statutory scheme.  See Fam. Rehab., Inc. v. Azar, 886 F.3d 496, 503 (5th Cir. 2018)("[I]f plaintiffs request relief that is proper under the organic statute . . . the claim is not collateral."); Rylee v. Apfel, 1999 WL 35808938, at *1 ("A Plaintiff's claim is collateral if it is not essentially a claim for benefits."); StimLabs, LLC v. Becerra, 651 F. Supp. 3d at 63 ("Plaintiffs' 'procedural' objection to the Secretary's failure to engage in rulemaking is, at bottom, a request for Medicare reimbursement." (no citation given for quotation)).  Furthermore, "[i]f the court must examine the merits of the underlying dispute, delve into the statute and regulations, or make independent judgments as to plaintiffs' eligibility under a statute, the claim is not collateral."  Fam. Rehab., Inc. v. Azar, 886 F.3d at 503.  See StimLabs, LLC v. Becerra, 651 F. Supp. 3d at 63 ("Nor is Plaintiffs' procedural claim one that is sufficiently divorced from the merits of coverage determinations.").

Here, the Plaintiffs seek injunctive relief prohibiting interference with their attorney-client relationship, and, therefore, their claim does not seek the same relief available under the HPPCCA, namely, money damages for harm resulting from the Hermit's Peak Fire.  Much like the class members' claim that the defendants "had adopted an unlawful, unpublished policy under which countless deserving claimants were denied benefits" in the Supreme Court's decision in Bowen v. City of New York, 476 U.S. 467, 473 (1986), the Plaintiffs' do not seek from the Court the same relief that might be afforded them through Congress' administrative scheme.  Furthermore, adjudicating the Plaintiffs' claim of interference would not require the Court to "examine the merits of the underlying" claims for monetary relief under the HPCCAA, nor require it to "delve into" the HPCCAA and its regulations.  Fam. Rehab., Inc. v. Azar, 886 F.3d at 503.  See Gen. Med., P.C. v. Sec'y of U.S. Dep't of Health & Hum. Servs., No. CIV 22-

11976, 2023 WL 6164556, at *8 (E.D. Mich. September 21, 2023)(Leitman, J.)("This request for procedural relief is entirely collateral to Plaintiffs' substantive claim for the permanent reinstatement of their reimbursement payments."); Complaint ¶¶ 66-85, at 18-21 (seeking injunctive and declaratory relief).  The Court concludes, therefore, that the Plaintiff's claims are collateral to those they present administratively.

### ii.   Enforcing the Exhaustion Requirement Will Not Irreparably Harm the Plaintiffs.

The Plaintiffs do not, however, make a colorable showing "that denial of relief will cause irreparable harm," such that the exhaustion requirement should be waived.   Sensory Neurostimulation, Inc., v. Azar, 977 F.3d at 981.  "The requirement of a colorable claim is not a stringent one," Abraham v. Exxon Corp., 85 F.3d 1126, 1129 (5th Cir. 1996), and a plaintiff need show nothing more than "some possible validity," Richardson v. United States, 468 U.S. 317, 326 n.6 (1984).   Accordingly, the standard that the Plaintiffs must meet to satisfy the "irreparability" requirement of the exhaustion waiver analysis is less stringent than that they must meet to demonstrate that they have suffered irreparable harm for the purposes of the TRO they request, which the Court analyzes infra, at 114-17.  StimLabs, LLC v. Becerra, 651 F. Supp. 3d at 64 (agreeing with the plaintiffs on reconsideration that the court initially "applied the wrong standard" in determining whether the plaintiffs made a colorable claim that requiring them to exhaust would cause irreparable injury when it "relied on the more stringent injunction standard").  But see Nat'l Ass'n for Home Care & Hospice, Inc. v. Burwell, 77 F. Supp. 3d 103, 111 (D.D.C. 2015)(Cooper, J.)("[A] plaintiff generally must demonstrate more than economic distress, even if severe.").  Nonetheless, the Plaintiffs do not meet the low bar of demonstrating that their attorney-client relationship or their chances of obtaining monetary relief through the

claims process would be irreparably harmed if the Court were to require them to proceed through the claims process. In arguing that they will suffer irreparable harm, the Plaintiffs contend only that "the harm to Plaintiffs' attorney-client relationships has caused and will continue to cause irreparable harm to Plaintiffs." TRO Memo. at 14. The claims process and FEMA's internal guidance, however, allows the Plaintiffs to proceed through the claims process while maintaining their representation and the integrity of their attorney-client relationship. See FOF ¶ 36, at 9. The Plaintiffs have not alleged any facts demonstrating that, following communications from FEMA and NRCS employees informing the Vigils and Griego that they must terminate their attorney-client relationships to proceed through the claims process, see FOF ¶ 50, at 12, and following Romero's communication to Sandoval that he would talk only to Sandoval directly, see FOF ¶¶ 70-71, at 15, their relationship with their attorneys has been damaged in any way, and FEMA and NRCS have made it clear that the Plaintiffs can continue to have counsel if they choose to proceed through the claims process, see FOF ¶ 36, at 9. Moreover, the Plaintiffs have not alleged that any economic harm may result from agency employees' alleged interference with their attorney client relationship or demonstrated how the interference reduces their chance of recovery under the HPCCAA. See StimLabs, LLC v. Becerra, 651 F. Supp. 3d at 65 ("Nor has APC asserted that other adverse consequences would flow from administrative review."). Cf. Fam. Rehab., Inc. v. Azar, 886 F.3d at 503 ("Family Rehab maintains that its bankruptcy will have detrimental effects on its employees and patients."); Gen. Med., P.C. v. Sec'y of U.S. Dep't of Health & Hum. Servs., 2023 WL 6164556, at *8 ("[I]f Plaintiffs were to go out of business while the suspension is pending, prevailing at a later administrative hearing would provide them no benefit. These allegations are sufficient to satisfy the 'colorable claim' element of the 'entirely collateral' exception." (quoting Fam. Rehab., Inc. v. Azar, 886 F.3d at 504)). In sum,

the Plaintiffs' conclusory allegation that they will suffer irreparable harm does not constitute a colorable showing that they will be irreparably harmed if the exhaustion requirement is enforced. See Bartlett v. Schweiker, 719 F.2d at 1062 ("[T]here were no allegations as to such elements of irreparable harm in plaintiffs' complaint and no such showing was made in their response to the defendant's motion to dismiss and supporting affidavit.  Thus, we cannot agree that . . . the plaintiffs alleged or made a showing of the degree of irreparable harm . . . .").

### iii. Requiring the Plaintiffs to Exhaust Their Administrative Remedies Would Not Be Futile.

In addition, the Plaintiffs have not satisfied the "futility" requirement by demonstrating that their claim is "one whose resolution would not serve the purposes of exhaustion."  Sensory Neurostimulation, Inc. v. Azar, 977 F.3d at 981.  "Futility is established if exhausting administrative remedies 'would not serve the policies underlying exhaustion.'"  Sensory Neurostimulation, Inc. v. Azar, 977 F.3d at 981 (quoting Cassim v. Bowen, 824 F.2d 791, 795 (9th Cir. 1987)).  "[T]he court must consider whether judicial resolution of the issue will interfere with the agency's efficient functioning, deny the agency the ability to self-correct, or deprive the Court of the benefits of the agency's expertise and an adequate factual record."  Nat'l Ass'n for Home Care & Hospice, Inc. v. Burwell, 77 F. Supp. 3d at 111.

> "Exhaustion is generally required as a matter of preventing premature interference with agency processes, so that the agency may function efficiently and so that it may have an opportunity to correct its own errors, to afford the parties and the courts the benefit of its experience and expertise, and to compile a record which is adequate for judicial review."

Weinburger v. Salfi, 422 U.S. at 765.  Were the Plaintiffs to present their claims that FEMA and NRCS employees are interfering with their relationships with counsel to the agencies through the claims process, FEMA and NRCS would have the opportunity "to self-correct" by amending

their internal policies regarding their communication with represented claimants.  Nat'l Ass'n for
Home Care & Hospice, Inc. v. Burwell, 77 F. Supp. 3d at 111.  In fact, it appears that this
correction may already have occurred by way of the Plaintiffs' communications with FEMA
attorneys.  After receiving the alleged communications from FEMA and NRCS employees, the
Plaintiffs expressed to the agencies their concern that they would not be able to maintain attorney
representation were they to proceed through the claims process.  See FOF ¶¶ 41-42, at 10-11.
FEMA responded and clarified that the Plaintiffs are more than welcome to retain their
representation while simultaneously pursuing relief through the claims process.  See FOF ¶ 43, at
11.  See Sensory Neurostimulation, Inc. v. Azar, 977 F.3d at 982 ("[T]hese proceedings might
result in the agency changing its mind and providing coverage for Relaxis, so further
proceedings would serve the policy of allowing the agency to 'correct its own errors through
administrative review.'" (quoting Johnson v. Shalala, 2 F.3d 918, 922 (9th Cir. 1993)).
Furthermore, ordering that FEMA and NRCS communicate with claimants in a certain way at
this early stage in the Plaintiffs' claims process experience would constitute "premature
interference with agency processes" and would prevent the agencies from "function[ing]
efficiently" as they carry out the HPCCAA's statutory mandate.  Weinburger v. Salfi, 422 U.S. at
765.  Rather, requiring the Plaintiffs to continue through the claims process would provide
FEMA and NRCS with the proper latitude to determine how best to carry out Congress' mandate
to compensate expeditiously those whom the Hermit's Peak Fire injured while course correcting
for ambiguities and addressing claimant concerns regarding the claims process, as already has
occurred in this case.  See Weinburger v. Salfi, 422 U.S. at 765.

   In conclusion, this case is not one "where the claimant's interest in having a particular
issue promptly resolved is so great that deference to the Secretary's judgment is inappropriate"

and the requirement that the Plaintiffs exhaust their remedies should be waived.  Mathews v. Eldridge, 424 U.S. at 330.  Accordingly, because the Plaintiffs have not exhausted their administrative remedies by obtaining a final decision under the HPCCAA, they may not take advantage of the limited waiver of sovereign immunity in § 104(i), and the Court has no jurisdiction over their claims under the HPCCAA.

>    **c.    Had the Plaintiffs Satisfied the HPCCAA's Final-Decision Requirement, Their Properly Presented and Exhausted Attorney-Client Interference Claims Would Fall Within the Scope of § 104(i)'s Sovereign Immunity Waiver.**

Had the Plaintiffs properly exhausted their claims or had they demonstrated that the Court should waive the exhaustion requirement, then the Plaintiffs' claims and their requested relief would fall within the scope of the HPCCAA's waiver, permitting the Court to entertain their claims.  See F.A.A. v. Cooper, 566 U.S. 284, 291 (2012)("The question that confronts us here is not whether Congress has consented to be sued for damages under the Privacy Act.  That much is clear from the statute . . . .  Rather, the question at issue concerns the scope of that waiver.").  In considering the scope of a waiver of the United States' sovereign immunity, the Court must be mindful of certain principles.  "The Supreme Court has oft repeated . . . that '[t]o abrogate sovereign immunity, Congress must make its intent unmistakably clear in the language of the statute.'"  Miller v. United States, 71 F.4th 1247, 1252 (10th Cir. 2023)(quoting LAC du Flambeau Band of Lake Superior Chippewa Indians v. Coughlin, 599 U.S. 382, 387 (2023)).  "For the same reason that we refuse to enforce a waiver that is not unambiguously expressed in the statute, we also construe any ambiguities in the scope of a waiver in favor of the sovereign."  F.A.A. v. Cooper, 566 U.S. 284, 291 (2012).  See Miller v. United States, 71 F.4th at 1252 ("[W]e must construe ambiguities regarding the waiver's scope in favor of the sovereign.").

Courts must apply traditional tools of statutory construction to determine whether the scope of Congress' sovereign immunity waiver is "clearly discernable from the statutory text." F.A.A. v. Cooper, 566 U.S. at 291. Courts may not "rely on legislative history" when "construing a congressional waiver of sovereign immunity." Miller v. United States, 71 F.4th at 1252.

In construing waivers of sovereign immunity, courts must often confront two interrelated questions regarding the waiver's scope: (i) what claims against the United States may be brought pursuant to the waiver; and (ii) what relief is available against the United States pursuant to the waiver. Regarding the first question, Section 405(g) of the Social Security Act, for example, "empowers district courts to review a particular type of decision by the Secretary, that type being those which are 'final' and 'made after a hearing.'" Weinberger v. Salfi, 422 U.S. at 764 (quoting 42 U.S.C. § 405(g)). In evaluating which kinds of claims may be brought pursuant to § 405(g)'s waiver, the Supreme Court recognizes that courts may review Constitutional claims which the claimant brings, and that have been adequately presented and exhausted. See Schweiker v. Chilicky, 487 U.S. 412, 424 (1988)("Once these elaborate administrative remedies have been exhausted, a claimant is entitled to seek judicial review, including review of constitutional claims."). In Mathews v. Eldridge, for example, Eldridge, whom the SSA had notified that his disability benefits would be terminated, "challeng[ed] the constitutional validity of the administrative procedures established . . . for assessing whether there exists a continuing disability" and sought "immediate reinstatement of benefits." Mathews v. Eldridge, 424 U.S. at 325-36. The Supreme Court concluded that the district court had subject-matter jurisdiction pursuant to § 405(g) to determine whether the denial of benefits was proper and also Eldridge's "constitutional claim to a pretermination hearing." Mathews v. Eldridge, 424 U.S. at 329-32. See Gen. Med., P.C. v. Sec'y of U.S. Dep't of Health & Hum. Servs., 2023 WL 6164556, at *8

(concluding that the Plaintiffs, who alleged "that the suspension of their Medicare payments violates the Due Process Clause . . . , satisfied the prerequisites for judicial review under Section 405(g) and . . . established that the claim is not barred by sovereign immunity," despite that the defendant argued that "the claims are barred by sovereign immunity because those claims do not qualify for review under the limited immunity waiver in Section 405(g)").  This result makes sense, because, to exercise properly its congressionally conferred "power to enter . . . a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security," 42 U.S.C. § 405(g), the Court, necessarily, would be obligated to review the Constitutionality of the procedural processes leading to the final decision.  Thus, the attendant Constitutional claims are intertwined with the court's review of the final decision, and, thus, fit comfortably within the sovereign immunity waiver Congress has provided to review final decisions.

This conclusion is not to say that plaintiffs are "permitted to bootstrap" all properly presented and exhausted claims through "a limited waiver of sovereign immunity" such as the waiver found in § 405(g).  S. Rehab. Grp., P.L.L.C. v. Sec'y of Health & Hum. Servs., 732 F.3d at 676-78.  Because "the jurisdiction granted by § 405(g) is limited to 'affirming, modifying, or reversing the [final] decision of the Commissioner,'" Washington v. Soc. Sec. Admin., No. CIV 19-0097, 2019 WL 2410407, at *4 (N.D. Ind. June 6, 2019)(Brady, J.), aff'd sub nom. Washington v. Saul, 788 F. App'x 388 (7th Cir. 2019), "courts lack jurisdiction to hear . . . claims for additional relief sought against the Commissioner," Gardner v. United States Comm'r of Soc. Sec., No. CIV 16-2940, 2018 WL 1470266, at *3 (S.D. Cal. March 26, 2018)(Houston, J.).  For example, district courts have declined to find that § 405(g) waives the United States' sovereign immunity for claims brought under the FTCA, see Stansberry v. United States, No. CIV 18-1563, 2018 WL 5619741, at *7-8 (N.D. Cal. October 29, 2018)(Westmore,

J.)("Congress and the SSA have not waived the government's sovereign immunity for Plaintiff's claim for negligence because the only limited waiver of sovereign immunity lies within 42 U.S.C. §§ 405(g) and 405(h), where parties can seek judicial review of SSA decisions from ALJs."); Gardner v. United States Comm'r of Soc. Sec., No. CIV 16-2940, 2018 WL 1470266, at *3 (S.D. Cal. March 26, 2018)(concluding that "any FTCA claim against the Commissioner must be dismissed," because the plaintiff has not demonstrated that sovereign immunity should be waived pursuant to the FTCA, and "the Court lacks jurisdiction to hear Plaintiff's claims for the additional relief sought against the Commissioner" under § 405(g)).

Regarding the second question inherent in interpreting a sovereign immunity waiver's scope -- what relief the waiver authorizes against the United States -- the Supreme Court has held that district courts can grant injunctive relief under § 405(g), despite that § 405(g) "speaks only of the power to enter a judgment 'affirming, modifying, or reversing the decision of the Secretary . . . .'" Califano v. Yamasaki, 442 U.S. 682, 704-05 (1979)(no citation given for quotation). The Supreme Court reasoned that the Secretary of the Department of Health, Education, and Welfare's argument that § 405(g) did not authorize courts to enter injunctive relief was "too grudging," and explained that, "[a]bsent the clearest command to the contrary from Congress, federal courts retain their equitable power to issue injunctions in suits over which they have jurisdiction." Califano v. Yamasaki, 442 U.S. at 705. See Livermore v. Heckler, 743 F.2d 1396, 1405 (9th Cir. 1984)("The Secretary contends on appeal that the sovereign immunity of the United States precludes any relief other than prospective relief. This is incorrect."). At the same time, because § 405(g) provides that a district court may only "affirm, modify, or reverse a decision of the Secretary," the Supreme Court has suggested that § 405(g) does not empower

courts to "enter an injunctive decree whose operation reaches beyond the particular applicants before the court." Weinberger v. Salfi, 422 U.S. at 763 n.8.

Courts may, likewise, enter declaratory relief pursuant to § 405(g). While the Declaratory Judgment Act, 28 U.S.C.A. §§ 2201-2202, does not provide an independent basis for jurisdiction, it enlarges the range of remedies a federal court may award. See Skelly Oil Co. v. Phillips Petroleum Co., 339 U.S. 667, 671 (1950); McGrath v. Weinberger, 541 F.2d 249, 252 (10th Cir. 1976). Accordingly, where § 405(g) grants the court jurisdiction and waives the United States' sovereign immunity, courts have held that the Declaratory Judgment Act enlarges the relief they may grant. See Trujillo v. Schweiker, 558 F. Supp. 1058, 1064 (D. Colo. 1983)(Kane, J.)(holding that the plaintiffs could seek declaratory relief against the Secretary of Health and Human Services where jurisdiction is premised on § 405(g)); Perez v. Sec'y of Health, Ed. & Welfare, 354 F. Supp. 1342, 1345 n.1 (D.P.R. 1972)(Toledo, J.)("Although this cause was filed under Title 42, United States Code, Section 405(g), as a final decision of the defendant, subject to review by this Court, it properly presents a request for a declaratory judgment . . . ."). On the other hand, the Supreme Court has concluded that "money damages" are not available pursuant § 405(g)'s waiver of sovereign immunity. Schweiker v. Chilicky, 487 U.S. at 424. See Donnelly v. Barnhart, 80 F. App'x 701, 702 (2d Cir. 2003)("[T]he United States has not waived its sovereign immunity for claims by a Social Security claimant seeking monetary relief in addition to benefits awards."). Nor may § 405(g) sustain claims seeking "damages for pain and suffering." Washington v. Soc. Sec. Admin., 2019 WL 2410407, at *4. See Walker v. Colvin, No. CIV 13-1762, 2013 WL 5737701, at *3 (N.D. Cal. October 21, 2013)(Davila, J.)("[T]he court lacks jurisdiction over any claim for tort damages because

Congress has not allowed plaintiffs 'a remedy in damages for emotional distress or for other hardships . . . .'" (quoting Schweiker v. Chilicky, 487 U.S. at 425)).

Applying these principles derived from the Social Security context to the HPCCAA's limited waiver of sovereign immunity, the Court concludes that, had the Plaintiffs met the HPCAA's final-decision requirement, § 104(i) would waive the United States' sovereign immunity such that the Court could review their attorney-client interference claims on the merits. First, the Plaintiffs' claims that FEMA and NRCS counsel are interfering with their attorney-client relationship are sufficiently intertwined with the Court's hypothetical review of FEMA's final decisions as to the Plaintiffs' HPCAA claims.  To evaluate properly and to determine whether "to modify or set aside" FEMA's final decisions, the Court necessarily would be required to determine whether FEMA or NRCS violated federal law by interfering with the Plaintiffs' relationship with their attorneys.  In this way, the Plaintiffs' attorney-client relationship interference claims bear close resemblance to Constitutional due process claims brought pursuant to § 405(g) challenging the sufficiency of agency procedural processes, which the Supreme Court has held district courts may review as part of their evaluation of agency final decisions.  See Mathews v. Eldridge, 424 U.S. at 332.  Moreover, had the Plaintiffs satisfied 104(i)'s exhaustion condition, their attorney-client relationship interference claims would not be "premised on something other than judicial review" of FEMA's final decision, Walker v. Colvin, 2013 WL 5737701, at *3, as would be the case, for instance, if the Plaintiffs brought a claim alleging negligence under the FTCA, see Stansberry v. United States, 2018 WL 5619741, at *7 ("Congress and the SSA have not waived the government's sovereign immunity for Plaintiff's claim for negligence because the only limited waiver of sovereign immunity lies within 42 U.S.C. §§ 405(g) and 405(h), where parties can seek judicial review of SSA decisions from

ALJs."); Kenney v. Barnhart, No. CIV 05-0426, 2006 WL 2092607, at *7 (C.D. Cal. July 26, 2006)(Nagle, M.J.)("This Court simply is not permitted to review Plaintiff's complaint about the reporting of his overpayment debt under Section 405(g), as such review does not fall within the scope of that statute and, thus, the waiver of sovereign immunity it effected.").  Accordingly, the Court concludes that the Plaintiffs' claims fall within § 104(i)'s sovereign immunity waiver.

Second, the Court concludes that it may grant the Plaintiffs' requested injunctive relief pursuant to the § 104(i) waiver.  The HPCCAA's sovereign immunity waiver provides the Court with the limited power "to modify or set aside the decision, in whole or in part."  HPCCAA § 104(i)(1).  While this authorization is slightly narrower than § 405(g), which provides that courts may "remand[] the cause for a rehearing" in addition to "affirming, modifying, or reversing" the administrative decision, 42 U.S.C. § 405(g), the HPCCAA contains no "clear[] command" that Congress intended to divest courts of "their equitable power to issue injunctions in suits over which they have jurisdiction."  Califano v. Yamasaki, 442 U.S. at 705.  "While it is clear that Congress has the authority to limit the equitable powers and discretion of the federal courts in order to implement important federal policy, such limitation will not be found in the absence of a clear legislative command."  Johnson v. Mathews, 539 F.2d 1111, 1125 (8th Cir. 1976).  "In this absence of any affirmative limitation on historic district court powers," the Court "will not infer that Congress meant to circumscribe them," and, accordingly, the Court concludes that § 104(i) does not bar issuance of an injunction.  In re Letourneau, 559 F.2d 892, 894 (2d Cir. 1977).

Moreover, the Plaintiffs do not seek additional money damages against the United States that fall outside of the scope of § 104(i)'s sovereign immunity waiver.  See Gardner v. United States Comm'r of Soc. Sec., 2018 WL 1470266, at *3 ("[T]he Court lacks jurisdiction to hear

Plaintiff's claims for the additional relief sought against the Commissioner."); Walker v. Colvin,
WL 5737701, at *3 ("[T]he court lacks jurisdiction over any claim for tort damages because
Congress has not allowed plaintiffs 'a remedy in damages for emotional distress.'" (Schweiker v.
Chilicky, 487 U.S. at 425)).  Accordingly, because the Plaintiffs claims and their requested relief
fall within the scope of § 104(i)'s sovereign immunity waiver, the Court concludes that, had the
Plaintiffs exhausted their claims or demonstrated that the Court should waive exhaustion, the
Court would have jurisdiction to review their claims on the merits and grant injunctive and
declaratory relief.  Nonetheless, because the Plaintiffs did not sufficiently present and exhaust
their claims, the HPCCAA's sovereign immunity waiver is insufficient to allow the Plaintiffs
claims to proceed.[9]

---

[9]Following the conclusions of courts that have considered FTCA claims brought in the
context of a § 405(g) sovereign immunity waiver, the Court also concludes that § 104(i) is not
broad enough to waive the United States' sovereign immunity for a separate FTCA claim -- i.e.,
if the Plaintiffs had exhausted properly, they still would not have been able to bring an FTCA
claim.  First, unlike the Plaintiffs' attorney-client relationship interference claims here, an FTCA
claim and the relief available under the FTCA falls outside of § 104(i)'s scope, which limits
district court review to final decisions.  An FTCA claim would be divorced completely from
review of a FEMA final decision under the HPCAA.  Rather than seeking review of a FEMA
final decision under the HPCCAA, for which § 104(i) has waived the United States' sovereign
immunity, the Plaintiffs would be seeking money damages for the negligence of government
employees under a completely separate statutory scheme.  See Walker v. Colvin, 2013 WL
5737701, at *3 (concluding that the plaintiff's claim for "tort recovery" was "premised on
something other than judicial review" under § 405(g)); Stansberry v. United States, 2018 WL
5619741, at *7 ("Congress and the SSA have not waived the government's sovereign immunity
for Plaintiff's claim for negligence because the only limited waiver of sovereign immunity lies
within 42 U.S.C. §§ 405(g) and 405(h), where parties can seek judicial review of SSA decisions
from ALJs.").  Furthermore, an FTCA claim would seek "additional relief" against the United
States in the form of money damages beyond the benefits that the HPCCAA provides.  Gardner
v. United States Comm'r of Soc. Sec., 2018 WL 1470266, at *3.  See Walker v. Colvin, WL
5737701, at *3 ("[T]he court lacks jurisdiction over any claim for tort damages because
Congress has not allowed plaintiffs 'a remedy in damages for emotional distress.'" (quoting
Schweiker v. Chilicky, 487 U.S. at 425)); Maloney v. Celebrezze, 337 F.2d 231, 233 (3d Cir.
1964)("The only questions open for determination on review are whether on the record as a

whole there is substantial evidence to support the factual determinations made by the Secretary and whether his ultimate decision has a reasonable basis in the law.").

Moreover, that the HPCCAA's Election of Remedy provision provides that claimants may opt to bring an FTCA claim does not alter this conclusion.  Unlike § 405(g)'s statutory scheme, the HPCCAA includes an election of remedy provision that expressly preserves a claimant's right to "seek compensation from the United States" through the Claims Process, through an FTCA action, or through "an authorized civil action under any other provision of law."  HPCCAA § 104(h)(1)(A)-(C).  FEMA has made clear that claimants have the flexibility to bring concurrently both an action through the Claims Process and in federal court under the FTCA, see FOF ¶¶ 8-12, at 4-6, and the regulations state that only upon acceptance of an award under the HPCCAA or of relief pursuant to the FTCA is a claimant barred from seeking redress by another method, see 44 C.F.R. § 296.5.  Accordingly, the question that must be answered is whether Congress intended the narrow waiver it provided in § 104(i) to extend also to FTCA claims and "civil action[s] under any other provision of law."  HPCCAA § 104(h)(1)(A)-(C).  Because a sovereign immunity waiver's scope must be interpreted narrowly, the Court concludes that Congress did not intend § 104(i)'s sovereign immunity waiver to extend to the additional forms of relief the HPCCAA acknowledges.

In Manypenny v. United States, 948 F.2d 1057 (8th Cir. 1991)("Manypenny"), the United States Court of Appeals for the Eighth Circuit has construed the scope of a limited sovereign immunity similar to § 104(i)'s waiver, and determined it did not extend to additional forms of relief authorized by the statute containing the waiver.  See 948 F.2d at 1063-66.  In 1985, Congress established the White Earth Reservation Land Settlement Act of 1985, Pub. L. No. 99-264 ("WELSA"), "to settle with finality specified 'unresolved legal uncertainties' arising out of clouded titles to allotted lands on the White Earth Indian Reservation."  Manypenny, 948 F.2d at 1063.  "WELSA settled titles by retroactively ratifying land transactions, extinguishing claims, and authorizing compensation to original allottees or their heirs from whom title was taken or transferred," and, like the HPCCAA, "set up procedures for determining entitlement to compensation and the amount of payment."  Manypenny, 948 F.2d at 1061 (citing WELSA §§ 6, 8).  WELSA contains a provision much like the HPCCAA's § 104(i) that provides for "the review of the Secretary's administrative determination of the amount of compensation."  Manypenny, 948 F.2d at 1064.  Specifically, WELSA states:

> The Secretary's administrative determination of the appropriate amount of compensation computed pursuant to the provisions of this Act may be judicially reviewed pursuant to the Administrative Procedure Act not later than one hundred and eighty days after the issuance of notice as aforesaid; after such time the Secretary's determination shall be conclusive and all judicial review shall be barred.  Exclusive jurisdiction over any such action is hereby vested in the United States District Court for the District of Minnesota.

WELSA § 8(d).

In addition, WELSA provides that WELSA does not bar an individual from bringing a Tucker Act claim to "challenging the constitutional adequacy of [WELSA's] compensation provisions . . . as they apply to a particular allotment or interest."  WELSA § 6(d).  Section 6(d)

expressly waives the United States' sovereign immunity for the Constitutional challenges it provides for.  See WELSA § 6(d)("The United States hereby waives any sovereign immunity defense it may have to such an action . . . .").  Although WELSA § 6(d) bears some resemblance to the HPCCAA's § 104(h)(1) election-of-remedy provision, which states that claimants are not prevented from simultaneously bringing an FTCA claim for Hermit's Peak Fire-related injuries, § 6(d) differs from § 104(h)(1) in that § 6(d) provides that individuals may pursue a Tucker Act challenge only after receiving "the Secretary's compensation determination" and also bars an individual "from receiving compensation" under WELSA upon bringing a Constitutional challenge pursuant to the Tucker Act.  WELSA § 6(d).  Finally, in § 6(c), "WELSA recognized that the allottee or heir might choose to file an action in federal district court seeking to recover title to an allotment, or damages in lieu of the statutory compensation."  Manypenny, 948 F.2d at 1062 (citing WELSA § 6(c)).  Specifically, § 6(c) provides that "any action in any court seeking to recover title or damages with respect to the transactions ratified by WELSA," Manypenny, 948 F.2d at 1064, "shall not be barred," provided they are brought within the time-periods WELSA provides, WELSA § 6(c).

Following WELSA's passage, members of the White Earth Band of Chippewa Indians sued the United States "seek[ing] to quiet title on behalf of certain Indians or their heirs to property currently possessed by others," and also alleging "civil rights violations, intentional torts, and negligence."  Manypenny, 948 F.2d at 1059.  The plaintiffs sought "declaratory, injunctive and monetary relief."  Manypenny, 948 F.2d at 1059.  After the district court concluded that it lacked jurisdiction over the claims, the plaintiffs argued on appeal that WELSA "waived the federal government's sovereign immunity" for their claims.  Manypenny, 948 F.2d at 1059.  Perhaps recognizing the limited nature of the sovereign immunity waiver embodied in WELSA's compensation review provision, the plaintiffs did "not argue that section 8(d), which permits judicial review of the Secretary's determination of the amount of compensation," and is most like the waiver of sovereign immunity in the HPCCAA, "contains a waiver of sovereign immunity as to any action filed under WELSA."  Manypenny, 948 F.2d at 1064.  Instead, the plaintiffs asserted "that the explicit waiver of sovereign immunity contained in section 6(d) is not limited to actions challenging the constitutional adequacy of compensation under the Tucker Act, but can be construed to apply to any action brought under WELSA," and, in particular, "to actions allowed under section 6(c) -- the section that [the plaintiffs] contend permits a suit under WELSA to recover title or damages."  Manypenny, 948 F.2d at 1064.

Although the Manypenny plaintiffs, by declining to argue that WELSA § 8(d)'s sovereign immunity waiver for review of compensation determinations applied broadly to other claims, did not make the argument that most closely parallels an argument that HPCCAA § 104(i) waives the United States' sovereign immunity to an FTCA claim, the Eighth Circuit's conclusion respecting the argument that the plaintiffs did make is highly instructive.  See Manypenny, 948 F.2d at 1065.  At their argument's core, the Manypenny plaintiffs argue that a sovereign immunity waiver in one statutory provision providing for a cause of action against the United States, § 6(d), should be read to apply to a separate provision within the same statutory scheme, § 6(c).  See Manypenny, 948 F.2d at 1065 ("'Arguably, the explicit waiver language [of 6(d)] was [also] meant to apply to the district court actions allowed under subsection (c)' as well as to suits under 6(d)." (quoting the plaintiffs' briefing)(alterations in Manypenny)).  This argument closely parallels an argument that the HPCCAA § 104(i)'s sovereign immunity waiver,

which provides the District of New Mexico with the authority to review FEMA's final decisions, "was also meant to apply to the" FTCA actions "allowed under" § 104(h)(1)(B). Manypenny, 948 F.2d at 1065 (cleaned up).

Acknowledging that "[a] waiver of sovereign immunity must be clear, express, and unequivocal," the Eighth Circuit in Manypenny concluded that "[t]he sentence in subsection 6(d) waiving sovereign immunity is specifically addressed to actions brought under the Tucker Act as provided for in 6(d) . . . ." Manypenny, 948 F.2d at 1065. Responding to the plaintiffs' argument "that the reference in the last sentence of section 6(d) to the 'filing of an action . . . under the provisions of this section . . .' also refers to actions allowed under section 6(c)," the Eighth Circuit reasoned that this "last sentence cannot be read to expand the clearly enunciated scope of the waiver." Manypenny, 948 F.2d at 1065. See id. ("Although the last sentence of 6(d) may indeed have relevance to the other subsections of section 6, this relationship is not strong enough to bear the weight placed on it by Manypenny and Fineday."). The same reasoning is readily applicable in the HPCCAA context. Like § 6(d), § 104(i) "is specifically addressed" to "actions brought under" the HPCCAA, Manypenny, 948 F.2d at 1065, "to modify or set aside" FEMA final decisions, HPCCAA § 104(i)(1). There is no language within § 104(i) that can "be read to expand the clearly enunciated scope of the waiver." Manypenny, 948 F.2d at 1065.

In addition, that the FTCA "provides the exclusive avenue to assert a claim sounding in tort against the United States" constitutes a separate bar to grafting 104(i)'s sovereign immunity waiver onto an FTCA claim. Franklin Sav. Corp., In re, 385 F.3d 1279, 1286 (10th Cir. 2004)("Franklin"). In Franklin, the plaintiff asserted claims against the United States "in bankruptcy court seeking damages under the Federal Tort Claims Act (FTCA) for negligence, breach of fiduciary duty, and conversion . . . ." Franklin, 385 F.3d at 1284. In response to the United States' assertion that "the discretionary function exception to the FTCA's waiver of sovereign immunity applied," the plaintiffs argued that 11 U.S.C. § 106, a Bankruptcy Code provision that "provides a waiver of sovereign immunity when the government files a proof of claim against a debtor in a bankruptcy proceeding," "constitutes a complete waiver of sovereign immunity separate and apart from the FTCA's waiver of immunity, and that this waiver permits tort claims against the United States which would otherwise not be permitted under the discretionary function exception of FTCA § 2680(a)." Franklin, 385 F.3d at 1284-85. The Bankruptcy Court concluded that "Bankruptcy Code § 106's waiver of sovereign immunity did not abrogate the discretionary function exception to the FTCA." Franklin, 385 F.3d at 1286 (citing In re Franklin Sav. Corp., 296 B.R. 521, 528-29 (Bankr. D. Kan. 2002)(Flannagan, B.J.), aff'd sub nom. 385 F.3d 1279 (10th Cir. 2004)). The Bankruptcy Court observed "that plaintiffs' overly-broad interpretation" of § 106's sovereign immunity waiver would "be inconsistent with the well-settled principle that the FTCA is the exclusive means by which a party may sue the United States for money damages for claims sounding in tort." In re Franklin Sav. Corp., 296 B.R. at 530.

At the Tenth Circuit, the appealing plaintiff reasserted its argument that "the waiver of sovereign immunity under Bankruptcy Code § 106 supercedes the more limited waiver of immunity under the FTCA." Franklin, 385 F.3d at 1288. Despite that the Tenth Circuit acknowledged that the plaintiff could "avail itself of the waiver of immunity in Bankruptcy Code § 106," the Tenth Circuit reasoned that "the FTCA remains the exclusive means by which

Franklin may assert its tort claims." Franklin, 385 F.3d at 1291.  Applying the principle that "'limitations and conditions upon which the Government consents to be sued must be strictly observed and exceptions thereto are not to be implied,'" Franklin, 385 F.3d at 1289-90 (quoting Lehman v. Nakshian, 453 U.S. 156, 160 (1981)), the Tenth Circuit concluded that "Congress did not unequivocally manifest an intent in Bankruptcy Code § 106 to displace" the FTCA's sovereign immunity waiver," Franklin, 385 F.3d at 1290.  The Tenth Circuit further concluded that, "[a]bsent such an unequivocal expression of intent," it was "not at liberty to construe § 106's waiver or [FTCA] § 2401(b)'s statute of limitations," which had expired before the lawsuit's commencement, "'beyond that which Congress intended' or to construe the limitations requirement of § 2401(b) 'so as to defeat its obvious purpose, which is to encourage the prompt presentation of claims.'"  Franklin, 385 F.3d at 1291 (quoting United States v. Kubrick, 444 U.S. 111, 117-18 (1979)). See In re Supreme Beef Processors, Inc., 468 F.3d 248, 256 (5th Cir. 2006).

Here too, the FTCA's exclusiveness for asserting tort claims against the United States prevents § 104(i)'s narrow sovereign immunity waiver from abrogating the FTCA's sovereign immunity waiver and its attendant limitations.  When a claimant properly presents and exhausts their HPCCAA claims, and simultaneously brings in district court a claim under the FTCA, as § 104(h) allows, § 104(i) does not "displace" the requirements inherent in bringing an FTCA claim.  Franklin, 385 F.3d at 1291.  See Matter of TPI Int'l Airways, Inc., 141 B.R. 512, 521 (Bankr. S.D. Ga. 1992)(Davis, Jr., C.J.)("Thus, although there has been waiver of immunity pursuant to Section 106(a) of the Bankruptcy Code, separate and independent from the Federal Tort Claims Act, nonetheless TPI's claims cannot be entertained due to the discretionary function exception which is implicitly applicable to the FAA's conduct.").  In short, an HPCCAA claimant cannot "circumvent" any defects in an FTCA claim "by relying on" § 104(i)'s sovereign immunity waiver.  In re Supreme Beef Processors, Inc., 468 F.3d at 256. See In re Szanto, 574 B.R. 862, 872 (Bankr. D. Or. 2017)(McKittrick, B.J.)("To allow plaintiff to assert the Tort Claims under the FTCA when such claims would clearly exceed the scope of the government's liability outside of bankruptcy stretches the boundaries of § 106 beyond its terms.").

Accordingly, because the Court must construe narrowly a sovereign immunity waiver's scope, see F.A.A. v. Cooper, 566 U.S. at 291, and because the plain meaning of the HPCCAA's text and the exclusiveness of the FTCA's remedy precludes extending § 104(i)'s sovereign immunity waiver to FTCA claims, the HPCCAA does not waive the United States' sovereign immunity for the FTCA claims that it advises claimants they may simultaneously pursue. Rather, such a claim would have to rely on the FTCA's waiver of sovereign immunity.  "[T]he FTCA waives the United States' sovereign immunity for some tort actions against the United States seeking money damages." De Baca v. United States, 399 F. Supp. 3d 1052, 1165 (D.N.M. 2019)(Browning, J.)("De Baca")(citing 28 U.S.C. § 1346(b)), aff'd sub nom. Ohlsen v. United States, 998 F.3d 1143 (10th Cir. 2021)("Ohlsen").  Several exceptions in the FTCA limit, however, this sovereign immunity waiver.  See 28 U.S.C. § 2680.  As with all determinations regarding a sovereign immunity waiver's scope, "[t]hese exceptions must be strictly construed in the United States' favor." De Baca, 399 F. Supp. 3d at 1170.  The discretionary function exception, whose "application is a threshold jurisdictional issue in any FTCA case," De Baca, 399 F. Supp. 3d at 1171, provides that the FTCA shall not apply to claims "based upon the exercise or performance or the failure to exercise or perform a discretionary-function or duty on

the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused," 28 U.S.C. § 2680(a).  The Supreme Court mandates a two-prong analysis for determining when the FTCA's discretionary function exception applies.  See Berkovitz v. United States, 486 U.S. 531, 536 (1988)("Berkovitz").  First, the acts or omissions must be "discretionary in nature, acts that 'involve an element of judgment or choice.'"  United States v. Gaubert, 499 U.S. 315, 322 (1991)(quoting Berkovitz, 486 U.S. at 536).  "The requirement of judgment or choice is not satisfied if a 'federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow,' because 'the employee has no rightful option but to adhere to the directive.'"  United States v. Gaubert, 499 U.S. at 322 (1991)(quoting Berkovitz, 486 U.S. at 536).  Second, the conduct must be "'based on considerations of public policy.'"  United States v. Gaubert, 499 U.S. at 323 (quoting Berkovitz, 486 U.S. at 537).

In De Baca, 399 F. Supp. 3d 1052, property owners brought FTCA claims against the United States seeking to recover damages for injuries sustained in the Dog Head Fire, which began after a masticator, a type of tractor-mounted woodchipper used in forestry management to reduce wildfire risk, hit a rock and ignited dry brush.  See De Baca, 399 F. Supp. 3d at 1072-73; Ohlsen, 998 F.3d at 1151-52.  "The fire raged for about three months, burning 17,912 acres and destroying twelve residences and forty-four other structures" in the Manzano Mountains in central New Mexico.  Ohlsen, 998 F.3d at 1152.  The Court dismissed the property owners' claims, concluding, among other things, that the United States' actions in causing the fire fell within the discretionary exception to the FTCA's sovereign immunity waiver.  De Baca, 399 F. Supp. 3d at 1206-28 ("The Court concludes . . . that it lacks subject-matter jurisdiction over the . . . Plaintiffs' . . . claims because of the discretionary function exception.").
The Tenth Circuit affirmed the Court's judgment in denying the property owners' FTCA claims.  Ohlsen, 998 F.3d at 1160-64.  Specifically, the Tenth Circuit held that the USFS's decisions "to allow slash to accumulate beyond the eighteen-inch limit," and "its decisions regarding fire suppression, namely, not to post a fire guard or truck at the mastication site and not to impose fire restrictions on the day of the fire," fell within the discretionary function exception.  Ohlsen, 998 F.3d at 1160.  The Tenth Circuit took an expansive view of the discretionary function exception, reasoning that "decisions regarding fire safety" such as "deciding whether to impose fire restrictions" involve "balancing practical considerations of funding and safety as well as concerns of a fire's impact on wildlife, vegetation, and human life."  Ohlsen, 998 F.3d at 1163.

In line with the Court's and the Tenth Circuit's analysis in De Baca and Ohlsen, courts assessing whether the United States' decisions regarding fire suppression, and, specifically, the management of prescribed burns, have concluded that "claims involving how the government conducts fire suppression operations are generally barred by the discretionary function exception . . . ."  Esquivel v. United States, 21 F.4th 565, 574 (9th Cir. 2021).  See Hardscrabble Ranch, L.L.C. v. United States, 840 F.3d 1216, 1222-23 (10th Cir. 2016)("[T]he balancing of the needs to protect private property, ensure firefighter safety, reduce fuel levels, and encourage natural ecological development . . . are precisely the kind of social, economic, and political concerns the discretionary function exception was designed to shield from 'judicial second guessing.'" (quoting Berkovitz, 486 U.S. at 536-37)); Green v. United States, 630 F.3d 1245, 1251 (9th Cir. 2011)(acknowledging that decisions regarding how to fight a fire, attack a fire, and allocate fire suppression resources are decisions grounded in public policy).  Recognizing this line of caselaw and highlighting that decisions regarding fire management generally involve

discretionary decision making grounded in public policy determinations, the Tenth Circuit recently remarked: "It is no wonder that, time and again, the courts have declined to manage the firefighting role."  Knezovich v. United States, 82 F.4th 931, 937-43 (10th Cir. 2023), cert. denied, No. 23-968, 2024 WL 2116299 (U.S. May 13, 2024).  Moreover, courts have extended the general proposition that decisions regarding fire management fall within the discretionary function exception to USFS employees' specific decisions whether to light a prescribed burn, see Thune v. United States, 872 F. Supp. 921, 924 (D. Wyo. 1995)(Brimmer, J.)("Mr. Chapman's decision to set the controlled burn was based on many different factors before him at that time. He had to consider the temperature, the wind, the weather forecast, the season and other considerations, including the broad policy behind the burns."), and, following ignition, "choices and decisions as to how to observe, monitor, and maintain" the controlled fire also fall under the exception, Foster Logging, Inc. v. United States, 973 F.3d 1152 (11th Cir. 2020).

Given the degree of discretion involved in decisions related to controlled burns, an FTCA claim based on the USFS's negligence regarding the Hermit's Peak Fire is not likely to survive a motion to dismiss on jurisdictional grounds.  First, each of the potentially challengeable actions are "matter[s] of choice for the acting employee." Berkovitz, 486 U.S. at 536.  For example, the decision to ignite the controlled burn in the first place "was based on many different factors before" the decision makers, such as "the temperature, the wind, the weather forecast, the season and other considerations, including the broad policy behind the burn[]." Thune v. United States, 872 F. Supp. at 924.  See Gallinas-Las Dispensas Prescribed Fire Declared Wildfire Review at 17, Forest Service, U.S. Department of Agriculture (April 2022)("Hermit's Peak Fire Report")("The decision was made to start the test fire there because there was minimum heavy fuel within the test fire area.").  The existence of the Gallinas Watershed Prescribed Fire Plan, which provides guidance on wildfire mitigation measures, such as prescribed burns, that could be undertaken in the area, see Hermit's Peak Fire Repot at 7, "did not remove USFS employees' choice or judgment regarding what measures to take," because "it did not 'specifically prescribe[] a course of action for an employee to follow.'"  Hardscrabble Ranch, L.L.C. v. United States, 840 F.3d at 1221 (quoting Berkovitz, 486 U.S. at 536).  See Thune v. United States, 872 F. Supp. at 924 ("Although burn plans had been developed, the ultimate decision of whether the burn should proceed was based on the judgment of Mr. Chapman.").  Likewise, decisions regarding how the USFS "observed, monitored, and maintained the controlled burn" involve "element[s] of judgment or choice," Foster Logging, Inc. v. United States, 973 F.3d at 1158, as do the USFS's response to the prescribed burn as it developed in intensity, see Hardscrabble Ranch, L.L.C. v. United States, 840 F.3d at 1220 (concluding that the USFS has "discretion in this case about how to respond to the Sand Gulch Fire").  Finally, USFS decision regarding the monitoring of smoldering debris piles following a nearby fuel treatment project which, despite being covered by snowfall, grew into the Calf Canyon Fire, which later merged with the Hermit's Peak Fire, involves discretionary decisions.  See Bill Gabbert, Investigators Determine Calf Canyon Fire Caused by Holdover From Prescribed Fire, Wildfire Today (May 28, 2022); Ruffino v. United States, 583 F. Supp. 3d 1288, 1290 (E.D. Cal. 2022)(Mueller, C.J.)(acknowledging the discretion involved in the USFS's monitoring of snow-covered, still-smoldering vegetation following a controlled burn).

Second, each of these decisions relating to forest management and fire suppression "necessarily 'involve[] balancing practical considerations of funding and safety as well as

2.      **The APA's Waiver of Sovereign Immunity Extends to the Plaintiffs' Claims.**

Although, because they fail to meet the HPCCAA's final-decision requirement, the Plaintiffs cannot rely on its sovereign immunity waiver, the Plaintiffs can invoke the waiver in 5 U.S.C. § 702, insofar as the Plaintiffs seeks equitable relief rather than monetary damages.  See Maehr v. United States Dep't of State, 5 F.4th 1100, 1106 (10th Cir. 2021)(quoting 5 U.S.C. § 702).  Section 702 provides, in relevant part, that:

> An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States . . . .

5 U.S.C. § 702.  Section 702's "waiver is not limited to suits under the Administrative Procedure Act."  Simmat v. U.S. Bureau of Prisons, 413 F.3d 1225, 1233 (10th Cir. 2005).  See Chamber of Commerce v. Reich, 74 F.3d 1322, 1329 (D.C. Cir. 1996)("The APA's waiver of sovereign immunity applies to any suit whether under the APA or not."); New Mexico v. McAleenan, 450 F. Supp. 3d 1130, 1195 (D.N.M. 2020)(Browning, J.)("[T]he APA's immunity-waiver applies to

---

concerns of a fire's impact on wildlife, vegetation, and human life,'" Knezovich v. United States, 82 F.4th at 943 (quoting Ohlsen, 998 F.3d at 1163), and, accordingly, "the judgment the USFS exercised was 'susceptible to policy judgment' and 'involve[d] an exercise of political, social, or economic judgment,'" Knezovich v. United States, 82 F.4th at 942 (quoting Duke v. Dep't of Agric., 131 F.3d 1407, 1410 (10th Cir. 1997)).  "The task of balancing these interests is best lodged with officials and experts on the ground than with judges aided by the benefit of hindsight." Knezovich v. United States, 82 F.4th at 942.  In sum, despite the FTCA's waiver of sovereign immunity, an FTCA claim based on the USFS's negligence regarding the Hermit's Peak Fire is unlikely to succeed, because the discretionary function exception likely applies. Finally, the Court thinks the same hurdle would face an FTCA claim based on agency flood control efforts within burn scar areas in the aftermath of the Hermit's Peak Fire.  Decisions regarding minimizing flood risk -- including whether to plant trees, build berms, and divert streams -- involve substantial discretion based on policy concerns.  See Ohlsen, 998 F.3d at 1163 (recognizing that decisions involving "balancing . . . concerns of a fire's impact on wildlife, vegetation, and human life" involve discretion).

suits seeking review of an official's action even where review is not available under the APA."). Rather, § 702 "enacted a broad, unqualified waiver for all non-monetary claims for relief against federal agencies." Navajo Nation v. Dep't of the Interior, 876 F.3d 1144, 1172 (9th Cir. 2017). Because the APA does not create an independent basis for subject-matter jurisdiction, however, see Eagle-Picher Indus., Inc. v. United States, 901 F.2d 1530, 1531 (10th Cir. 1990); Califano v. Sanders, 430 U.S. 99, 107 (1977), § 702 often waives the United States' sovereign immunity where 28 U.S.C. § 1331 establishes jurisdiction, see Maehr v. U.S. Dep't of State, 5 F.4th at 1107-08 ("Sovereign immunity is no bar to our or the district court's exercise of jurisdiction. . . . . Consequently, the district court was free to exercise the jurisdiction conveyed by § 1331.").

Here, the Plaintiffs' claims seek "relief other than money damages" for claims "that an agency or an officer or employee thereof acted or failed to act in an official capacity." 5 U.S.C. § 702.   See Trudeau v. Fed. Trade Comm'n, 456 F.3d 178, 187 (D.C. Cir. 2006)("Trudeau")("APA § 702's waiver of sovereign immunity permits not only Trudeau's APA cause of action, but his nonstatutory and First Amendment actions as well.").  In addition, while "'a party must first clear the hurdle of § 701(a) . . . before the waiver of sovereign immunity under § 702 of the APA applies," High Country Citizens All. v. Clarke, 454 F.3d 1177, 1181 (10th Cir. 2006), no "statutes preclude judicial review" and the complained of agency action is not "committed to agency discretion by law," 5 U.S.C. § 701.  First, overcoming the APA's presumption of judicial review is a "heavy burden," Dunlop v. Bachowski, 421 U.S. 560, 567 (1975), and the parties have not identified, nor has the Court been able to locate, any statute that evinces a clear "congressional intent to preclude judicial review" of the Plaintiffs' claims. Second, because the complained of agency action -- allegedly communicating with represented

claimants in violation of federal law -- is not "of the sort that is traditionally unreviewable," Webster v. Doe, 486 U.S. 592, 608 (1988)(Scalia, J., dissenting), it is not an action committed to agency discretion by law.  Moreover, by outlining in the HPCCAA a detailed claims process for FEMA to follow, Congress did not devise the HPCCAA "so that a court would have no meaningful standard against which to judge the agency's exercise of discretion."  Heckler v. Chaney, 470 U.S. 821, 830 (1985).

There is also an open question in the Tenth Circuit, namely, whether the APA § 706's requirement that the plaintiff challenge a final agency action, which is a jurisdictional prerequisite to bringing a challenge under the APA, see New Mexico v. McAleenan, 450 F. Supp. 3d at 1190 ("The Tenth Circuit . . . consider[s] lack of finality a jurisdictional question."), also precludes the plaintiff from relying on the APA's waiver of sovereign immunity for the purposes of their non-APA claims, see Guzman Loera v. True, No. CIV 21-2794, 2023 WL 2528629, at *14 n.12 (D. Colo. March 15, 2023)(Wang, J.)("[W]hether the requirement of a final agency action implicates a waiver of sovereign immunity . . . is an unsettled question.").  Although the Court concludes infra, at 98-100, that the Plaintiffs have not identified a final agency action, and therefore the Court does not have jurisdiction over their APA claims, the Court concludes that the APA's waiver of sovereign immunity still may apply to the Plaintiffs' other alleged violations of federal law.  In New Mexico v. McAleenan, 450 F. Supp. 3d 1130, the Court concluded that, despite that the Plaintiffs did not identify a final agency action, see 450 F. Supp. 3d at 1190-94, § 702 waived the United States' sovereign immunity in respect to the plaintiffs' other federal claims, see 450 F. Supp. 3d at 1199 ("New Mexico and Albuquerque may therefore bring their constitutional claims separately, and not under the APA, against the Defendants without implicating sovereign immunity, because of the United States' general

waiver, in 5 U.S.C. § 702, of sovereign immunity in suits seeking equitable relief."). In addition, the Tenth Circuit has only ever held that § 701 is a prerequisite to § 702's sovereign immunity waiver, and not § 706. See High Country Citizens All. v. Clarke, 454 F.3d at 1181. Accordingly, the Court concludes that § 702's sovereign immunity waiver applies to the Plaintiffs' additional federal claims. See New Mexico v. McAleenan, 450 F. Supp. 3d at 1199-200 ("When a plaintiff alleges 'a cause of action that is independent of the APA, it may eschew the statutory requirements that apply only to APA claims and rely nevertheless on the APA's sovereign immunity waiver to support its contention that sovereign immunity does not block the court from exercising jurisdiction.'" (quoting Z St., Inc. v. Koskinen, 44 F. Supp. 3d 48, 65 (D.D.C. 2014)(Brown Jackson, J.), aff'd sub nom. Z St. v. Koskinen, 791 F.3d 24 (D.C. Cir. 2015))). Accordingly, the waiver of sovereign immunity in § 702 applies to the Plaintiffs' claims for equitable relief, and the Court concludes, therefore, that the Plaintiffs have met their burden to identify a waiver of sovereign immunity sufficient to allow their non-APA claims against the United States to proceed. See Clark v. Libr. of Cong., 750 F.2d 89, 102 (D.C. Cir. 1984)("It is well-established that sovereign immunity does not bar suits for specific relief against government officials where the challenged actions of the officials are alleged to be unconstitutional or beyond statutory authority.").[10]

---

[10]The Court reiterates that the APA waives the United States' sovereign immunity in this case, because the Plaintiffs seek equitable relief as opposed to money damages. See Franklin Sav. Corp. v. United States, 180 F.3d 1124, 1140 (10th Cir. 1999)("Congress has limited the relief available under the APA by waiving sovereign immunity only as to suits 'seeking relief other than money damages.'" (quoting 5 U.S.C. § 702)). For suits against the United States seeking money damages, by contrast, plaintiffs ordinarily must rely on the waiver of sovereign immunity in the FTCA. See Franklin Sav. Corp. v. United States, 180 F.3d at 1140 ("The *raison d'etre* of the FTCA . . . is to waive sovereign immunity to suits seeking relief via money damages."). Because the APA waiver of sovereign immunity extends only to non-APA claims seeking relief other than money damages, a plaintiff may not extend the statute's waiver to

C. **28 U.S.C. § 1331 PROVIDES A BASIS FOR THE COURT'S SUBJECT-MATTER JURISDICTION OVER THE PLAINTIFFS' NON-APA CLAIMS.**

To conclude this section of the Court's analysis -- having established that the Plaintiffs can invoke the APA's waiver of sovereign immunity -- the Court turns to the final question concerning its subject-matter jurisdiction, namely pursuant to what basis of the Court's jurisdiction the Plaintiffs may seek substantive relief; the Court concludes that it has jurisdiction under 28 U.S.C. § 1331. As courts of limited jurisdiction, federal courts "possess only that power authorized by Constitution and statute." Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. at 377. Among the powers that Congress has bestowed upon the courts is the power to hear controversies arising under federal law. See 28 U.S.C. § 1331. To demonstrate proper jurisdiction under 28 U.S.C. § 1331, the plaintiff must satisfy "two conditions": (i) "a question of federal law must appear on the face of plaintiff's well-pleaded complaint"; and (ii) "the plaintiff's cause of action must either be (1) created by federal law, or (2) if it is a state-created cause of action, 'its resolution must necessarily turn on a substantial question of federal law.'" Nicodemus v. Union Pac. Corp., 318 F.3d at 1235 (quoting Rice v. Office of Servicemembers' Group Life Ins., 260 F.3d 1240, 1245 (10th Cir. 2001)). "A court examining whether a case turns on a question of federal law should focus on whether Congress evidenced an intent to provide a federal forum." Morris v. City of Hobart, 39 F.3d 1105, 1111 (10th Cir. 1994).

The Plaintiffs contend that the "Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 . . . ." Complaint ¶ 4, at 3. The Court agrees with the Plaintiffs, because, on their

---

FTCA claims seeking money damages. See Geronimo v. Obama, 725 F. Supp. 2d 182, 186 (D.D.C. 2010)(Roberts, J.)("The APA's waiver of sovereign immunity does not apply to actions seeking money damages. . . . The plaintiffs' claim seeking money damages from all defendants . . . would fall outside of the bounds of an APA waiver of sovereign immunity for the federal defendants.").

Complaint's face, the Plaintiffs allege at least one cause of action arising under federal law, namely, a violation of the McDade Act.  See Complaint ¶¶ 21-22, at 6.  The United States responds that none of the federal statutes of which the Plaintiffs allege a violation confer jurisdiction, because the Plaintiffs fail to identify a viable cause of action under the statutes.  See Response at 10 ("Plaintiffs' complaint does not set forth any viable cause of action that can provide a foundation for the Court's jurisdiction.").  The Court agrees with the United States to the extent that the Court does not have jurisdiction over the Plaintiffs' APA claims, because the Court concludes infra, at 98-100, that the plaintiffs do not identify a final agency action sufficient to bring an APA claim, and identification of such an action is a prerequisite to jurisdiction under the APA.  See Kansas ex rel. Schmidt v. Zinke, 861 F.3d 1024, 1034 (10th Cir. 2017).

Beyond the Plaintiff's APA claim, however, failure to identify a proper cause of action that would entitle one to relief is not a defect in jurisdiction that courts should seek to resolve at the outset under rule 12(b)(1) of the Federal Rules of Civil Procedure; rather, courts consider whether a plaintiff identifies a valid cause of action when considering whether the plaintiff states a claim under rule 12(b)(6).  See Air Courier Conf. of Am. v. Am. Postal Workers Union AFL-CIO, 498 U.S. 517, 523 n.3 (1991)("Whether a cause of action exists is not a question of jurisdiction, and may be assumed without being decided."); Trudeau, 456 F.3d at 183-87 (concluding that the district court erred by dismissing the plaintiff's federal claims for lack of jurisdiction, because the district court had jurisdiction pursuant to § 1331, despite that the district court properly held that the plaintiff failed to identify a cause of action to maintain his suit).  The Court analyzes whether the Plaintiffs have alleged a cause of action authorizing their suit under the federal statutes that they identify and, if so, the merits of the Plaintiffs' claims, when it

considers infra, at 96-114, whether the Plaintiffs have established a likelihood of success on the merits. See Trudeau, 456 F.3d at 188 ("Whether these are claims 'upon which relief can be granted' depends in part on whether there is a cause of action that permits Trudeau to invoke the power of the court to redress the violations of law that he claims the FTC has committed." (quoting Fed. R. Civ. P. 12(b)(6))). For now, however, the Court concludes that the Plaintiffs' proper invocation of 28 U.S.C. § 1331 in tandem with 5 U.S.C. 702's waiver of the United States' sovereign immunity and the Plaintiffs' demonstration of their standing renders proper the Court's exercise of its subject matter jurisdiction over the Plaintiffs' non-APA claims.

## II.     THE PLAINTIFFS HAVE NOT DEMONSTRATED THAT THEY ARE ENTITLED TO A TRO.

A TRO is an "extraordinary remedy," for which a movant must demonstrate a "clear and unequivocal right" to have its request granted. Greater Yellowstone Coalition v. Flowers, 321 F.3d at 1256. See Herrera v. Santa Fe Pub. Sch., 792 F. Supp. 2d at 1181. Before a district court may issue a TRO pursuant to rule 65, the movant must make the same four showings as for a PI: (i) that it is substantially likely to succeed on the merits; (ii) that it will suffer irreparable injury if the court denies the requested relief; (iii) that its threatened injury without the restraining order outweighs the opposing party's under it; and (iv) that the requested relief is not adverse to the public interest. See Mrs. Fields Franchising, LLC v. MFGPC, 941 F.3d 1221, 1232 (10th Cir. 2019). When the United States is the opposing party, the "third and fourth factors 'merge.'" Aposhian v. Barr, 958 F.3d at 978 (quoting Nken v. Holder, 556 U.S. at 435). The likelihood-of-success and irreparable-harm factors are "the most critical" in the analysis. Nken v. Holder, 556 U.S. at 434.

The Court concludes that the Plaintiffs are not entitled to a TRO.  First, the Plaintiffs have not demonstrated a likelihood of success on the merits, because the Plaintiffs have not identified a viable cause of action to maintain their claims, nor plausibly alleged that agency counsel is allowing and encouraging non-attorney agency personnel to contact represented claimants in violation of agency policies and procedures.  Second, the Plaintiffs are not likely to suffer irreparable injury absent a TRO, because they have not demonstrated lasting or substantial harm to their attorney-client relationship that cannot be undone.  Third, the threatened injury does not outweigh the damage that the TRO may cause the Defendants and to the claims process, and a TRO would be adverse to the public interest.  Accordingly, the Court denies the TRO Motion.

### A.      THE PLAINTIFFS ARE NOT LIKELY TO SUCCEED ON THE MERITS.

The Plaintiffs have not shown that they are likely to succeed on the merits of their claim because: (i) they have not identified a viable cause of action on which to maintain their claim; and (ii) the Complaint's allegations are insufficient to state the violations that the Plaintiffs assert.  See Trudeau, 456 F.3d at 188 (addressing the question whether the plaintiff stated a claim first by determining whether the plaintiff identified a cause of action and second by evaluating the sufficiency of the plaintiff's claims).  The Court concludes that: (i) none of the statutory bases which the Plaintiffs identify supply a valid cause of action; and (ii) the Complaint's allegations are, furthermore, insufficient to state a claim upon which relief can be granted.  The Plaintiffs' inability to show a substantial likelihood of success on the merits is fatal to their application for a TRO.  See Nken v. Holder, 556 U.S. at 434.

1.   <u>The Plaintiffs Do Not Identify a Viable Cause of Action</u>.

The Plaintiffs identify three causes of action that they allege authorize their suit: (i) the APA and, specifically, 5 U.S.C. § 500(f); (ii) the McDade Act; and (iii) "the inherent power under Article III of the United States Constitution to control the practice of law of federal agencies and their attorneys in New Mexico . . . ."  Complaint ¶¶ 8, 21-22, at 4, 6-7.  <u>See</u> TRO Brief. at 7-10; Reply at 6-10.  The United States responds that none of the statutory bases which the Plaintiffs identify provide a cause of action and that the Court has no "inherent, Article III authority to enforce ethical rules against government lawyers."  Response at 10-13.  The Court agrees with the United States that the Plaintiffs do not identify a cause of action.

a.   **The Plaintiffs Do Not Identify a Cause of Action Under the <u>APA</u>.**

The APA authorizes suit by "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute." 5 U.S.C. § 702.  <u>See</u> <u>Bond v. United States</u>, 564 U.S. 211, 220 (2011)(identifying § 702 as the APA's cause of action); <u>Md. Dep't of Human Res. v. Dep't of Health & Human Servs.</u>, 763 F.2d 1441, 1445 n.1 (D.C. Cir. 1985)(recognizing that the APA "suppl[ies] a generic cause of action in favor of persons aggrieved by agency action").  To sustain a claim under the APA, the plaintiff must identify an agency action, which the APA defines as an "agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. § 551(13).  Furthermore, "the 'agency action' complained of must be 'final agency action.'"  <u>Norton v. S. Utah Wilderness All.</u>, 542 U.S. 55, 61-62 (2004). "An agency action is final if it meets two conditions."  <u>Sinclair Wyoming Ref. Co., LLC v. United States Env't Prot. Agency</u>, 72 F.4th 1137, 1143 (10th Cir. 2023).  "'First, the action must mark the consummation of the agency's

decisionmaking process -- it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." Sinclair Wyoming Ref. Co., LLC v. United States Env't Prot. Agency, 72 F.4th at 1143 (quoting Bennett v. Spear, 520 U.S. at 177-78). "Plaintiffs have the burden of identifying specific federal conduct and explaining how it is 'final agency action' within the meaning of section 551(13)." Colorado Farm Bureau Fed'n v. U.S. Forest Serv., 220 F.3d 1171, 1173 (10th Cir. 2000).

In their briefing, the Plaintiffs do not direct the Court to a challenged final agency action, and the Court is unable to locate one. First, the FEMA and NRCS communications which the Plaintiffs seek to enjoin are not agency actions, because they are not the equivalent of an "agency rule, order, license, sanction, relief . . . ." 5 U.S.C. § 551(13). Rather, these actions constitute the "day-to-day" activities of agency employees with which the Supreme Court has directed the judiciary not to interfere. Norton v. S. Utah Wilderness All., 542 U.S. 55, 67 (2004)("The prospect of pervasive oversight by federal courts . . . is not contemplated by the APA."). To the extent that the Plaintiffs' claim can be interpreted as a challenge to FEMA's internal policy of "work[ing] with Claimants . . . when claimant insists that they want to proceed without counsel," Reply at 5 (quoting Letter from Michael K. Cameron to Thomas Tosdal (dated October 18, 2023), filed November 14, 2023 (Doc. 19-6)("October 18 Letter")), this argument is likewise unavailing, because the Attorney Guidance Document and the statements made in the October 18 Letter are "nothing more than an internal guidance . . . that do[] not carry the 'force and effect of law,'" and, therefore, do not "reflect final agency action." Ass'n of Flight Attendants-CWA, AFL-CIO v. Huerta, 785 F.3d 710, 713 (D.C. Cir. 2015)(quoting Perez v. Mortg. Bankers Ass'n, 575 U.S. 92, 97 (2015)). See Cherry v. U.S. Dep't of Agric., 13 F. App'x 886, 890-91 (10th Cir.

2001)(concluding that a letter "which merely informs plaintiff" of his obligations under a statute did not "determine[] his legal rights," because it reflected previous decisions, and the letter "merely implemented the decisions").[11]   Finally, while FEMA's adoption of the final rule now codified at 44 C.F.R. 296 is a final agency action, see 5 U.S.C. § 551(13), the Defendants' subsequent actions to implement the regulations included therein are not final agency actions, see Chem. Weapons Working Grp., Inc. v. U.S. Dep't of the Army, 111 F.3d 1485, 1494 (10th Cir. 1997)(holding that "the implementation of" an already consummated final agency action is not itself final agency action).   In sum, the Plaintiffs bring "challenges to an agency's daily operations and implementation decisions made pursuant to a broader agency plan" that do not constitute final agency actions reviewable pursuant to the APA.   County Comm'rs of County of Sierra v. U.S. Dep't of the Interior, 614 F. Supp. 3d 944, 953 (D.N.M. 2022)(Wormuth, M.J.).

The Plaintiffs allege further that "[t]he agency actions are unlawful under § 706(2) because they violate 5 U.S.C. § 500(f) . . . ." Reply at 3.  Section 500(f) states, in relevant part:

> When a participant in a matter before an agency is represented by an individual qualified under subsection (b) or (c) of this section, a notice or other written communication required or permitted to be given the participant in the

---

[11]Cherry v. U.S. Dep't of Agric., 13 F. App'x 886 (10th Cir. 2001), is an unpublished opinion, but the Court can rely on a Tenth Circuit unpublished opinion to the extent its reasoned analysis is persuasive in the case before it.  See 10th Cir. R. 32.1(A) ("Unpublished decisions are not precedential, but may be cited for their persuasive value.").  The Tenth Circuit has stated:

> In this circuit, unpublished orders are not binding precedent, . . . and we have generally determined that citation to unpublished opinions is not favored. However, if an unpublished opinion or order and judgment has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005).  The Court concludes that Cherry v. U.S. Dep't of Agric. Has persuasive value with respect to a material issue, and will assist the Court in its disposition of this Memorandum Opinion and Order.

matter shall be given to the representative in addition to any other service specifically required by statute.

5 U.S.C. § 500(f).  While § 706, which defines the scope of judicial review under the APA, provides that a court shall "hold unlawful and set aside" certain agency actions, the Plaintiffs have not identified an agency action sufficient to trigger the Court's judicial review.  Audubon of Kansas, Inc. v. United States Dep't of Interior, 568 F. Supp. 3d 1167, 1179 (D. Kan. 2021)(Teeter J.)("An initial hurdle for [§ 706(1) and § 706(2)] claims is demonstrating that the action or inaction complained of meets the definition of 'agency action' under the APA. . . . The agency action must also be final." (citing Norton v. S. Utah Wilderness All., 542 U.S at 62)), aff'd in part, appeal dismissed in part, 67 F.4th 1093 (10th Cir. 2023).  In addition, § 500(f) does not provide an independent cause of action upon which the Plaintiffs could sustain their claims.  See Aiwasian v. Egger, No. CIV 84-4433, 1984 WL 178978, at *4 (C.D. Cal. November 30, 1984)(Brynem Jr., J.)("[T]he Court finds that section 500(f) of the Act does not create an independent cause of action, and plaintiffs have failed to state a claim upon which relief may be granted.").  To the contrary, Courts that have addressed alleged violations of § 500(f) have held that, when the prerequisites to the subsection are met, which the Court addresses in detail infra, at 107-08, the statute may only provide for the invalidation of the "notice or other written communication" required to be sent.  5 U.S.C. § 500(f).  See Alfieri v. Comm'r of Internal Revenue, 60 T.C. 296, 299 ("The remedy, if any, that petitioners might have under the provisions of 5 U.S.C. 500 is not having the notice of deficiency sent in accordance with all of the provisions of the Internal Revenue Code held to be invalid."), aff'd sub nom. Alfieri v. Comm'r, 487 F.2d 1393 (2d Cir. 1973).  In sum, the Plaintiffs cannot rely on the APA to provide

a cause of action, and, moreover, the Court is divested of jurisdiction over the Plaintiffs' APA claims.

### b.    The Plaintiffs Do Not Identify a Cause of Action Under the McDade Act.

"The McDade Act mandates that federal attorneys for the government are to be bound by state professional rules . . . ."  United States v. Colorado Supreme Ct., 189 F.3d 1281, 1284 (10th Cir. 1999).  Specifically, the McDade Act provides:

> **(a)**    An attorney for the Government shall be subject to State laws and rules, and local Federal court rules, governing attorneys in each State where such attorney engages in that attorney's duties, to the same extent and in the same manner as other attorneys in that State.

> **(b)**    The Attorney General shall make and amend rules of the Department of Justice to assure compliance with this section.

> **(c)**    As used in this section, the term "attorney for the Government" includes any attorney described in (section 77.2(a) of part 77 of title 28 of the Code of Federal Regulations and also includes any independent counsel, or employee of such a counsel, appointed under chapter 40.

28 U.S.C. § 530B.  28 C.F.R § 77.2, in turn, states:

> (a)    The phrase attorney for the government means the Attorney General; the Deputy Attorney General; the Solicitor General; the Assistant Attorneys General for, and any attorney employed in, the Antitrust Division, Civil Division, Civil Rights Division, Criminal Division, Environment and Natural Resources Division, and Tax Division; the Chief Counsel for the DEA and any attorney employed in that office; the Chief Counsel for ATF and any attorney employed in that office; the General Counsel of the FBI and any attorney employed in that office or in the (Office of General Counsel) of the FBI; any attorney employed in, or head of, any other legal office in a Department of Justice agency; any United States Attorney; any Assistant United States Attorney; any Special Assistant to the Attorney General or Special Attorney duly appointed pursuant to 28 U.S.C. 515; any Special Assistant United States Attorney duly appointed pursuant to 28 U.S.C. 543 who is authorized to conduct criminal or civil law enforcement investigations or proceedings on behalf of the United States; and any other attorney employed by the Department of Justice who is authorized to conduct criminal or civil law enforcement proceedings on behalf of the United States. The phrase attorney for the government also includes any

independent counsel, or employee of such counsel, appointed under chapter 40 of
title 28, United States Code. The phrase attorney for the government does not
include attorneys employed as investigators or other law enforcement agents by
the Department of Justice who are not authorized to represent the United States in
criminal or civil law enforcement litigation or to supervise such proceedings.

28 C.F.R § 77.2(a).   In addition, 28 C.F.R. § 77.5 states that "[t]he principles set forth

herein . . . are intended solely for the guidance of attorneys for the government."  28 C.F.R. §

77.5.  The regulation proceeds to advise that the principles are "not intended to, do not, and may

not be relied upon to create a right or benefit, substantive or procedural, enforceable at law by a

party to litigation with the United States . . . ."  28 C.F.R. § 77.5.

The Plaintiffs' assertions that the McDade Act provides them a cause of action runs

headlong into two fatal limitations.  First, the McDade Act does not provide an independent

cause of action on which the Plaintiffs can premise their claims. See King v. Moossy, No. CIV

10-1893, 2010 WL 4569994, at *1 (D.D.C. November 3, 2010)(Collyer, J.), aff'd, 424 F. App'x

11 (D.C. Cir. 2011); Perkins v. Lewis, No. CIV 06-2177, 2007 WL 1118723, at *7 (C.D. Ill.

April 10, 2007)(McCuskey, C.J.)("Plaintiff cannot enforce this statute because the statute does

not 'create a right or benefit, substantive or procedural, enforceable at law by a party to

litigation.'" (quoting 28 C.F.R. § 77.5)); Dixon v. Admin. Appeal Dep't Off. of Info. & Priv.,

No. CIV 06-6069, 2008 WL 216304, at *6 (S.D.N.Y. January 22, 2008)(Kaplan, J.)("This statute

contains no suggestion that it is intended to provide an independent right of action to members of

the public."), aff'd, 336 F. App'x 98 (2d Cir. 2009).  Moreover, attorneys for FEMA and NRCS,

whom the Plaintiffs allege violated the McDade Act, do not fall within the definition of "attorney

for the government" in 28 C.F.R. § 77.2, which identifies as covered attorneys those attorneys

working within the United States Department of Justice, United States Attorney's Offices, and

several United States law enforcement agencies, nor are they independent counsel appointed

pursuant to 28 U.S.C. § 40.  See 28 U.S.C. § 530B(c); SEC v. Harkins, No. CIV 19-2418, 2022

WL 3597453, at *5 n.7 (D. Colo. August 23, 2022)(Brimmer, C.J.)("Section 77.2(a), however,

does not list attorneys for the SEC.").   Accordingly, the McDade Act does not provide the

Plaintiffs a cause of action.

> ### c.      The Court's Local-Rule Authority Over Attorneys Who Appear Before It Does Not Provide the Plaintiffs with an Independent Cause of Action to Bring Their Claims.

The Plaintiffs contend that they state a cause of action based on the Court's "inherent

power under Article III of the United States Constitution to control the practice of law of federal

Agencies and their attorneys in New Mexico."   Complaint ¶ 8, at 4.  See TRO Brief. at 9-10.   In

support of this proposition, the Plaintiffs identify language in Matter of Doe, 801 F. Supp. 478

(D.N.M. 1992)(Burciaga, J.), that they contend "confirm[s]" that "this is a special proceeding

invoking 'the inherent [Article III] power of [federal] courts over their officers' to protect the

attorney-client relationship from Government intrusion."   TRO Brief. at 10 (quoting Matter of

Doe, 801 F. Supp. at 483).  See Reply at 3; Tr. at 8:16-21 (Dow)(arguing that Matter of Doe

establishes "that an attorney, through agents, cannot communicate through those agents to

interfere with the attorney-client relationship").   The United States responds that federal courts

do not have "authority to enforce ethical rules against government lawyers" and contends that

Matter of Doe supports this conclusion by acknowledging "the primacy of state courts in

enforcing state ethical rules."   Response at 13-14.   The Court concludes that it has no inherent

power to control the conduct of federal attorneys practicing in New Mexico not appearing before

it which provides the Plaintiffs with a cause of action.

In Matter of Doe, the New Mexico Disciplinary Board ("NM Disciplinary Board")

initiated disciplinary proceedings against an Assistant United States Attorney ("AUSA") licensed

in New Mexico for "allegedly communicat[ing] personally or through his detective with" a defendant he was prosecuting "with full knowledge that [the defendant] was represented by an attorney." Matter of Doe, 801 F. Supp. at 480. The AUSA removed the disciplinary proceeding to federal court pursuant to 28 U.S.C. § 1442, which "permits removal of a 'civil action' or 'criminal prosecution' commenced against a federal officer." Matter of Doe, 801 F. Supp. at 481. The NM Disciplinary Board argued for remand. See Matter of Doe, 801 F. Supp. at 481. Chief Judge Burciaga concluded that, because the disciplinary proceeding was "neither a criminal prosecution of nor civil action against" the AUSA, the latter could not remove the proceeding pursuant to § 1442. Matter of Doe, 801 F. Supp. at 483. In reaching this conclusion, Chief Judge Burciaga recognized that disciplinary proceedings for violations of attorney conduct rules are matters that "federal courts have consistently left in state hands." Matter of Doe, 801 F. Supp. at 483. In support of his conclusion that a "disciplinary proceeding is neither a criminal prosecution of nor civil action," Matter of Doe, 801 F. Supp. at 482-83, Chief Judge Burciaga quotes language from In re Echeles, 430 F.2d 347 (7th Cir. 1970), in which the United States Court of Appeals for the Seventh Circuit notes that "'[d]isbarment and suspension proceedings are neither civil nor criminal in nature, but are special proceedings, *sui generis*, and result from the inherent power of courts over their officers,'" Matter of Doe, 801 F. Supp. at 483 (quoting In re Echeles, 430 F.2d at 349). The Seventh Circuit, in In re Echeles, recognized that "the District Court appropriately has adopted a local rule defining the grounds upon which suspension or disbarment of an attorney may be had." In re Echeles, 430 F.2d at 350. D.N.M.LR-Civ. 83.10(a) likewise provides that "[t]he Court, *sua sponte* or upon determining that a member of the Bar of this District Court has been disciplined, suspended or disbarred by any state or has been convicted of a felony, may discipline, suspend or disbar the attorney."

The Court, therefore, understands Matter of Doe and In re Echeles to provide support for district courts' inherent authority to discipline, suspend, or disbar members of the district bar, as outlined in the District of New Mexico Local Rules ("DNM Local Rules"), but not for a wide-ranging authority to prevent federal attorneys not appearing before the court from taking certain actions.  See D.N.M.LR-Civ. 83.10(a).  See Hayes v. SkyWest Airlines, Inc., 12 F. 4th 1186, 1194 (10th Cir. 2021)(explaining that courts' power over officers derives from "[n]either rule nor statute" but "from the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases").  As the Plaintiffs concede, this case "is not a disciplinary or suspension proceeding" over which the court has inherent authority. Reply at 10.  Rather, the Plaintiffs request that the Court enjoin certain attorney behavior, an action for which the DNM Local Rules provide no support.  See Complaint ¶ 8, at 4 ("This Court has the inherent power . . . to prohibit a pattern and practice of continued violations of the New Mexico Rules of Professional Conduct . . . .").  Moreover, even if the Plaintiffs were requesting that the Court discipline, suspend, or disbar FEMA and NRCS attorneys for alleged ethical violations, neither the DNM Local Rules nor any case that the Plaintiffs cite provide an avenue by which litigants may petition a district court to take punitive action against a member of the district bar.  Rather, the "'[d]isbarment and suspension proceedings,'" Matter of Doe, 801 F. Supp. at 483 (quoting In re Echeles, 430 F.2d at 349), contemplated by the DNM Local Rules may only be initiated sua sponte by the district court, see D.N.M.LR-Civ. 83.10(a).  As was the case in In re Matter of Doe, the Disciplinary Board of the New Mexico Supreme Court remains the proper venue for complaints alleging that attorneys practicing in New Mexico violated the NMRCP.   See Official Complaint Against an Attorney Form, Disciplinary Board of the New Mexico Supreme Court (last visited April 16, 2024), https://nmdisboard.org/for-the-public/file-a-

complaint/complaint-against-attorney-form.[12]

Finally, as Chief Judge Burciaga identifies, the NMRPC, which the Plaintiffs allege FEMA and NRCS attorneys are violating, states: "Violation of a rule should not itself give rise to a cause of action . . . .  The rules are designed to provide guidance to lawyers and to provide a structure for regulating conduct through disciplinary agencies.  They are not designed to be a basis for civil liability."  NMRPC Scope.  That the Supreme Court of New Mexico, in promulgating the NMRPC, has advised that a civil action cannot be premised on a violation of the NMRPC, supports both the conclusion that the Court has no inherent authority to control federal attorney behavior vis-à-vis the NMRCP and the conclusion that, even if the Court had such authority, the Plaintiffs would not have a civil cause of action to invoke this authority.  For these reasons, the Court concludes that its inherent power over attorneys appearing in proceedings before it, see D.N.M.LR-Civ. 83.10(a), does not provide an independent cause of action on which the Plaintiffs can petition the Court to enjoin the behavior of attorney's practicing in New Mexico.  In sum, the Plaintiffs do not have a likelihood of success on the merits, because they have not stated a cause of action under the APA, the McDade Act, or the Court's inherent authority over federal officers.

### 2.    The Plaintiffs' Allegations are Legally Insufficient to State a Claim Upon Which Relief Can be Granted.

Even if the Plaintiffs had identified a viable cause of action, the Court concludes that they

---

[12]On this point, the Court agrees with Judge Burciaga that matters of attorney misconduct are, as a general rule, best left to State disciplinary boards.  As Judge Burciaga notes, "this result comports with the deference federal courts accord states to admit or discipline the attorneys they choose to license."  Matter of Doe, 801 F. Supp. at 483.  The Supreme Court, likewise, has recognized that the States are "responsible for the discipline of lawyers."  Leis v. Flynt, 439 U.S. 438, 442 (1979).  See id. at 442 ("Since the founding of the Republic, the licensing and regulation of lawyers has been left exclusively to the States and the District of Columbia within their respective jurisdictions.").

are not likely to succeed on the merits, because their allegations are insufficient to allege plausibly a violation of the statutes which the Plaintiffs identify.  See Trudeau, 456 F.3d at 191 ("[W]e now discuss why the allegations of Trudeau's complaint are nonetheless legally insufficient to state claims upon which relief can be granted.").  The Plaintiffs argue that they "are substantially likely to succeed on the merits because of 5 U.S.C. § 500(f) of the APA," Reply at 6, and because the Defendants are violating the NMRPC, Reply at 10.  Specifically, the Plaintiffs contend that "FEMA's general counsel has promulgated policies which . . . blatantly violate the 'no contact' rule and 5 U.S.C. § 500f," Reply at 6 (no citation given for quotation), and allege that "FEMA general counsel advises that an employee may make direct contact with represented claimants to submit a written offer," Reply at 10.  The Defendants respond that the Plaintiffs do not demonstrate a likelihood of success on the merits, because they "offer no evidence of lawyers directing impermissible communications with claimants."  TRO Response at 17.

First, even if § 500(f) could provide the Plaintiffs with a cause of action, the Plaintiffs have not alleged plausibly a violation of the statute for four independent reasons.  First, the Plaintiffs have not alleged that their counsel "fil[ed] with the agency a written declaration" asserting that they are "qualified" and "authorized" to represent the Plaintiffs.  5 U.S.C. § 500(b).  See McDaniel v. Israel, 534 F. Supp. 367, 368 (W.D. Va. 1982)(Michael, J.)("In each case . . . plaintiff, C. Waverly Parker, an attorney . . . submitted [a] statement to the Department of Health and Human Services [requesting the agency to send her] all notices or other written communication required or permitted to be given to my said client in connection with such claims . . . .").  Second, the Plaintiffs have not alleged that they received "a notice or other written communication" which should have been sent to their attorneys pursuant to § 500(f).

5 U.S.C. § 500(f).  The Vigils and Sandoval received only verbal communications directing them to withdraw from their representation, see FOF ¶¶ 50, 70-71 at 12, 15, and the settlement offer which Griego alleges that he received was not in writing, see TRO Brief. at 4 ("[T]he FEMA personnel . . . left when Mr. Griego asked them to put in writing their statement to him . . . .").

Third, § 500(f) does not bar "an agency from conducting preliminary investigations . . . ." Nai v. Immigr. & Naturalization Serv., 537 F.2d 566, 568-69 (1st Cir. 1976)(declining to find a violation § 500(f) where an immigration inspector came to the petitioners' home, "inquired whether a particular attorney (whom he named) represented the couple in immigration matters," and took the petitioners' passports).  The inquiry whether Sandoval would allow an inspection of his property, see FOF ¶ 67, at 15, and the home visits from agency staff that the Vigils and Griego experienced, see FOF ¶¶ 46-47, 59, at 12, 14 -- both of which, notably, occurred before the Vigils and Griego had initiated the claims process before FEMA by submitting a Notice of Loss -- constitute preliminary investigatory activities.  Fourth, where courts have found a § 500(f) violation, no remedy has been afforded the plaintiffs, because the violations have all been adjudged harmless.  See Neuhoff v. Comm'r of Internal Revenue, 75 T.C. 36, 42 (1980)("While respondent failed to comply with 5 U.S.C. sec. 500(f) by not notifying petitioner's legal representative with respect to the consent, we find such failure to be harmless under the facts of this case."), aff'd sub nom. Neuhoff v. Comm'r, 669 F.2d 291 (5th Cir. 1982); Alfieri v. Comm'r of Internal Revenue, 60 T.C. 296, 300 (1973)(concluding that "petitioners were in no way harmed by a failure of the Commissioner to send a copy of the notice of deficiency to their attorney," and recognizing that "[t]he remedy, if any, that petitioners might have under the provisions of 5 U.S.C. 500 is not having the notice of deficiency sent in accordance with all of the provisions of the Internal Revenue Code held to be invalid"), aff'd sub

nom. Alfieri v. Comm'r, 487 F.2d 1393 (2d Cir. 1973).  Here too, any failure to communicate

with the Plaintiffs' counsel is harmless, because, as the existence of this lawsuit proves, the

Plaintiffs have informed their counsel about the communications they receive.  See Alfieri v.

Comm'r of Internal Revenue, 60 T.C. at 300 (concluding that the Internal Revenue Service's

failure to provide the petitioner's attorney with a written notice was harmless, because "it is clear

that petitioners' attorney did in some manner come by a copy of the deficiency notice").

Second, even if the Court could enforce the NMRPC under the McDade Act or under

some other cause of action, the Plaintiffs have not alleged sufficiently that the Defendants are

violating the rules.  In relevant part, NMRPC 16-402 provides:

> In representing a client, a lawyer shall not communicate about the subject of the
> representation with a person the lawyer knows to be represented by another
> lawyer in the matter, unless the lawyer has the consent of the other lawyer or is
> authorized to do so by law or a court order.

NMRPC 16-402.  The commentary to NMRPC 16-402 provides that "[t]he rule applies even

though the represented person initiates or consents to the communication."  NMRPC 16-402,

cmt. 3.  NMRPC 16-402's commentary further states that "[a] lawyer may not make a

communication prohibited by this rule through the acts of another," but advises that "[p]arties to

a matter may communicate directly with each other."  NMRPC 16-402, cmt. 4.  Finally,

"[c]ommunications authorized by law may . . . include investigative activities of lawyers

representing governmental entities, directly or through investigative agents, prior to the

commencement of criminal or civil enforcement proceedings."  NMRPC 16-402, cmt. 6.

Here, the Plaintiffs do not dispute that dispute that NMRPC 16-402 does not bar a

represented client from communicating with another represented client in the same matter.  See

Response at 10.  Because the FEMA and NRCS employees who are alleged to have interfered

with the Plaintiff's attorney-client relationship are clients of the agencies' counsel, see FOF ¶ 33, at 9, any communications between agency employees and the Plaintiffs do not violate NMRPC 16-402, unless these communications constitute communications by agency counsel "through the acts of" agency employees, NMRPC 16-402, cmt. 4.   See McClelland v. Blazin' Wings, Inc., 675 F. Supp. 2d 1074, 1077 (D. Colo. 2009)(Boland, M.J.) ("There is no allegation that the plaintiff's lawyers violated Rule 4.2 by personally contacting Mehas.   Instead, the defendant claims that the plaintiff's lawyers engaged Cinquanta, who violated the rule.").

Although there "is a dearth of authority specifically addressing when an attorney has violated the rules of professional conduct 'through the acts of another,'" district courts in the Tenth Circuit have suggested "that there is a broad spectrum of conduct that constitutes a violation of" professional conduct rules prohibiting attorney communications with represented parties through the acts of another.   Holdren v. Gen. Motors Corp., 13 F. Supp. 2d 1192, 1195 (D. Kan. 1998)(Lungstrum, J.)(no citation given for quotation).   For example, on one end of the spectrum, courts have suggested that an "attorney's mere knowledge of a client's contact or action is sufficient to constitute an ethical violation," where the attorney's client is alleged to have communicated with the opposing party at his or her client's behest.   Holdren v. Gen. Motors Corp., 13 F. Supp. 2d 1192, 1195 (D. Kan. 1998)(Lungstrum, J.)(citing Massa v. Eaton Corp., 109 F.R.D. 312, 313 (W.D. Mich. 1985)).   See Miano v. AC & R Advert., Inc., 148 F.R.D. 68, 82 (S.D.N.Y. 1993)(Katz, M.J.)("There is an argument to be made, however, that the constraints on an attorney must go even further, so as to address the situation where he or she does not explicitly instruct another to act but accomplishes the same result indirectly."), as amended (March 4, 1993), adopted, 834 F. Supp. 632 (S.D.N.Y. 1993).   But see Contini By & Through Contini v. Hyundai Motor Co., No. CIV 90-3547, 1991 WL 274465, at *4 (S.D.N.

December 10, 1991)(Dolinger, M.J.))("If the attorney did not request or encourage the improper contact, then he did not 'cause' it and hence has not violated the Disciplinary Rule.").  On the other end of the spectrum, "cases in which an attorney actually requests or engineers a contact or action by the client that would otherwise be prohibited by the disciplinary rules," constitute clear violations of the prohibition on attorney contact through the acts of another with represented individuals.  Holdren v. Gen. Motors Corp., 13 F. Supp. 2d at 1195 (citing In re Marietta, 223 Kan. 11, 569 P.2d 921 (1977)).  When evaluating an attorney's conduct, the Court has recognized that "the requirement of knowing in rule 16-402 is very important."  Walker v. THI of N.M. at Hobbs Ctr., 803 F. Supp. 2d 1285, 1287 (D.N.M. 2011)(Browning, J.).

The Plaintiffs have supplied no evidence that agency attorneys directed the agency employees' alleged communications or knew about agency employees' alleged communications with the Plaintiffs.  See Complaint ¶ 33, at 9 ("Upon information and belief . . . it is the official policy of FEMA to seek to dissuade claimants from being represented by counsel, and to interfere with the attorney-client relationship . . . .").  For example, the Plaintiffs contend that "FEMA general counsel advises that an employee may make direct contact with represented claimants to submit a written offer to Griego," but offer no evidence to support their contention that any FEMA attorney directed an agency employee to attempt to settle with Griego.  Reply at 20.  Instead, the Plaintiffs argue that the Court must presume that FEMA attorneys would approve the offer.  See Tr. at 18:5-10 (Tosdal)(arguing that it "defies belief" that "FEMA attorney[s]" would not have approved "a $1.5 million settlement" offer").  FEMA attorneys, however, "do not 'draft settlement documents' nor do they 'direct the substance of communications that . . . claims office personnel engage in with claimants.'"  FOF ¶ 33, at 9 (quoting Tr. at 22:12-23:5 (Court, Juzaitis)).

Despite that the Plaintiffs have offered no direct evidence that agency counsel caused or had knowledge of the alleged communications, FEMA attorneys have knowledge that FEMA employees will communicate with represented claimants if the claimants initiate contact with FEMA employees and affirm that they wish to proceed without their counsel's presence.  See FOF ¶¶ 28-30, at 8; October 6 Letter at 2 ("Claims personnel only work with the claimants, some of whom may be your clients, when the claimant insists that they want to proceed without counsel.").  The question remains, therefore, whether FEMA counsel violate NMRPC 16-402 through their knowledge that their clients, FEMA employees, may communicate with represented claimants in this manner.  The Court concludes that FEMA counsel have not violated NMRPC 16-402, because "parties have a right to deal directly with each other and without the consent of an attorney . . . ."  Miano v. AC & R Advert., Inc., 148 F.R.D. at 82.  See NMRPC 16-402, cmt. 4 ("Parties to a matter may communicate directly with each other . . . ."); Dorsey v. Home Depot U.S.A., Inc., 271 F. Supp. 2d 726, 730 (D. Md. 2003)(Messitte, J.)("Nothing in the law prohibits litigants or potential litigants from speaking among and between themselves, as opposed to attorneys for such parties attempting direct communications with represented parties.").  Despite that FEMA counsel understand that their FEMA-employee clients may communicate with represented claimants where those claimants insist on working with them, "'there is nothing in the disciplinary rules which restricts a client's right to act independently in initiating communications with the other side, or which requires that lawyers prevent or attempt to discourage such conduct.'"  Holdren v. Gen. Motors Corp., 13 F. Supp. 2d at 1195 (quoting Miano v. AC & R Advertising, Inc., 148 F.R.D. at 83).  See Boyd v. Johnson, 125 A. 697, 698 (1924)("The great weight of authority sustains the right of a client, at any time before judgment, if acting in good faith, to compromise, settle, or dismiss his cause of action, without his

attorney's intervention, knowledge, or consent."). To the contrary, "contact among parties is generally encouraged as a means of facilitating settlement and avoiding protracted litigation." Trujillo v. Bd. of Educ. of the Albuquerque Pub. Sch., No. CIV. 02-1146, 2007 WL 1306604, at *1 (D.N.M. April 4, 2007)(Browning, J.). Moreover, the American Bar Association ("ABA") has advised "that a lawyer may give substantial assistance to a client regarding a substantive communication with a represented adversary" without violating the prohibition on communications with represented parties by acting through their clients. Advising Clients Regarding Direct Contacts with Represented Persons, ABA Formal Op. 11-461 (2011).

Finally, affording claimants the agency to communicate with FEMA claims staff without their attorney present effectively balances the "policy purposes" behind the rule barring attorney communication with represented parties with "the principle that, as a general proposition, parties to a matter may communicate directly with each other." Communication with a Represented Person by a Pro Se Lawyer, ABA Formal Op. 22-502 (2022). The Supreme Court of New Mexico has held that "[t]he purpose of [rule 16-402] is to protect the lay person from the possibility of an attorney utilizing his or her legal training and expertise to gain an advantage in a situation where the lay person already has acknowledged unfamiliarity with the legal complexities at hand by having retained counsel." In re Herkenhoff, 1993-NMSC-081, 116 N.M. 622, 624 866 P .2d 350, 352. Where a represented claimant "independently initiate[s] . . . contact" with Claims Office personnel, "[t]he claimant must express their intent to engage with the Claims Office without the participation of their counsel." Attorney Interaction Guide at 4. Claims Office employees must "[a]sk if the claimant would like to stop the discussion until their attorney is included or if they would like the Claims Office to work with their attorney directly," and "cannot . . . appear to give legal advice." Attorney Interaction Guide

- 113 -

at 5.   Next, represented claimants must sign an Intent to Proceed Without Counsel acknowledging that, despite their representation, the claimant "nonetheless would like to discuss my claim or portions thereof directly with the Claims Office."   Intent to Proceed at 1.   In addition, the form advises the claimant that Claims Office employees have recommended that the Claimant inform his or her attorney that the claimant is "working directly with the Claims Office on [his or her] claim," and explains that, even if the claimant "personally and individually negotiate[s] a settlement," he or she still may "owe fees" to their attorney.   Intent to Proceed at 1. The Court concludes that these safeguards -- which ensure that a represented claimant may involve his or her attorney even in communications with non-attorney FEMA employees -- sufficiently protect claimants "who ha[ve] chosen to be represented by a lawyer in a matter against possible overreaching by other lawyers who are participating in the matter."   NMRPC 16-402, cmt. 1.   Accordingly, FEMA counsel do not violate NMRPC 16-402 when they have knowledge that their clients, FEMA claims employees, may communicate with represented claimants regarding the claims process where the claimants insist on communicating with claims employees without their attorney present.   Because the Plaintiffs have not identified a cause of action nor alleged facts sufficient to state the violations that they assert, they have not demonstrated a likelihood of success on the merits.

### B.   THE PLAINTIFFS HAVE NOT SHOWN THAT THEY WILL SUFFER IRREPARABLE HARM.

The Plaintiffs have not made "a clear and unequivocal showing it will likely suffer irreparable harm absent preliminary relief."   State v. U.S. Env't Prot. Agency, 989 F.3d 874, 886 (10th Cir. 2021).   See Winter v. Nat. Res. Def. Council, Inc., 555 U.S. at 22 ("Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with our

characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a

clear showing that the plaintiff is entitled to such relief."). "Although irreparable harm 'does not

readily lend itself to definition,' 'a plaintiff must demonstrate a significant risk that he or she will

experience harm that cannot be compensated after the fact by money damages.'" New Mexico

Dep't of Game & Fish v. United States Dep't of the Interior, 854 F.3d 1236, 1250 (10th Cir.

2017)(quoting Fish v. Kobach, 840 F.3d 710, 751-52 (10th Cir. 2016)). The harm a plaintiff

must demonstrate "must be both certain and great," and not "merely serious or substantial."

Prairie Band of Potawatomi Indians v. Pierce, 253 F.3d 1234, 1250 (10th Cir. 2001). "[A]

speculative or theoretical injury will not suffice." State v. U.S. Env't Prot. Agency, 989 F.3d at

884. "[C]ourts should interpret the 'irreparable harm' factor in conjunction with whether the

movant is likely to succeed on the merits." Legacy Church, Inc. v. Kunkel, 455 F. Supp. 3d

1100, 1163 (D.N.M. 2020)(Browning, J.), aff'd Legacy Church, Inc. v. Collins, 853 F. App'x

316 (10th Cir. 2021).

Here, the Plaintiffs argue that "the damage to attorney-clients relationships is not just

probable but is actual, ongoing, persistent and irreparable if allowed," TRO Brief at 13, and

allege that "the harm to Plaintiffs' attorney-client relationships has caused and will continue to

cause irreparable harm to Plaintiffs," TRO Brief at 14. The Court agrees with the Plaintiffs to

the extent that the harm that the Plaintiffs allege to their attorney-client relationships is not a

harm that money damages can easily remedy. See Prairie Band of Potawatomi Indians v. Pierce,

253 F.3d at 1250 ("Cases have also noted that irreparable harm is often suffered when "the injury

can[not] be adequately atoned for in money . . . ."). Harm to an individual's relationship with

their attorney is "not easily subject to valuation . . . ." Prairie Band of Potawatomi Indians v.

Pierce, 253 F.3d at 1251. See Dominion Video Satellite, Inc. v. Echostar Satellite Corp., 356

F.3d 1256, 1264 (10th Cir. 2004)("[T]he irreparable harm findings are based on such factors as the difficulty in calculating damages . . . .").

Nevertheless, the harm that the Plaintiffs must show is likely to occur "must be both certain and great." Prairie Band of Potawatomi Indians v. Pierce, 253 F.3d at 1250.  First, the alleged harm is not certain; it is "speculative."  State v. U.S. Env't Prot. Agency, 989 F.3d at 884.  The Plaintiffs' allegation that "the harm to Plaintiffs' attorney-client relationships . . . will continue to cause irreparable harm" is conclusory; the Plaintiffs do not supply any evidence demonstrating that their relationship with their attorneys has been disrupted or will be harmed in the future.  TRO Brief at 14.  Although the Plaintiffs' declarations describe the communications they received from FEMA and NRCS employees, they do not allege in any way that these communications harmed or will harm their relationship with their attorneys.  See State v. U.S. Env't Prot. Agency, 989 F.3d at 887 ("The declaration doesn't describe when these unidentified enforcement actions occurred, what they entailed, or where the violations occurred.").  "The record evidence raises, at most, the mere possibility" that the Plaintiffs may, "at some point in the future," be deterred from communicating with their attorneys.  State v. U.S. Env't Prot. Agency, 989 F.3d at 887.  "Allegations of a subjective 'chill,'" like the potential that some future plaintiff may be chilled from engaging in their attorney-client relationship, however, "are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm." Citizen Ctr. v. Gessler, 770 F.3d 900, 913 (10th Cir. 2014)(quoting Laird v. Tatum, 408 U.S. 1, 13-14 (1972)).  Moreover, at bottom, "[t]he mere possibility of irreparable harm is not enough to justify the granting of a temporary restraining order," New Mexico Cattle Growers' Ass'n v. United States Forest Serv., 2023 WL 2185698, at *12,  because "[i]ssuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with our

characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief," Winter v. Nat. Res. Def. Council, Inc., 555 U.S. at 22.

Second, the alleged harm is not "great"; it is slight.  Prairie Band of Potawatomi Indians v. Pierce, 253 F.3d at 1250.  See Heideman v. S. Salt Lake City, 348 F.3d 1182, 1190 (10th Cir. 2003)("[W]hile the harm to the Plaintiffs may arguably be imminent and irreparable, it is not 'great' or 'substantial.'" (no citation given for quotation)).  The Plaintiffs have not alleged sufficiently that their attorney-client relationship has been or will be greatly damaged absent a TRO; rather, the fact that, shortly after the alleged communications from FEMA and NRCS employees were received, the Plaintiffs provided their attorneys with declarations and filed the present lawsuit suggests the relationship has suffered little damage.  Cf. Seneca-Cayuga Tribe of Oklahoma v. State of Okl. ex rel. Thompson, 874 F.2d 709, 716 (10th Cir. 1989)(finding irreparable injury where threatened loss of revenues and jobs created "prospect of significant interference with [Tribal] self-government"); Fish v. Kobach, 840 F.3d at 753 ("[W]e determine that the court did not abuse its discretion in concluding that there was an almost certain risk that thousands of otherwise qualified Kansans would be unable to vote in November.").  Moreover, because the Court must "interpret the 'irreparable harm' factor in conjunction with whether the movant is likely to succeed on the merits," Legacy Church, Inc. v. Kunkel, 455 F. Supp. 3d at 1163, that the Plaintiffs have not identified a proper cause of action nor demonstrated the legal validity of their allegations, and are, therefore, unlikely to succeed on the merits, further suggests that the Plaintiffs will not suffer irreparable harm absent an injunction, Legacy Church, Inc. v. Kunkel, 455 F. Supp. 3d at 1163 ("Without a constitutional violation to point to, Legacy Church has not presented 'actual or significant' injury." (quoting Schrier v. Univ. of Colo., 427 F.3d

1253, 1267 (10th Cir. 2005)).  For these reasons, and recognizing that a showing of irreparable

harm is "not an easy burden to fulfill," Greater Yellowstone Coal. v. Flowers, 321 F.3d at 1258,

the Court concludes that the Plaintiffs have not made "a clear and unequivocal showing [that

they] will likely suffer irreparable harm absent preliminary relief," State v. U.S. Env't Prot.

Agency, 989 F.3d at 886.[13]

### C. THE BALANCE OF THE EQUITIES WEIGHS IN THE DEFENDANTS' FAVOR AND THE PUBLIC HAS A STRONG INTEREST IN THE TRO'S DENIAL.

The third and fourth Winter factors "assess[] the harm to the opposing party and weigh[]

the public interest."  Nken v. Holder, 556 U.S. at 435.  To determine whether the "balance of

equities tips in [the movant's] favor," Winter v. Nat. Res. Def. Council, Inc., 555 U.S. at 20, the

court must assess whether the "threatened injury outweighs any injury to [non-movants] caused

by granting the injunction," Awad v. Ziriax, 670 F.3d 1111, 1131 (10th Cir. 2012).  Whether the

preliminary injunction is in the public's interest, "is another way of inquiring whether there are

policy considerations that bear on whether the order should issue." 11A C. Wright & A. Miller,

Fed. Prac. & Proc. Civ. § 2948.4.  These final two Winter factors "merge when the Government

---

[13]That the Court concludes that the Plaintiffs have not established a likelihood of
irreparable harm because the harm they allege is not "great," Prairie Band of Potawatomi Indians
v. Pierce, 253 F.3d at 1250, is not at odds with the Court's conclusion that the Plaintiffs
demonstrate that they have suffered an injury in fact sufficient to confer Article III standing, see
supra, at 48-57.  The inquiry whether a plaintiff suffers an injury in fact for standing purposes is
a distinct from an assessment of the harm a plaintiff alleges to sustain their claim on its merits.
See Warth v. Seldin, 422 U.S. at 500 ("[S]tanding in no way depends on the merits of the
plaintiff's contention that particular conduct is illegal . . . ."); In re Special Grand Jury 89-2, 450
F.3d at 1172 ("[A]n interest can support standing even if it is not protected by law.").  To
conflate the assessment of injury in fact with merits arguments regarding the degree of harm the
plaintiff alleges to have suffered would "put the merits cart before the standing horse," Initiative
& Referendum Inst. v. Walker, 450 F.3d at 1093, and "collapse [the] evaluation under Federal
Rule of Civil Procedure 12(b)(6) for failure to state a claim into an Article III standing
evaluation," Cottrell v. Alcon Lab'ys, 874 F.3d at 164.

is the opposing party." Nken v. Holder, 556 U.S. at 435.  The Plaintiff's argue that "[t]he

threatened and continued violation of federal and state rules of professional conduct by

Defendants . . . far exceeds any perceived (if any) injury to Defendants," who, according to the

Plaintiffs, "cannot credibly argue that following the APA and the NM RPC will cause any

injury . . . ."  Reply at 11.  The United States responds that a TRO would "hamstring FEMA's

claims process, delay relief to harmed parties, and contravene the Act's purpose of providing

expeditious relief," and "rais[e] profound separation-of-powers concerns."  Response at 22-23.

The Court concludes that the Plaintiffs have "not shown that the threatened injury outweighs the

harms that the preliminary injunction will cause the government or that the injunction, if issued,

will not adversely affect the public interest."  Aposhian v. Barr, 958 F.3d at 990.

As the Court has previously discussed, the threatened injury to the Plaintiff's attorney-

client relationship is slight.  See supra, at 55, 72, 116-17.  Cf. Diamond Care Vida Encantada,

LLC v. 2301 Collins Drive NM, LLC, No. CIV 23-0054, 2023 WL 1410142, at *15 (D.N.M.

January 31, 2023)(Browning, J.)("[T]he injury that the Plaintiffs would suffer is the forfeiture of

their leasehold and their business . . . .").  That the Plaintiffs have not shown a likelihood of

success on the merits further demonstrates the lack of weight on their side of the scale.  See

Legacy Church, Inc. v. Kunkel, 455 F. Supp. 3d at 1164 ("Without a likely First Amendment

violation, Legacy Church has alleged no harm.  New Mexico's stated harms -- a potential

escalation in COVID-19 cases [--] are not insignificant.  Accordingly, when weighed against

each other, the balance of equities favors New Mexico.").  On the other hand, the Defendants

and, in this case, the public stand to suffer a significantly greater deal of harm, should a TRO

issue.  Congress has tasked FEMA with implementing the HPCCAA to reimburse expeditiously

claimants' injuries suffered from the Hermit's Peak Fire, and the agency suffers "inherent harm"

when it is prevented from developing and operating a statutory scheme "that Congress found it in the public interest to direct an agency to develop and enforce."  National Propane Gas Ass'n v. U.S. Dept. of Homeland Security, 534 F. Supp. 2d 16 (D.D.C. 2008)(Roberts, J.).  See Hunter v. Fed. Energy Regulatory Comm'n, 527 F.Supp.2d 9, 18 (D.D.C. 2007)(Leon, J.)("Given . . . the harm that issuing an injunction would cause to [the agency's] enforcement authority, the Court finds that the public interest would not be served by issuing an injunction at this time.").  Granting the Plaintiffs' requested relief and enjoining Claims Office staff from communicating with represented claimants when they reach out directly to the Claims Office with questions or to settle their claims would interfere directly with Congress's stated aims in passing the HPCCAA:  "to provide for the expeditious consideration and settlement of claims for [Hermit's Peak Fire] injuries."  HPCCAA § 102(b), at 2169.  The Court is mindful that "our 'democratically elected representatives' . . . are in a better position than this Court to determine the public interest[;] . . . [t]he courts' peculiar function is to say what the law is, not to second-guess democratic determinations of the public interest."  Fish v. Kobach, 840 F.3d at 755 (quoting Heideman v. S. Salt Lake City, 348 F.3d at 1191)(alterations in Fish v. Kobach).

    Moreover, there are valid reasons why a represented claimant may want to communicate directly with Claims Office personnel without the presence of his or her counsel, as did Plaintiffs the Vigils and Griego in this case.  See FOF ¶ 52, at 12 (describing the Vigils' visit to a Claims Office and independent contact with a Claims Navigator); FOF ¶ 57, at 13; (describing that "Griego visited a claims office to 'see if there was going to be help for the flooding' that he had recently experienced on his property" (quoting Griego Second Decl. ¶ 7, at 1-2)); 88 FR 59730-01 ("FEMA designed the claims process so that claimants will receive all eligible compensation without the need to engage the services of an attorney, and the Claims Office hired Claims

Navigators to assist claimants compiling necessary documentation and with the Proof of Loss.").

Indeed, "contact among parties is generally encouraged as a means of facilitating settlement,"

and the Court is reluctant to grant relief that would interfere with such potentially fruitful

communications and claimants' interest in engaging in them.   Trujillo v. Bd. of Educ. of the

Albuquerque Pub. Sch., 2007 WL 1306604, at *1.[14]   Finally, Claims Office personnel must

verify that claimants wish to proceed without their counsel, see FOF ¶¶ 27-29, at 8, and, if a

claimant changes his or her mind and determines that he or she would like to have his or her

representation present, nothing prevents the claimant from ceasing the communication and

contacting his or her attorney, see 88 FR 59730-01 ("Although claimants have the right to hire an

---

[14]Probably no seasoned and experienced counsel has not had his or her clients push the attorneys aside, and go to lunch with the party on the other side to try to work out the dispute. David Dodge, When Your Client Wants to Talk to the Other Side, Arizona Attorney (1999)("There is nothing wrong with the opposing sides dealing with themselves directly . . . ."). Such circumstances are not surprising, because sometimes the parties know each other well. Oftentimes, there was a happier time and relationship, when the parties went into business together, entered into a contract with each other, and/or got married. The parties often understand each other and sometimes remain friendly. Sometimes, they are continuing to do business together even as they litigate against each other.   When the Court was a lawyer, he was representing a defendant lawyer in a legal malpractice case, and as the Court was deposing the plaintiff, the plaintiff and defendant were, during the breaks, planning further legal work together.  Also, insurance adjusters sometimes think they are better negotiators than lawyers and talk directly to the other party to try to work out a settlement.

The Court should not construe and apply the ethical rules in a way that shuts down these methods of settling disputes and cases. Hiring an attorney should not straightjacket a client from still being engaged in the litigation.  While lawyers may not like their clients talking to each other, the ethical rules are meant to protect clients more than lawyers.  In fact, a lawyer who tried to bar his or her client from communicating with the opposing client by telling the client that they cannot talk to the other party would violate the attorney's ethical obligation to "abide by a client's decisions concerning the objectives of representation," particularly where the client makes the decision to attempt to settle the case.   NMRPC 16-102(A).   See Scope of Representation and Allocation of Authority between Client and Lawyer, Ann. Mod. Rules Prof. Cond. § 1.2 ("Rule 1.2(a) specifically provides that it is the client who decides whether to accept a settlement offer and that the "lawyer shall abide by a client's decision" in such matters.").  A lawyer may counsel his or her client not to talk to an adjuster or his or her opponent, but the lawyer needs to be careful what he or she is telling the client is the law.  After all, if the lawyer does not like his or her clients meeting with the opposing party, the lawyer can find other clients.

attorney, one is not required.").  Accordingly, the harm that the Defendants would suffer should the Court enter a TRO and the damage a TRO would do to the public interest both counsel against granting the Plaintiffs' requested injunctive relief.  In sum, because the Plaintiffs do not demonstrate a likelihood of success on the merits, because they have not shown they will suffer irreparable harm, and because the Defendants and the public interest likely will experience harm if the Court enters a TRO, the Court concludes that the Plaintiffs are not entitled to a TRO.

**IT IS ORDERED** that: (i) the Plaintiffs' request for a temporary restraining order, as set forth in the Plaintiffs' Application for Entry of Temporary Restraining Order and Order to Show Cause Regarding Preliminary Injunction, filed November 3, 2023 (Doc. 8), is denied; and (ii) the hearing on the Plaintiffs' request for a preliminary injunction is set for June 6, 2024, at 1:30 p.m.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Bill Robbins
Robbins Cloud LLP
Santa Monica, California

-- and --

Antonia Roybal-Mack
Darren Cordova
Roybal-Mack & Cordova, P.C.
Albuquerque, New Mexico

-- and --

Christopher P. Bauman

Mark Dow
Cynthia L. Weisman
Bauman & Dow, P.C.
Albuquerque, New Mexico

    *Attorneys for the Plaintiffs*

Alexander M. M. Uballez
  United States Attorney
Nicholas M. Sydow
Robert D. Ortega
  Assistant United States Attorneys
United States Attorney's Office
Albuquerque, New Mexico

    *Attorneys for the Defendants*